UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> LENDINGCLUB CORPORATION, <br><br> Defendant. | Case No. 18-cv-02454-JSC <br><br> **ORDER RE: DEFENDANT'S MOTION TO DISMISS AND REQUEST FOR JUDICIAL NOTICE** <br><br> Re: Dkt. Nos. 23 & 24 |

Plaintiff the Federal Trade Commission ("the FTC") brings causes of action against LendingClub Corporation alleging deceptive and unfair business practices in violation of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and violation of the Gramm-Leach-Bliley Act's ("GLB Act") Privacy of Consumer Financial Information Rule ("Privacy Rule and Regulation P"), 16 C.F.R. Part 313, recodified at 12 C.F.R. § 1016.[1]  (Dkt. No. 1 at ¶ 1.)[2]  Now pending before the Court are LendingClub's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and accompanying request for judicial notice.  (Dkt. Nos. 23 & 24.)  After careful consideration of the parties' briefing, and having had the benefit of oral argument on September 13, 2018, the Court GRANTS in part and DENIES in part LendingClub's motion to dismiss, and GRANTS LendingClub's request for judicial notice.  The complaint fails to plausibly allege a substantial injury for Plaintiff's unfairness claim based on alleged unauthorized charges.  The complaint does, however, plausibly allege deceptive practices claims regarding LendingClub's representation of "no hidden fees" and LendingClub's communication of loan approval, and a violation of the Privacy Rule and Regulation P.

//

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 6 & 12.)

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

**BACKGROUND**

**I.     The Parties**

    **A.     The FTC**

"The FTC is an independent agency of the United States Government created by statute." (Dkt. No. 1 at ¶ 5) (citing 15 U.S.C. §§ 41-58.)  As part of its duties, and as relevant here, "[t]he FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce."  (*Id.*)  In addition, the FTC "enforces the Privacy Rule, 16 C.F.R. Part 313, recodified at 12 C.F.R. § 1016, which requires financial institutions to protect the privacy of consumer information."  (*Id.*)

    **B.     LendingClub**

LendingClub is a Delaware corporation with its principal place of business in San Francisco, California.  (Dkt. No. 1 at ¶ 7.)  LendingClub "operates an online platform" whereby "consumers may apply for and obtain personal loans that are underwritten and issued by third-party banks."  (Dkt. No. 23 at 12) (footnote omitted.)  "Lending Club's platform also facilitates investment in interests in the loans by retail and institutional investors.  Lending Club services the loans and acts as an intermediary between the borrower and investors."  (*Id.*)

**II.     Complaint Allegations**

The FTC alleges deceptive practices related to LendingClub's loan application process and withdrawal of fees from customers who receive loans.  The FTC further alleges that LendingClub "fail[s] to provide consumers with clear and conspicuous privacy notices" in violation of the GLB Act's Privacy Rule and "the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. Part 1016 ("Regulation P")."  (Dkt. No. 1 at ¶¶ 10-11.)

    **A.     Loan Application Flow**

        **1.     Origination Fee**

LendingClub advertises its personal loans to consumers as containing "no hidden fees." (Dkt. No. 1 at ¶ 12.)  Consumers can apply for personal loans directly through LendingClub's website.  (*Id.* at ¶ 15.)  Applicants must first complete a form providing basic identifying information (e.g., name, address, date of birth, yearly income) that LendingClub then uses to

conduct a "front-end" credit check.  (*Id*. at ¶ 18.)  LendingClub immediately rejects applicants who fail to pass the front-end check's baseline criteria.  (*Id*.)  Applicants who meet the baseline criteria are directed to a "Loan Offer" webpage that includes "bold-faced offers of a specific 'Loan Amount.'"  (*Id*. at ¶¶ 19, 28.)  The webpage represents that the loan includes "[n]o hidden fees."  (*Id*.)

On desktops, the webpage allows users to click on a "tooltip," which is "a small green dot with a white question mark inside [that] appears beside the word 'APR.'"  (*Id*. at ¶ 20.)  If users click on the tooltip, a pop-up window appears with text explaining the Annual Percentage Rate ("APR") and notifying users that the APR includes "a one-time origination fee . . . that is collected out of your loan proceeds."[3]  (*Id*. at 10.)  The text provides the exact dollar amount of the origination fee.  (*Id*.)  The pop-up window does not appear if users do not click on the tooltip, and users are not required "to click on the tooltip in order to move forward with the loan application."  (*Id*. at ¶ 21.)  The amount of the origination fee is "calculated as a percentage—on average, approximately 5 percent—of the consumer's requested loan amount, and often amounts to more than a thousand dollars."  (*Id*. at ¶ 23.)

The origination fee is next disclosed on the Loan Rate & Terms webpage, which contains the federally-required Truth In Lending Disclosure Statement ("TILA disclosure").  (*Id*. at 14.)  The TILA disclosure specifies the APR ("The cost of your credit as a yearly rate"), Finance Charge ("The dollar amount the credit will cost you"), Amount Financed ("The amount of credit provided to you or on your behalf"), Total Payments ("The amount you will have paid when you have made all scheduled payments"), and the number and amount of payments.  (*Id*.)  The TILA disclosure also includes an itemized breakdown as follows:

> Total Amount Requested:  $10,000.00
> Origination Fee:  $500.00
> Total Amount Received:  $9,500.00[4]

---

[3] This message also appears for users accessing the website through a mobile device, although there is no "tooltip" icon.  (Dkt. No. 1 at ¶ 22.)  Users instead must click on "APR" to view the pop-window.  (*Id*.)

[4] The amounts indicated are taken directly from the screenshot included in the FTC's complaint; as previously discussed, the amounts vary according to a customer's particular loan terms.

United States District Court
Northern District of California

1   (*Id*.)  The breakdown is viewable only if a user scrolls down the webpage; however, a user must

2   scroll to the bottom of the page to click "Next" and complete the loan application.  (*Id*.)  Prior to

3   2017, some mobile users could click "I Agree" to complete the loan application without having to

4   read the TILA disclosure. [5]  (*See id.* at ¶¶ 31-32.)  "On desktops and mobile phones, after

5   consumers agree to the loan terms and enter bank account information, they then click a "Done!"

6   button and are taken to a screen that has stated, in large type:  "Your [amount requested] loan is on

7   the way."  (*Id.* at ¶ 34.)

8      LendingClub deducts the origination fee "from the promised 'Loan Amount' before

9   disbursing the loan funds to the consumer."  (*Id.* at ¶ 24.)  Consumers "must pay interest on the

10  entire 'Loan Amount,' including the fee."  (*Id*.)  LendingClub is aware that customers have

11  complained about the origination fee, and its "training materials for customer service

12  representatives" have addressed such complaints.  (*Id.* at ¶ 26.)  "At least tens of thousands of

13  consumers contacted [LendingClub] after their loan proceeds were disbursed to ask about the

14  [origination] fee or to ask why they did not receive the full loan amount."  (*Id*. at ¶ 33.)

15       **2.**  **Communication of Loan Approval**

16     Following notice to the consumer "that his or her 'loan is on the way,' a consumer's

17  application . . . must undergo two additional processes after completion in order to receive final

18  approval."  (*Id.* at ¶ 35.)  The application must first "attract sufficient investor backing," and then

19  it must pass a more thorough "back-end" credit review.  (*Id*.) (internal quotation marks omitted.)

20  "[A]t least approximately 196,000 consumers" whose applications received investor backing

21  received an email stating, in part:

22       Great news! Investors have backed your loan 100%. Your money is
     almost in your hands. You can always visit your Account Summary

23       to view the details of your loan. Welcome to Lending Club!

24  (*Id.* at ¶¶ 36-37.)  However, the loan applications of "at least approximately 43,000" of those

25  consumers "were subsequently rejected" because they did not pass the back-end credit review.

26

27  _____

28  [5] LendingClub notes in its motion to dismiss that "[i]n early 2017 . . . LendingClub voluntarily
changed the mobile website to mirror the desktop site and require consumers to scroll through the
entire TILA disclosure before proceeding with the application."  (Dkt. No. 23 at 15.)

United States District Court
Northern District of California

1   (*Id*. at ¶ 38.)  LendingClub "received numerous complaints from consumers" as a result of such

2   back-end denials.  (*Id*. at ¶ 40.)

3       **B.**   **Withdrawal of Fees**

4       LendingClub's "default method of receiving consumers' scheduled monthly payments is

5   automated electronic bank account withdrawal via ACH [Automated Clearing House] transfer."

6   (*Id.* at ¶ 41.)  On "numerous instances" LendingClub "has withdrawn money from consumers'

7   bank accounts without consumers' authorization, or in amounts in excess of the amount

8   consumers authorized [LendingClub] to withdraw."  (*Id.* at ¶ 42.)

9       **C.**   **GLB Act's Privacy Rule and Regulation P**

10       The GLB Act's Privacy Rule "was promulgated by the [FTC] on May 24, 2000, and

11   became effective on July 1, 2001."  (*Id*. at ¶ 47) (citing 16 C.F.R. Part 313.)  Since July 21, 2010,

12   the Consumer Financial Protection Bureau ("Consumer Bureau") has been "responsible for

13   implementing the Privacy Rule," and in doing so the Consumer Bureau promulgated Regulation P,

14   effective October 28, 2014.  (*Id*.)  "The GLB Act authorizes both the [Consumer Bureau] and the

15   [FTC] to enforce Reg[ulation] P."  (*Id*.)

16       LendingClub "is a financial institution subject to the GLB Act" and the requirements of

17   Regulation P because it "collects nonpublic personal information," as defined by [the Privacy Rule

18   and Regulation P], such as Social Security Numbers and bank routing information."  (*Id*. at ¶ 46.)

19   "Both the Privacy Rule and Reg[ulation] P require financial institutions to provide consumers with

20   an initial and annual privacy notice."  (*Id*. at ¶ 48.)  A financial institution provides "actual notice"

21   to consumers where the consumer "acknowledges receipt of the notice as a necessary step to

22   obtaining the financial product or service."  (*Id*.)  Prior to "at least the end of 2016," LendingClub

23   did not provide actual notice to loan applicants.  (*Id*. at ¶ 49.)

24                  **REQUEST FOR JUDICIAL NOTICE**

25       As a preliminary matter, the Court must decide what materials it will consider when

26   determining whether the FTC's complaint survives Defendant's motion to dismiss because the

27   motion relies in part on materials outside the pleadings.

28       When considering a motion to dismiss, a court ordinarily does not look beyond the four

corners of the complaint.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Under Federal Rule of Evidence 201(b), a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

LendingClub requests judicial notice of screenshots of its Personal Loan Rates & Fees webpage ("Rates & Fees"), (Dkt. No. 24), submitted as 13 exhibits to the declaration of Betty X. Yang, (Dkt. No. 24-2).  The screenshots are of archived webpages from LendingClub's website dated October 26, 2016, (Dkt. No. 24-3, Ex. 1-2), September 28, 2017, (Dkt. No. 24-3, Ex. 3-5), May 19, 2018, (Dkt. No. 24-3, Ex. 6-9), and June 16, 2018, (Dkt. No. 24-3, Ex. 10-13).  LendingClub accessed the archived webpages through the Internet Archive's Wayback Machine. (Dkt. No. 24-2 at ¶¶ 3-7.)

The FTC opposes the request for judicial notice as to all exhibits, arguing that: (1) incorporation by reference is improper because the complaint does not rely on the Rates & Fees page; and (2) the authenticity of the exhibits is in dispute; thus, judicial notice is improper under Rule 201(b).  As to the latter, Plaintiff argues that "the screenshots that Defendant includes in its motion have been mischaracterized and artfully cropped so as to present a false impression of the Rates & Fees page's accessibility and contents."  (Dkt. No. 31 at 4.)  The Court disagrees, and because the Court determines that judicial notice is proper under Rule 201(b), it need not address incorporation by reference.

As previously noted, the Court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Courts in this circuit have noted that the Wayback Machine is such a source.  *See, e.g., UL LLC v. Space Chariot, Inc.*, 250 F. Supp. 3d 596, 604 n.2 (C.D. Cal. 2017) (taking judicial notice of disputed Wayback Machine

6

archived webpages "because they 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'") (collecting cases); *Erickson v. Nebraska Mach. Co.*, 15-cv-01147-JD, 2015 WL 4089849, at *1 n.1 (N.D. Cal. July 6, 2015) (noting that "[c]ourts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned . . . and the Court does so here.") (collecting cases). The only case cited by the FTC in its opposition to judicial notice addressing documents obtained through the Wayback Machine is distinguishable on its facts. *See Prime Healthcare Servs., Inc. v. Harris*, No. 16-cv-00778-GPC-AGS, 2017 WL 3525169), at *10 (S.D. Cal. Aug. 16, 2017) (denying request for judicial notice of screenshots obtained through the Wayback Machine because the exhibits either did not "bear the Internet Archive Wayback Machine watermark on the top of the exhibit," or the dates reflected on the exhibit did not match plaintiffs' representations"). Here, LendingClub's screenshots all bear the Wayback Machine watermark and the dates on the documents match those asserted in the Yang declaration. Thus, there is nothing to suggest that the Wayback Machine's "accuracy can[ ] reasonably be questioned." *See* Fed. R. Evid. 201(b).

Nor is the actual *content* of LendingClub's screenshots in dispute. The FTC submitted the declaration of Sarah Michelle Kerman in support of its opposition to LendingClub's motion to dismiss. (Dkt. No. 30-1.) The Kerman declaration includes an exhibit depicting a single-page compilation of screenshots comprising the entire Rates & Fees webpage as of July 12, 2018. (*Id.* at 10.) The FTC's screenshot includes the same content depicted in LendingClub's screenshots of its Rates & Fees webpage. (*Compare* Dkt. No. 30-1, Ex. B *with* Dkt. No. 24-3, Ex. 3-5, 6-9, 11-13.) As LendingClub notes:

> [T]he only difference between LendingClub's screenshots and the FTC's Exhibit B are: (a) LendingClub's screenshots excise irrelevant portions of the Rates & Fees page that are included in the FTC's Exhibit B; and (b) formatting differences presumably due to the fact that the screenshots were taken using different computer screen sizes.

(Dkt. No. 35 at 5 n.3.) Despite the FTC's contentions, LendingClub did not alter the content of the screenshots such that their "accuracy and reliability . . . is not beyond dispute." (*See* Dkt. No.

United States District Court
Northern District of California

31 at 4.)  LendingClub's screenshots instead "plainly show the [key portions] of the Rates & Fees page as it appears on a consumer's computer screen" as it scrolls "down the page."  (Dkt. No. 35 at 5.)  Simply put, LendingClub's representation makes sense in that it reflects what the consumer actually sees as it navigates the webpage; further, it does not alter the content of the Rates & Fees webpage in a way that would subject the screenshots to reasonable dispute.  The FTC cannot reasonably dispute that LendingClub's screenshots accurately represent the Rates & Fees webpage when the FTC's own exhibit in support of its opposition to LendingClub's motion to dismiss contains the same content.

Accordingly, the Court GRANTS LendingClub's request for judicial notice pursuant to Federal Rule of Evidence 201(b).

**LEGAL STANDARD**

A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

"[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotation marks and citation omitted); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law").  The court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64.

United States District Court
Northern District of California

**DISCUSSION**

The FTC brings three claims against LendingClub seeking injunctive and other equitable relief[6] for the following purported violations of Section 5 of the FTC Act: (1) deceptive practices in charging the origination fee ("Count I"); (2) deceptive practices in communicating loan approval prior to back-end review ("Count II"); and (3) unfair practices in making unauthorized withdrawals from customer accounts ("Count III").  The FTC also brings a claim for violation of the GLB Act's Privacy Rule and Regulation P ("Count IV").  LendingClub moves to dismiss the complaint as to each of the four claims brought against it.  The Court addresses each cause of action in turn.

I.    **Violations of the FTC Act**

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).

A.    **Deceptive Practice: Up-Front Fee**

To state a claim for deceptive acts or practices under Section 5 of the FTC Act, a plaintiff must allege (1) a material "representation, omission, or practice that" (2) "is likely to mislead consumers acting reasonably under the circumstances."  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).  "Deception may be found based on the 'net impression' created by a representation."  *Id.* (quoting *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006)).

The FTC alleges that LendingClub charges a "hidden up-front fee" constituting a deceptive practice in violation of Section 5(a) of the FTC Act, in light of LendingClub's representation in its ads and consumer loan applications that its loans contain "no hidden fees."  (Dkt. No. 1 at ¶¶ 10, 12-14, 19, 54-56.)  LendingClub seeks to dismiss Count I on the grounds that the complaint's allegations do not plausibly support an inference that the representation "no hidden fees" is misleading given that the origination fee is disclosed to consumers in the loan application flow and the Rates & Fees webpage.  (Dkt. No. 23 at 9-11.)  LendingClub further argues that Count I "is

---

[6] The FTC also seeks "such relief as the Court finds necessary to redress injury to consumers resulting from [LendingClub's] violations of the FTC Act, the Privacy Rule and Regulation P including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies."  (Dkt. No. 1 at 27.)

precluded as a matter of law" because LendingClub's TILA disclosure complies with and was

modeled after Consumer Bureau Model Form H-2, and thus, LendingClub is entitled to "safe

harbor" from liability under Section 5 of the FTC Act.  (*Id*. at 11-12.)  The FTC counters that

"each of [LendingClub's] hidden disclosures—the 'tooltip,' the 'Rates & Fees' page, and the

TILA Disclosure Statement—are inadequate to inform consumers about the up-front fee."  (Dkt.

No. 30 at 10.)  Furthermore, the FTC insists that even if LendingClub's "disclosures had been

TILA-compliant," such compliance does not pre-empt the FTC's claims for deceptive practices

under Section 5 of the FTC Act.  The Court addresses each argument in turn.

### 1.       Disclosure of Fee in Loan Application Flow

As noted above, the origination fee is first accessible to a loan applicant after the applicant

passes the front-end credit check and is directed to a webpage that includes the tooltip icon beside

the APR.



(Dkt. No. 1 at 9.)  To view the origination fee, the applicant must click on the tooltip to produce a

10

United States District Court
Northern District of California

pop-up window that explains the origination fee and amount:



(Dkt. No. 1 at 10.)  Mobile users must click on "APR" to produce the same pop-up window:



(Dkt. No. 1 at 11.)

As shown in the screenshots above, the webpages for both desktop and mobile users

contain a masked bandit icon above the phrase "No hidden fees."  There is no similar icon for

United States District Court
Northern District of California

1    "origination fee."  Given that a user must actively search for the origination fee by clicking on

2    either the tooltip or the APR and the user can complete the application without clicking on either,

3    and the webpage does not direct the user to click on either, the complaint gives rise to a plausible

4    inference that the origination fee is effectively "hidden" or "concealed"[7] on these pages. Under

5    these circumstances, a reasonable consumer would proceed with the application without clicking

6    on the tooltip or the APR, and be misled by the phrase "no hidden fees" when ultimately learning

7    of the origination fee *after* receiving the loan.  Indeed, the complaint alleges that a LendingClub

8    compliance review noted:

9    
10   > The origination fee is disclosed on the offer page tooltip, but is not
     > readily apparent unless an applicant clicks on the tooltip. This
     > omission could be perceived as deceptive as it is likely to mislead
     > the consumer.

11   

12   (Dkt. No. 1 at ¶ 26.)

13       As noted in the complaint, however, the tooltip is not the only place a user encounters the

14   origination fee before completing the loan application flow.  The origination fee next appears on

15   the Loan Rate & Terms webpage, which includes the following TILA disclosure:

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   

27   

28   [7] *See Oxford English Dictionary Online*, http://www.oed.com/view/Entry/86711 (defining
     "hidden" as "concealed")

United States District Court
Northern District of California



(Dkt. No. 1 at 14.)[8]  Scrolling down the page, the consumer next sees the following:

//

//

//

---

[8] This image is taken directly from the complaint, which contains the full webpage containing the screenshot above and the itemization with the origination fee below.  The Court has altered the image by presenting it as two separate images only to increase the clarity of the images and provide a better representation of the actual-user view.

Other than payment dates, items marked (e) will decrease if you receive less than 100% funding. Regardless of the ultimate amount of the loan, your APR will not change. Subject to your right to cancel, an unsecured loan may issue for less than the full requested loan amount if it is not 100% funded by the end of the listing period.

Total Amount Requested: $10,000.00
Origination Fee: $500.00
Total Amount Received: $9,500.00

Unsuccessful payment fee. When a payment fails and is rejected by your bank, you will be charged an Unsuccessful Payment Fee of $15 to cover the cost Lending Club incurs on the transaction.
Each attempt to collect a monthly payment is considered a separate transaction, so an Unsuccessful Payment Fee will be assessed for each failed attempt.

Check Processing Fee. If you elect to make payments by check, there will be a $7 processing fee by payment.

**You are not required to complete this agreement merely because you have received these disclosures or signed a borrower agreement.**

Clicking the box below constitutes your electronic signature and acceptance of:

☐ the Borrower Agreement and the Credit Score Notice.

**Next ▸**

(Dkt. No. 1 at 14.)

As detailed in the screenshot above, the itemization appearing under the first bolded paragraph includes: (i) the total loan amount requested; (ii) the origination fee; and (ii) the total amount the consumer will receive after the origination fee is subtracted from the total loan amount. The itemization is the same font size and type as the other text on the page, and it is separated from the preceding and subsequent paragraphs by spacing that sets it apart from the immediately surrounding text. A consumer must scroll past the itemization to proceed with the loan application and click the "Next" button.

The Court cannot conclude as a matter of law, however, that this webpage sufficiently discloses the origination fee such that a reasonable consumer would not be misled by the "no hidden fees" advertisement. The itemization is placed between two bolded paragraphs, one of which contains an underlined passage. Naturally, the bolded and underlined text is more conspicuous than the itemization and it is plausible to infer that a reasonable consumer would skip over the non-bolded text and click "Next" before reading the entire contents of the page. The single-line origination fee disclosure in the itemization bears similarities to disclosures found inadequate in cases cited by the FTC. *See, e.g., FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1220 (D. Nev. 2011), *aff'd in part, vacated in part on other grounds,* 763 F.3d 1094 (9th Cir. 2014) (disclosures inadequate to cure overall net impression of deception where disclosures

14

made "in smaller, often hard to see type that [was] buried by the larger, sensationalized text," or included as "small, compact type" at bottom of terms and conditions page); *FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1353 (D. Nev. 2014) (disclosure "inconspicuous because it was buried in the fourth paragraph and overshadowed by two all caps hyperlinks.").  Indeed, "[a]t least tens of thousands of consumers contacted [LendingClub] after their loan proceeds were disbursed to ask about the up-front fee or to ask why they did not receive the full loan amount."  (Dkt. No. 1 at ¶ 33.)  Furthermore, "one of the two main post-disbursement complaints" encountered by LendingClub customer service representatives is "I didn't receive the full loan amount."  (*Id.* at ¶ 26) (internal quotation marks omitted.)  LendingClub's "quarterly complaint reviews have proposed highlighting [the] origination fee to address complaint volumes."  (*Id.*)  Thus, taking the complaint allegations as true, it is plausible to infer that reasonable consumers have been misled by the phrase "no hidden fees."  To hold otherwise would mean that even drawing all inferences in Plaintiff's favor, all of those consumers who complained about the origination fee were unreasonable consumers as a matter of law.  The Court cannot reach such a conclusion on this record.

The pleadings-stage cases cited by LendingClub are distinguishable on their facts.  In *Smith v. Wells Fargo Bank, N.A.*, the court merely restated the defendant's argument that a "$53 recording fee was not a 'hidden fee'" because "it was disclosed in the FAQ contained in the Mortgage Kit."  158 F. Supp. 3d 91, 102 (D. Conn. 2016).  The court did not analyze the sufficiency of the disclosure, and instead dismissed plaintiff's state law misrepresentation claim on other grounds.  *See id*. at 102-103 (finding that a $637.93 interest charge was neither "hidden" nor a "fee" because it was disclosed as a "loan obligation").  Further, it does not appear that there were any allegations, as there are here, that thousands of consumers have in fact been deceived.  In *Castagnola v. Hewlett-Packard Co.*, No C 11-05772 JSW, 2012 WL 2159385, at *10 (N.D. Cal. June 13, 2012), the court dismissed plaintiff's state law deceptive practices claims where "the disclosures at issue were on the same page and in close proximity to the box provided to enter the [consumer's] email and zip code[,]" and "the amounts that will be charged are in bold."  In *Keithly v. Intelius Inc.*, the court dismissed the Section 5 claim of one plaintiff where the "Order

Summary" box on four consecutive screens disclosed the alleged deceptive fee, including the screen where the plaintiff "provided his payment information." 764 F. Supp. 2d 1257, 1269 (W.D. Wash. 2011) (finding that "a reasonable consumer could not ignore or skim over the repeated disclosure of the $19.95 monthly cost, especially when it was conspicuously presented at the moment the consumer was required to authorize the purchase."). In *Lowden v. T-Mobile USA Inc.*, the court affirmed dismissal of plaintiffs' state law claim deceptive practices claim where complaint failed to "explain how any particular pre-sale advertising might have induce[d] contact through deception, or allege with specificity that [defendant] materially misrepresented the nature or amount of its fees," and the terms and conditions stated "that plaintiffs would be billed for all taxes and regulatory fees imposed on the customer or on T-Mobile as permitted or required by law." 378 F. App'x 693, 695 (9th Cir. 2010) (internal quotation marks and citations omitted).

### 2. Disclosure of Fee on Rates & Fees Webpage

LendingClub's Rates & Fees webpage is accessible through its homepage, but it is undisputed that a customer need not access the Rates & Fees page to apply for a loan. Therefore, drawing all reasonable inferences in the FTC's favor, and given that the complaint alleges deception based on the loan application flow, the disclosure of the origination fee on the Rates & Fees webpage does not mean as a matter of law that the origination fee is not "hidden" or is in fact disclosed to an actual *loan applicant*.

\*\*\*

The complaint does not allege that LendingClub advertises its loans as containing "no fees." Thus, to constitute a "hidden fee" in contravention of LendingClub's representation of "no hidden fees," the origination fee must necessarily be concealed from consumers. Accepting the factual allegations as true and construing the pleadings in the light most favorable to the FTC, *see Manzarek*, 519 F.3d at 1031, the complaint gives rise to a plausible inference that the origination fee is effectively hidden.

The complaint includes screenshots of LendingClub's loan application demonstrating that the origination fee is expressly disclosed on only one line of the TILA disclosure page. Further, the complaint alleges that "tens of thousands" of consumers have complained about the fee after

16

United States District Court
Northern District of California

1  receiving their loan.  And although LendingClub's Rates & Fees webpage details the origination

2  fee in a clear and conspicuous manner, a consumer need not access the Rates & Fees page to apply

3  for a loan.  Thus, the complaint plausibly alleges that the "net impression" created by the

4  representation "no hidden fees" is likely to mislead a reasonable consumer into believing that there

5  is no origination fee despite the disclosures.  *See Cyberspace.com LLC*, 453 F.3d at 1200 ("A

6  solicitation may be likely to mislead by virtue of the net impression it creates even though the

7  solicitation also contains truthful disclosures.").

8        The Court must next address whether this claim is precluded as a matter law.  It is not.

9             **3.      Preclusion**

10       LendingClub next argues that Count I is precluded by LendingClub's "full compliance"

11 with TILA.[9]  The FTC counters that LendingClub's TILA disclosure is not TILA-compliant, and

12 even if it were, "Congress did not grant immunity from liability whereby satisfaction of TILA-

13 specific requirements permits separate deceptive conduct."  (Dkt. No. 30 at 19.)  The Court agrees

14 with the FTC.

15       Assuming arguendo that LendingClub's TILA disclosure is in "full compliance" with

16 TILA, LendingClub cites no case that provides express support for the proposition that

17 compliance with TILA immunizes a defendant from liability based on alleged violations of the

18 FTC Act.  Instead, LendingClub cites cases involving federal preemption of "improper-disclosure

19 claims" brought under state law or TILA itself.  *See, e.g., Chae v. SLM Corp.*, 593 F.3d 936, 942-

20 43 (9th Cir. 2010) (California state law claims under the Unfair Competition Law ("UCL") and

21 Consumer Legal Remedies Act preempted by defendant's compliance with disclosure

22 requirements under the Federal Family Education Loan Program of the Higher Education Act);

23 *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1121 (9th Cir. 2009) ("[Defendant's]

24

25 [9] LendingClub's motion to dismiss characterizes its purported "full compliance" with TILA as an "undisputed fact" because the complaint "includes no allegations that LendingClub's disclosures,

26 including its TILA form, fail to comply in any way with the Truth in Lending Act."  (Dkt. No. 23 at 23.)  The FTC asserts, however, that the complaint includes no "TILA claims because

27 [LendingClub]—who does not extend credit to consumers but facilitates loans by third-party banks—is not a 'creditor' for TILA purposes and is therefore not a proper defendant under TILA

28 as to the cited disclosure requirements."  (Dkt. No. 30 at 21) (citing the definition of "creditor" under 12 C.F.R. § 1026.2.)

compliance with TILA's disclosure requirements provides safe harbor with respect to [plaintiff's] UCL claims based only on the sufficiency of [defendant's] disclosures."); *Rubio v. Capital One Bank (USA), N.A.*, 572 F. Supp. 2d 1157 (C.D. Cal. 2008) (dismissing claim brought under TILA and UCL claim predicated on alleged TILA violation because defendant's disclosures complied with TILA and Regulation Z), *rev'd in part on other grounds by* 613 F.3d 1195 (9th Cir. 2010).

LendingClub acknowledges that, unlike the cases above, "this case involves a conflict between two federal statutes," but insists that the preemption principles applied in those cases "are 'instructive insofar as they are designed to assess the interaction of laws that bear on the same subject.'" (Dkt. No. 23 at 25) (quoting *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014).) Although the FTC Act and TILA may "bear on the same subject," however, there is nothing to suggest that the laws are in *conflict* such that claims brought under the FTC Act are precluded by compliance with TILA. *See United States v. Borden Co.*, 308 U.S. 188, 198 (1939) ("When there are two acts upon the same subject, the rule is to give effect to both if possible."). LendingClub argues that the "Court[ ] must analyze the specific claims and the 'text, structure [and] history' of the two statutes in question to determine preclusive effects." (Dkt. No. 34 at 16) (quoting *POM*, 134 S. Ct. at 2236.) The Court has done so, and concludes that "[t]here is no statutory text or established interpretive principle to support the contention that the [TILA] precludes [FTC Act] suits like the one brought by [the FTC] in this case." *See POM*, 134 S. Ct. at 2233. Further, "[n]othing in the text, history, or structure of the [TILA] or the [FTC Act] shows the congressional purpose or design to forbid these suits." *See id.* "Quite to the contrary, the [TILA] and the [FTC Act] complement each other in the federal regulation of misleading [consumer lending practices]." *Id.*

Pursuant to Section 5 of the FTC Act, Congress "empowered and directed" the FTC "to prevent persons, partnerships, or corporations . . . from using . . . unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2), as amended December 22, 2006. LendingClub fails to identify any statutory language in TILA suggesting that Congress intended to restrict the FTC in enforcing that mandate. Instead, LendingClub cites to Supreme Court cases recognizing that the Federal Reserve Board is "'the primary source for interpretation and

1    application of truth-in-lending law'"; specifically, TILA.  (*See* Dkt. No. 23 at 23) (quoting

2    *Household Credit Servs., Inc. v. Pfenning*, 541 U.S. 232, 238 (2004); *Ford Motor Credit Co. v.*

3    *Milhollin*, 444 U.S. 555, 566 (1980).)  Nothing in those cases suggests, however, that the Federal

4    Reserve Board's implementation of TILA restricts the FTC's ability to bring claims under Section

5    5 of the FTC Act.

6           As to any "safe harbor" available to creditors who model their disclosures on the

7    Consumer Bureau's model forms, the relevant section of TILA states, in pertinent part:

8                 A creditor or lessor shall be deemed to be *in compliance with the*
                  *disclosure provisions of this subchapter* with respect to other than
9                 numerical disclosures if the creditor or lessor (1) uses any
                  appropriate model form or clause as published by the [Consumer
10                Bureau], or (2) uses any such model form or clause and changes it
                  by (A) deleting any information which is not required by this
11                subchapter, or (B) rearranging the format, if in making such deletion
                  or rearranging the format, the creditor or lessor does not affect the
12                substance, clarity, or meaningful sequence of the disclosure.

13   15 U.S.C. § 1604(b) (emphasis added).  Thus, by its terms, use of Consumer Bureau model forms

14   constitutes compliance with the disclosure provisions of *TILA*; it follows that any "safe harbor"

15   extends only to federal claims brought under *TILA*.  Again, LendingClub cites no cases to the

16   contrary.

17          By LendingClub's logic, an unscrupulous lender could advertise its loans as entailing "No

18   Fees!" although it actually charged an origination fee, and be immunized from liability for

19   deceptive practices under the FTC Act provided that the lender disclosed the origination fee in a

20   Consumer Bureau-compliant TILA disclosure.  Such a result would render the FTC Act toothless

21   in deceptive practices claims involving blatantly misleading advertisements, and could not have

22   been what Congress intended.  While here the issue is less stark given that the representation is

23   "no hidden fees" rather than "no fees," nothing in TILA suggests that an advertisement cannot be

24   misleading merely because the loan terms are subsequently disclosed consistent with TILA.

25          Accordingly, the Court denies LendingClub's motion to dismiss Count I.  The complaint

26   plausibly alleges that the origination fee is effectively hidden from consumers in contravention of

27   LendingClub's representation of "No hidden fees," and the FTC's claim is not precluded as a

28   matter of law.

United States District Court
Northern District of California

19

**B.      Deceptive Practice: Certainty of Loan Approval**

The FTC also alleges that LendingClub's practice in communicating loan approval prior to back-end review constitutes a deceptive act or practice prohibited by Section 5 of the FTC Act because "in numerous instances" customers who received the initial approval email were ultimately denied a loan.  (Dkt. No. 1 at ¶ 58.)  LendingClub seeks dismissal of Count II because it is "entirely backward-looking and seek[s] only injunctive relief" and "Section 5 of the FTC Act does not empower the FTC to challenge past conduct that is not likely to recur."  (Dkt. No. 23 at 26.)

**1.      Injunctive Relief for Past Violations of the FTC Act**

Under Section 13(b) of the FTC Act, the Commission may bring suit seeking injunctive relief whenever it has "reason to believe" that a defendant "is violating, or is about to violate, any provision of law enforced by the [FTC]."  15 U.S.C. § 53(b).  LendingClub quotes *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) for the proposition that injunctive relief under Section 13(b) "'cannot be used to remedy past violations [of Section 5]. . .' because 'the statute does not mention past violations.'"  As further noted by the *Evans* court, however, injunctive relief *can* be used to remedy past violations of Section 5 where the past violation is "likely to recur." *Evans Prods. Co.*, 775 F.2d at 1088-89 ("Even though Evans' alleged violations [of Section 5] have completely ceased, we must review whether those violations are likely to recur.").  Thus, in the Ninth Circuit, there is no per se bar to injunctive relief under Section 13(b) for past violations of Section 5; instead, past conduct is actionable if there is a likelihood of recurrence.  Indeed, LendingClub's reply in support of its motion to dismiss recognizes that the rule espoused in *Evans* "controls here."  (*See* Dkt. No. 19.)

As discussed below, the Court cannot conclude as a matter of law that the conduct is not ongoing or likely to recur based on the complaint's allegations.

**2.      Likelihood of Recurrence**

Lending Club argues that the complaint fails to plead a plausible claim for injunctive relief because the FTC fails to plead that LendingClub's alleged violation under Count II is ongoing or likely to recur.  The FTC counters that the complaint's allegations are sufficient to show a

20

possibility that LendingClub "will continue to engage in the conduct alleged." (Dkt. No. 30 at 26.) The Court agrees.

Despite LendingClub's argument that the complaint "does not allege that LendingClub continues to send the challenged email," (see Dkt. No. 34 at 17), nowhere in the complaint does the FTC contend that LendingClub has *ceased* sending the challenged email. The complaint provides no timeframe specifying when the email was sent. It alleges instead that LendingClub "has sent" the challenged email to "at least approximately 196,000 consumers." (*See* Dkt. No. ¶ 36.) The FTC's opposition to LendingClub's motion to dismiss likewise states that the alleged violation under Count II was "recurring and widespread, affecting at least 196,000 consumers," but again does not specify when or whether LendingClub ceased the alleged conduct. (*See* Dkt. No. 30 at 27) ("Because [LendingClub's] business has not changed, it has the same incentive to misrepresent approval status.") Although the language used in the complaint regarding Count II is backwards-looking, it matches the language used to describe conduct under Counts I and III (i.e., "[i]n numerous instances," "Defendant has represented," "Defendant has made these representations"), (Dkt. No. 1 at ¶¶ 54-55, 57-58, 60). Thus, the Court cannot conclude as a matter of law that there is no likelihood of recurrence because—construing the pleadings in the light most favorable to the non-moving party—it is plausible to infer that the conduct is *ongoing*.

Accordingly, the Court denies LendingClub's motion to dismiss Count II. However, if in fact the FTC is aware that the conduct has stopped, then it should not pursue this claim unless it has a good faith belief that it is likely to recur.

### C.    Unfair Practice: Unauthorized Charges

The FTC Act defines an actionable unfair practice or act as one that "'causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.'" *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) (quoting 15 U.S.C. § 45(n)). The FTC alleges that LendingClub has made numerous unauthorized withdrawals from customer accounts through its default payment method of ACH transfer, causing customer's substantial and unavoidable injury. LendingClub seeks to dismiss this claim because the "allegations fail to meet the statutory

United States District Court
Northern District of California

causation, substantial injury, and net consumer harm requirements of a Section 5 'unfairness'

claim." (Dkt. No. 23 at 12.)  The Court agrees that the FTC fails to plead sufficient facts

regarding the substantial injury element of an unfairness claim.

### 1.      Causation

LendingClub argues that the complaint fails to adequately allege that LendingClub

"engaged in actionable unfair conduct (whether negligent, reckless, or intentional)," and instead,

the "allegations effectively impose a strict liability standard." (Dkt. No. 23 at 30.)  The Court

disagrees, and despite LendingClub's protracted argument in support of its theory that the FTC

Act prohibits only "negligent, reckless, or intentional" conduct, the complaint easily satisfies the

causation element because it plausibly alleges that LendingClub's practice in making unauthorized

withdrawals *directly causes* consumers harm.

LendingClub's attempts to separate the causation analysis from the substantial injury

element are unconvincing.  Causation is intertwined with the substantial injury element of an

unfairness claim.  In other words, it is the *effect* of the conduct at issue that determines whether it

is unfair.  The Ninth Circuit case cited by LendingClub as endorsing a new "proximate cause"

element in unfairness claims does not counsel a different result.  (*See* Dkt. No. 23 at 29) (citing

*Neovi*, 604 F.3d at 1155.)

The *Neovi* court addressed causation at length and as a separate issue only because it was

at issue under the facts of the case.  In *Neovi*, the defendant argued that causation was lacking

because the defendant did not perpetrate the underlying fraud; instead, it only distributed

fraudulent checks drafted by others.  604 F.3d at 1155.  The court rejected that argument, noting:

> [B]usiness can cause direct consumer harm as contemplated by the
> FTC Act in a variety of ways. In assessing that harm we look of
> course to the deceptive nature of the practice, but the absence of
> deceit is not dispositive. Nor is actual knowledge of the harm a
> requirement under the Act. Courts have long held that consumers are
> injured for purposes of the Act solely through the machinations of
> those with ill intentions, but also through the actions of those whose
> practices facilitate, or contribute to, ill intentioned schemes if the
> injury was a predictable consequence of those actions.

*Id.* at 1156.  Thus, the *Neovi* court did not establish a new proximate cause element for unfairness

claims, but instead reiterated that businesses need not directly perpetrate the underlying fraud to be

held liable under Section 5.

The Court declines LendingClub's invitation to establish a new "four-part" test incorporating proximate cause into the unfairness analysis under Section 5, and instead, will conduct its analysis under the three-part test that is "followed without embellishment by courts in this Circuit." *See FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030, at *6 (W.D. Wash. July 22, 2016) (rejecting a similar argument suggesting "a new, more searching, definition of 'unfair' practices," and noting that [t]he three-part test for whether a practice is 'unfair' under the FTC Act [is]  found in the statute itself") (citing *Neovi*, 604 F.3d at 1153; *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012)).

## 2.    Substantial Injury

An act causes "substantial injury" if it does "small harm to a large number of people, or if it raises a significant risk of concrete harm." *Neovi, Inc.*, 604 F.3d at 1157 (internal quotation marks and citation omitted); *see also FTC v. Johnson*, 96 F. Supp. 3d 1110, 1151 (D. Nev. 2015) ([C]ourts have recognized that consumer injury is substantial when it is the aggregate of many small individual injuries."). The complaint alleges that "in numerous instances," LendingClub made unauthorized account withdrawals from customers by billing them "twice in one month," continuing to bill customers after they "have already paid off their loans," and refusing to "stop automatic ACH withdrawals" despite customer requests to do so. (Dkt. No. 1 at ¶ 42.) These unauthorized withdrawals result in many customers being "forced to pay overdraft fees," or leave customers "unable to pay other bills." (*Id.* at ¶ 44.)

LendingClub argues that the complaint "does not adequately plead substantial injury because it offers no allegations regarding the magnitude or frequency of the alleged harm." (Dkt. No. 23 at 31.) The gravamen of LendingClub's argument is that the term "numerous" is too nondescript for the Court to infer that the "alleged errors resulted in harm to a 'large number of people.'" (*Id.*) (quoting *Neovi*, 604 F.3d at 1157.) The Court agrees.

The complaint alleges that LendingClub's unauthorized charges resulted in "many consumers [being] forced to pay overdraft fees." (Dkt. No. 1 at ¶ 44.) It does not allege *how* many or provide even a rough approximation. Likewise, the complaint alleges "numerous

instances," and "numerous other instances" of unauthorized charges, but fails to provide any allegations giving rise to a plausible inference that LendingClub's unauthorized withdrawals have inflicted many small individual injuries on a *large* number consumers.  Absent sufficient facts alleging substantial injury, the FTC's unfairness claim must fail.  *See Twombly*, 550 U.S. at 570 (holding that plaintiff must allege "enough facts to state a claim to relief that is plausible on its face" to survive motion to dismiss).

Accordingly, the Court grants LendingClub's motion to dismiss Count III.

## II.    Violations of the Privacy Rule and Regulation P

The FTC alleges that LendingClub violated the GLB Act's Privacy Rule and Regulation P because, prior to 2016, LendingClub "did not require customers to acknowledge receipt of the [privacy] notice as a necessary step to obtaining a particular financial product or service."  (Dkt. No. 1 at ¶ 49.)  As with Count II, LendingClub seeks dismissal of Count IV because the FTC alleges only past violations of the Privacy Rule and Regulation P and fails to plead that such conduct is ongoing or likely to recur; thus, the complaint fails to plead a plausible claim for injunctive relief.[10]  The FTC responds that LendingClub's defense of mootness "is particularly unwarranted at the motion to dismiss stage because possible recurrence is a quintessential issue of fact."  (Dkt. No. 30 at 24.)

A "court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).  "[I]t is . . . well-settled that an action for an injunction does not become moot merely because the conduct complained of was terminated, if there is a *possibility of recurrence*, since otherwise the defendant's [sic] would be

---

[10] LendingClub's arguments seeking dismissal of Count IV are the same as those set forth regarding dismissal of Count II (violation of Section 5 of the FTC Act for deceptive practice in communicating loan approval prior to back-end review).  (*See* Dkt. No. 23 at 26-28.)  However, LendingClub's argument that Section 13(b) of the FTC Act cannot be used to remedy past violations of Section 5 of the FTC Act because "the FTC Act only empowers the agency to sue for ongoing or imminent violations" is inapplicable to Count IV's alleged violation of the Privacy Rule and Regulation P.  The FTC brings Count IV pursuant to the GLB Act, 15 U.S.C. §§ 6801-6803, 6805, which authorizes the FTC to enforce the Privacy Rule and Regulation P.  Thus, the Court addresses only LendingClub's second line of argument concerning the mootness of Count IV; specifically, that it must be dismissed because the FTC fails to "plausibly plead that the alleged conduct is either ongoing or likely to recur."  (*See* Dkt. No. 23 at 27) (internal quotation marks and citation omitted.)

United States District Court
Northern District of California

1  free to return to [their] old ways." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1237 (9th Cir.

2  1999) (emphasis in original) (internal quotation marks and citations omitted).  Further, the burden

3  of showing mootness is on the defendants, and in order to meet their burden, the defendants must

4  show that "subsequent events [have] made it absolutely clear that the allegedly wrongful behavior

5  cannot reasonably be expected to recur." *Id.* at 1238 (internal quotation marks and citation

6  omitted).

7  LendingClub has not met its burden as it does not identify anything in the complaint that

8  makes "it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to

9  recur." *See id.*  The complaint states that LendingClub's alleged violations occurred "until at least

10  the end of 2016." (Dkt. No. 1 at ¶ 49.)  Further, the complaint alleges that LendingClub's "own

11  compliance group had recommended repeatedly that the company require customer

12  acknowledgment [of the privacy notice] in the years prior to the 2016 change." (*Id*. at ¶ 50.)  The

13  complaint provides no allegations regarding any violations after 2016, but also no allegations as to

14  why the violations ceased after 2016.  Given that it is LendingClub's burden to show mootness,

15  the mootness challenge fails at this early stage of the proceedings.

16  Accordingly, the Court denies LendingClub's motion to dismiss Count IV.

## CONCLUSION

18  For the reasons set forth above, the Court GRANTS without prejudice LendingClub's

19  motion to dismiss Count III, and DENIES its motion to dismiss Counts I, II and IV.  The FTC

20  shall file its amended complaint, if any, within 20 days of the date of this Order.

21  **IT IS SO ORDERED.**

22  Dated:  October 3, 2018

24  _____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge