M. SEAN ROYALL (*pro hac vice*)
sroyall@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
Telephone: 214.698.3100
Facsimile: 214.571.2900

BRIAN M. LUTZ (SBN #255976)
blutz@gibsondunn.com
AVERY E. MASTERS (SBN #306703)
amasters@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8379
Facsimile: 415.374.8474

RICHARD H. CUNNINGHAM (*pro hac vice*)
rhcunningham@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1801 California Street
Denver, CO 80202-2642
Telephone: 303.298.5752
Facsimile: 303.298.5907

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

LENDINGCLUB CORPORATION,

d/b/a Lending Club,

Defendant.

CASE NO. 3:18-cv-02454-JSC

**LENDINGCLUB'S ANSWER TO FIRST AMENDED COMPLAINT**

Judge: Hon. Jacqueline Scott Corley

Action Filed: April 25, 2018
Trial Date: Not Set

Plaintiff, the Federal Trade Commission ("FTC"), for its First Amended Complaint ("FAC") alleges:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and the Privacy of Consumer Financial Information Rule ("Privacy Rule"), 16 C.F.R. Part 313, recodified at 12 C.F.R. § 1016 ("Reg. P"), and issued pursuant to Sections 501-504 of the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6801- 6803, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Privacy Rule, 16 C.F.R. Part 313, recodified at 12 C.F.R. § 1016.

**ANSWER**:      Paragraph 1 contains only legal conclusions to which no response is required. To the extent that a response is required, LendingClub denies the allegations in paragraph 1.  More specifically, LendingClub denies that it has engaged in conduct that violates Section 5 of the FTC Act, 15 U.S.C. § 45(a), the Privacy Rule, Regulation P, or the Gramm-Leach-Bliley Act.  Defendant denies that any equitable or statutory remedy, as alleged, is warranted.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

**ANSWER**:      Defendant admits the allegations in paragraph 2.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

**ANSWER**:      Defendant admits the allegations in paragraph 3.

## INTRADISTRICT ASSIGNMENT

4.      Assignment to the San Francisco Division is proper because at all relevant times Defendant has conducted business, marketed its services, and provided its services in the county of San Francisco.

**ANSWER**:      Defendant admits the allegations in paragraph 4.

**PLAINTIFF**

5.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Privacy Rule, 16 C.F.R. Part 313, recodified at 12 C.F.R. § 1016, which requires financial institutions to protect the privacy of consumer information.

**ANSWER**:      Defendant admits the allegations in paragraph 5.

6.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, and the Privacy Rule, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), and 16 C.F.R. Parts 313 & 314.

**ANSWER**:      Paragraph 6 contains only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 6.

**DEFENDANT**

7.      Defendant Lending Club Corporation, also doing business as Lending Club ("Lending Club"), is a Delaware corporation with its principal place of business at 71 Stevenson Street, Suite 300, San Francisco, California 94105.  Lending Club transacts or has transacted business in this district and throughout the United States.  At all times material to this complaint, Lending Club has advertised, marketed, and distributed unsecured personal loans to consumers throughout the United States.

**ANSWER**:      LendingClub admits that it is a Delaware corporation with its principal place of business at 71 Stevenson Street, Suite 1000, San Francisco, California 94105, that it transacts or has transacted business in this district and throughout the United States, and that it has advertised and marketed unsecured personal loans to consumers in the United States.

LendingClub was founded in 2007 and operates an online platform that connects borrowers with investors.  Through the platform, consumers may apply for and obtain personal loans that are

underwritten and issued by third-party banks.[1] LendingClub's platform also facilitates investment in interests in the loans by retail and institutional investors. LendingClub services the loans and acts as an intermediary between the borrower and investors. Since 2015, LendingClub has facilitated more than $32 billion in personal loans to more than 2.3 million borrowers. LendingClub's internal tracking indicates that a majority of personal loan borrowers use loans available through LendingClub to consolidate and refinance high-cost credit card debt, and that the average such borrower reduces the annual percentage rate ("APR"—an all-in metric of the total cost of debt) on their debt by more than 5%.

Except as expressly admitted herein, LendingClub denies the allegations in paragraph 7.

**COMMERCE**

8. At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**ANSWER**: Paragraph 8 contains only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 8.

**DEFENDANT'S BUSINESS ACTIVITIES**

9. Defendant offers consumer loans through its website, www.lendingclub.com. Defendant advertises its loan offerings and handles consumer interactions during the life of the application and loan, including application processing, assessment of creditworthiness, and loan servicing, although the loans are formally issued by a bank.

**ANSWER**: LendingClub admits that it facilitates unsecured consumer loans through its website, www.lendingclub.com. LendingClub admits that it advertises loans available through LendingClub and handles certain consumer interactions during the life of the application and loan, including application processing, assessment of creditworthiness based on criteria provided by its partner banks, and loan servicing. LendingClub admits that loans available through LendingClub are

---

[1] Although the FAC suggests that LendingClub itself charges origination fees, in fact these fees are charged by the partner banks that originate the loans facilitated by LendingClub's platform.

issued by the originating banks that partner with LendingClub. Except as expressly admitted, LendingClub denies the allegations in paragraph 9.

10. Defendant lures prospective borrowers by promising "no hidden fees," but when the loan funds arrive in consumers' bank accounts, they are hundreds or even thousands of dollars short of expectations due to a hidden up-front fee that Defendant deducts from consumers' loan proceeds. Defendant is persisting in this conduct despite warnings from its own compliance department that Defendant's concealment of the up-front fee is "likely to mislead the consumer." Defendant also has misled consumers about whether their loan applications have been approved, stringing consumers along by, for example, telling consumers, "Hooray! Investors Have Backed Your Loan" when Defendant knew many such consumers would never receive a loan. Based on these misrepresentations, consumers believed that Defendant's funds were forthcoming, and did not apply for credit with Defendant's competitors. And with numerous consumers who have received a loan, Defendant has withdrawn double payments from consumers' accounts and continued to charge consumers who cancelled automatic payments or even paid off their loans entirely, costing consumers overdraft fees and preventing them from making other payments.

**ANSWER**: LendingClub admits that an origination fee of 1% to 6% of the total loan amount (depending on the creditworthiness of the borrower, among other factors) is charged in connection with unsecured personal loans available through LendingClub, and this fee is deducted up-front from the proceeds disbursed to the borrower.

LendingClub admits that it has previously used the phrase "no hidden fees" in its advertising and the personal loan application flow on its platform. The statement "no hidden fees" is true because, among other reasons, LendingClub has, at all times, disclosed all fees associated with the personal loans available on its platform, both (1) in a manner that complies with the Truth in Lending Act ("TILA"), and (2) in clear, understandable language at other logical locations on its website.

First, the personal loan application flow on LendingClub's platform contains a TILA disclosure, an example of which is provided below, that closely tracks a model form promulgated by the Consumer Financial Protection Bureau ("CFPB"). This government-prescribed disclosure is unavoidable, meaning that every prospective borrower is necessarily exposed to the disclosure before finalizing her

personal loan application. The form provides multiple disclosures of the origination fee and other loan terms. A box at the top of the form (referred to as the "Federal Box") contains the most significant information about the loan—including the annual percentage rate, the total cost of the loan, and the amount received by the borrower at the outset of the loan—in the exact format and language that the CFPB form specifies. Below the Federal Box, the TILA disclosure separately states the "Total Amount Requested," the "Origination Fees," and the "Total Amount Received" by the borrower.

(screenshot on next page)

Gibson, Dunn & Crutcher LLP

6

LENDINGCLUB'S ANSWER TO FIRST AMENDED COMPLAINT
3:18-cv-02454-JSC



LendingClub

How it Works | Privacy | Sign Out

Loan Rate & Terms

1 Check Your Rate → 2 Loan Details → 3 Loan Terms → 4 Bank Account

TRUTH IN LENDING DISCLOSURE STATEMENT

**Lender**

WebBank
215 South State Street
Suite 800
Salt Lake City, UT 84111

**Borrower**

hammie lazarus
4114 pine street
philadelphia, PA 19104

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid when you have made all scheduled payments |
|---|---|---|---|
| 14.98% | $2,353(e) | $9,500(e) | $11,853(e) |

Your payment schedule will be as follows:

| Number of payments | Amount (e) | When payments are due(e) |
|---|---|---|
| 35 | $329.24 | Your first payment will be due one month after the issuance of your loan and then monthly thereafter. Payments are due on the same date each month. If your due date is the 29th, 30th or 31st, and the current month is shorter, your payment will be on the last day of the month. |
| 1 | $329.60 | Your last payment will be due 36 months from the issuance date of your loan. |

Late charges: If your payment arrives after your **15** day grace period, you will be charged a late fee equal to the greater of: 5.00% of the late payment amount or **$15**. This fee is charged only once per late payment.

Prepayment policy: If you pay off your loan early, you will not be charged a penalty. In the event of a full prepayment, you may be entitled to a refund of part of the finance charge.

**See your borrower agreement for any additional information about nonpayment, default, or other matters related to your loan.**

**(e) means estimate**

**Other than payment dates, items marked (e) will decrease if you receive less than 100% funding. Regardless of the ultimate amount of the loan, your APR will not change. Subject to your right to cancel, an unsecured loan may issue for less than the full requested loan amount if it is not 100% funded by the end of the listing period.**

Total Amount Requested: $10,000.00
Origination Fees: $500.00
Total Amount Received: $9,500.00

Unsuccessful payment fee. When a payment fails and is rejected by your bank, you will be charged an Unsuccessful Payment Fee of $15 to cover the cost Lending Club incurs on the transaction.
Each attempt to collect a monthly payment is considered a separate transaction, so an Unsuccessful Payment Fee will be assessed for each failed attempt.

Check Processing Fee. If you elect to make payments by check, there will be a $7 processing fee by payment.

**You are not required to complete this agreement merely because you have received these disclosures or signed a borrower agreement.**

Clicking the box below constitutes your electronic signature and acceptance of:

☐ the Borrower Agreement and the Credit Score Notice.

Next ▸

7

Gibson, Dunn & Crutcher LLP

LENDINGCLUB'S ANSWER TO FIRST AMENDED COMPLAINT
3:18-cv-02454-JSC

Second, LendingClub prominently discloses the APR at multiple stages during the application process, including on the loan options page in the personal loan application flow. APR is an FTC- and CFPB-endorsed, all-in metric of the cost of credit that includes the interest rate and all applicable fees, including origination fees, incident to the extension of credit. In addition, the loan options page includes a "tooltip," a bolded green circle icon containing a question mark that appears immediately next to the APR disclosure and provides additional information about how the APR is derived, including a specific explanation of the origination fee.

We have a great rate for you:

$10,000
Loan Amount

$308.73 (36 payments)
Monthly Payment

6.99%
Interest Rate

9.41%
APR

Get Loan

APR stands for Annual Percentage Rate, and is a measure of the total cost of credit as an annual rate. The APR is comprised of the annual interest you pay at a rate of 6.99% - which is ultimately paid each month to the investors who enable your loan - and a one-time origination fee of 3.5% ($350.00) that is collected out of your loan proceeds.

Third, LendingClub's website includes a page titled "Rates & Fees" that provides numerous descriptions of the origination fee, including "Real-Life Examples" illustrating precisely how the fee works. This page, an example of which is included below, is accessible through prominent tabs and links placed throughout LendingClub's website, including from the personal loans homepage, available at https://www.lendingclub.com/loans/personal-loans/.



LendingClub denies that it "lure[d] prospective borrowers" to select loans available through LendingClub "by promising 'no hidden fees.'" LendingClub removed the "no hidden fees" statements and related icon from its website in May 2018, shortly after the FTC filed the Complaint. In the subsequent months, LendingClub has observed no material change in its personal loans business as a result of this change. Specifically, the total volume of unsecured personal loans originated through LendingClub has increased since May 2018—averaging 64,095 loans originated per month for June and July 2018—compared to its monthly average loan volumes in the six months before removal of the "no hidden fees" statements (average of 53,523 loans originated per month) and compared to June and July of the previous year (average of 55,208 loans originated per month). And LendingClub has not observed any material change in (1) the very low rates at which borrowers who obtain loans through LendingClub complain about the origination fee (0.030% before and 0.025% after removal of "no hidden fees" statements[2]); (2) the very low rates at which borrowers inquire[3] about the origination fee

[2] The quoted rates before removal of the "no hidden fees" statement are based on a 6-month average from November 2017 through April 2018. The quoted rates after removal of the "no hidden fees" statement are based on a 2-month average from June and July 2018.

[3] These inquiry rates are based on the number of template emails LendingClub sent in response to borrowers or prospective borrowers contacting the company via email with questions of any kind pertaining to the origination fee, extrapolated to account for the 3:1 ratio of communications by phone to communications by email to LendingClub's customer service representatives.

(2.88% before and 3.08% after removal of "no hidden fees" statements); or (3) the rate at which prospective borrowers complete the application process and become borrowers (6.1% before and 5.9% after removal of "no hidden fees" statements).[4] The absence of any material impact to LendingClub's unsecured personal loan business resulting from the removal of the "no hidden fees" claim and icon indicates that the claim did not impact the decisions of prospective borrowers and did not "lure" borrowers into selecting a personal loan through LendingClub.

LendingClub admits that a December 4, 2015 memorandum from an employee in its compliance department used the words "likely to mislead the consumer" in reference to the tooltip disclosure of the origination fee, but denies that this memorandum was a "warning[]" that LendingClub engages in "concealment of the up-front fee." The memorandum was prepared as part of a voluntary "monitoring exercise for UDAAP risk across Lending Club's Personal Loans and Small Business units" and involved review of (1) LendingClub's UDAAP policy; (2) marketing and sales material; (3) payment processing and collections processes; and (4) LendingClub's UDAAP-related compliance training. After considering these categories of materials, the memorandum concluded that the "review exercise did not identify any apparent UDAAP violations," but suggested "opportunities to enhance the customer experience in a way that reduces UDAAP risk." The language quoted in paragraph 10 of the FAC was not presented as a conclusion of the exercise and, instead, was a limited observation about the tooltip on the loan option page. Indeed, the monitoring exercise concluded that the origination fee is "clearly disclosed" on the "the Truth in Lending Disclosure presented at Step 3" of the personal loan application process.

LendingClub admits that it has previously sent prospective personal loan borrowers an email with the statement "Hooray! Investors Have Backed Your Loan" after investors had backed a prospective borrower's loan, but before a loan approval decision had been made. This email was sent after investors, in fact, agreed to purchase interests in—in other words, "back"—the borrower's loan. LendingClub denies that such emails have misled a significant number of prospective borrowers about

---

[4] The quoted rates before removal of the "no hidden fees" statement are based on a 6-month average from November 2017 through April 2018. The quoted rates after removal of the "no hidden fees" statement are based on a 2-month average from June and July 2018.

whether their loan applications have been approved. Fewer than 10 prospective borrowers have complained to LendingClub about the denial of a personal loan application after they received one of the referenced emails. LendingClub lacks knowledge or information sufficient to form a belief about the truth of the allegation that "consumers believed that Defendant's funds were forthcoming, and did not apply for credit with Defendant's competitors," and on that basis denies such allegations.

LendingClub does not know the number or percentage of individuals being referred to in the allegation that LendingClub has made erroneous withdrawals from "numerous consumers," and denies the allegation on that basis. LendingClub admits that, in spite of its rigorous processes for preventing erroneous ACH drafts, inadvertent errors—including double payments and charging of customers who cancelled automatic payments—have occasionally occurred, in very small numbers, during the course of the tens of millions of ACH payments processed by LendingClub. Based on LendingClub's internal tracking processes, between 2015 and 2017 LendingClub made 1,456 withdrawal errors affecting borrowers, compared with 1.8 million personal loans initiated and tens of millions of payments processed during this same time period—resulting in an error rate of far less than 1%. Even if one accepted as true the allegations in the FAC that LendingClub made 3,850 unauthorized withdrawals from July 2016 to September 2018, which LendingClub does not (and indeed denies), these figures imply an error rate of far less than 1%, in light of LendingClub's monthly volume of ACH withdrawals.

Except as expressly admitted, LendingClub denies the allegations in paragraph 10.

11. In addition, Defendant failed to provide consumers with clear and conspicuous privacy notices.

**ANSWER**: LendingClub denies the allegations in paragraph 11. At all points in time, LendingClub presented its Privacy Policy in a logical, accessible manner to current and prospective borrowers. Since December 2016, LendingClub has included a separate link to its Privacy Policy on the "Check Your Rate" page of the application process that all prospective borrowers must complete to obtain a personal loan through LendingClub. All prospective borrowers must click a check-box acknowledging that they have "read and agree to" the Privacy Policy to advance in the personal loan application process.

(screenshot on next page)

The FAC does not allege that this method of presentation is inadequate in any way. Before December 2016, LendingClub disseminated its Privacy Policy in a similar manner, except that, rather than requiring customers to separately acknowledge receipt of the Privacy Policy, LendingClub required customers to consent to its Terms of Use, which incorporated a consent to LendingClub's Privacy Policy, as a necessary step of completing a personal loan application on LendingClub's website.

**CONSUMERS' APPLICATION PROCESS**

12. Many consumers first learn of Defendant's products through its advertisements. In those advertisements, Defendant often represents that it charges "no hidden fees." For example, many of Defendant's mail advertisements include a line that states, "**FEES**: There are no hidden fees or prepayment penalties." An example of such an advertisement is attached as Exhibit A. Many other mail advertisements prominently represent in bold type, "**No hidden fees or prepayment penalties**," directly underneath a large, colorful exclamation point. An example of such a representation from

Defendant's mail advertisements appears below. An example of an advertisement in which this representation appears is attached as Exhibit B.

**ANSWER**: LendingClub does not know the number or percentage of individuals being referred to with the term "[m]any customers," and denies the allegation on that basis. LendingClub admits that some portion of consumers first learn of the company from its advertisements. However, substantial portions of consumers learn of the company's products through other means, including referrals from other borrowers, loan comparison engines such as LendingTree.com, credit monitoring websites like CreditKarma.com, and search engine results.

LendingClub admits that it has previously used advertisements containing the truthful statements that loans available through LendingClub have "no hidden fees" and/or "no hidden fees or prepayment penalties." As noted above in LendingClub's response to paragraph 10 of the FAC, LendingClub removed the "no hidden fees" statements and the related icon from its website and advertising materials in May 2018.

LendingClub admits that the screenshot incorporated in paragraph 12 of the FAC is an incomplete excerpt of an advertisement LendingClub has previously used. LendingClub admits that Exhibits A and B of the FAC are examples of advertisements LendingClub has previously used.

Except as expressly admitted, LendingClub denies the allegations in paragraph 12.

13. Defendant's online advertisements also frequently represent that its loans contain "no hidden fees." An example of an online banner advertisement making this representation appears below.

**ANSWER**: LendingClub does not know the number or percentage of advertisements being referred to with the term "frequently," and denies the allegation on that basis. LendingClub admits that it has previously used advertisements containing the truthful statements that loans available through LendingClub have "no hidden fees." LendingClub admits that the screenshot incorporated in paragraph 13 of the FAC is an incomplete excerpt of an advertisement LendingClub has previously used. Except as expressly admitted herein, LendingClub denies the allegations in paragraph 13.

14. In addition, Defendant created online advertising in the form of paid blog posts promoting its product on popular financial blogs; many of these posts included the "no hidden fees" representation. For example, a blog post that Defendant created that still appears on the credit website

Quizzle states, "[O]nce you're approved, your money goes straight into your account, with no hidden fees."

**ANSWER**: LendingClub admits that it has previously used advertisements containing the truthful statements that loans available through LendingClub have "no hidden fees" and that LendingClub has advertised its services in the form of sponsored blog posts. LendingClub admits that, on June 25, 2014, Quizzle published on its blog a post by Quizzle containing the quoted language in paragraph 14 of the FAC, among other statements. Except as expressly admitted, LendingClub denies the allegations in paragraph 14, including that LendingClub "created" the June 25, 2014 blog post on Quizzle.

15. Consumers who view Defendant's online, mail, or television advertisements or hear Defendant's radio advertisements are directed to apply for Defendant's loans by visiting Defendant's website, www.lendingclub.com. When consumers visit the home page of Defendant's website to apply for a personal loan, they have seen a screen similar to the following: [image omitted]. The page has asked consumers "How much do you need?"

**ANSWER**: LendingClub admits that its advertisements contain information on how to apply for a loan online through LendingClub's website, including its homepage at www.lendingclub.com. LendingClub admits that the screenshot incorporated in paragraph 15 is an incomplete excerpt of a previous version of LendingClub's homepage, depicting the first of many steps in the personal loan application flow on LendingClub's platform and containing the quoted language. Except as expressly admitted, LendingClub denies the allegations in paragraph 15.

16. Consumers who visit Defendant's home page on a mobile device see a screen similar to the following: [image omitted]. Again, Defendant asks consumers, "How much do you need?"

**ANSWER**: LendingClub admits that the screenshot incorporated in paragraph 16 is an incomplete excerpt of a previous version of LendingClub's mobile homepage, depicting the first of many steps in the personal loan application flow on LendingClub's platform and containing the quoted language. Except as expressly admitted, LendingClub denies the allegations in paragraph 16.

17. Consumers next see a page titled "Check Your Rate," similar to the example below: [image omitted].

**ANSWER**: LendingClub admits that the screenshot incorporated in paragraph 17 is an incomplete excerpt of a previous version of the personal loan application flow on LendingClub's platform, depicting one of many steps in the personal loan application flow and containing the quoted language. Except as expressly admitted, LendingClub denies the allegations in paragraph 17.

18. Once consumers complete this page, Defendant conducts a credit pull on applicants' credit reports. Defendant then immediately rejects those consumers that it determines do not meet certain baseline criteria. Defendant refers to this step as "front-end" denial. Consumers who are rejected on the front end are not shown any loan offers from Defendant.

**ANSWER**: LendingClub admits that, like virtually all lenders, LendingClub's partner banks set certain baseline creditworthiness criteria that prospective borrowers must meet in order to be approved for a loan. After prospective borrowers complete the initial steps of the personal loan application process, LendingClub performs an initial creditworthiness review based on criteria set by its partner bank, and, depending on the results of that initial review, some prospective borrowers are determined to be ineligible for a personal loan through LendingClub in this "front-end" review and are not shown any loan offers. Except as expressly admitted, LendingClub denies the allegations in paragraph 18.

19. If Defendant determines that a consumer meets Defendant's baseline lending criteria, Defendant has presented consumers a page of loan offers similar to the following: [image omitted]. On this page, Defendant presents consumers with bold-faced offers of a specific "Loan Amount." The only mention of fees on this page is the representation, "No hidden fees," accompanied by an icon of a smiling masked bandit.

**ANSWER**: LendingClub admits that, if a prospective borrower meets the initial creditworthiness criteria set by its partner bank, the prospective borrower is presented with personal loan options with varying terms, and that the screenshot incorporated in paragraph 19 is an incomplete excerpt of a previous version of this page. LendingClub admits that the depicted page presents loan options of different "Loan Amounts" and that the language "No hidden fees" appears on the page, accompanied by a smiling masked icon.

LendingClub denies that "[t]he only mention of fees on this page" is the statement "No hidden fees."   As shown in the screenshot incorporated in paragraph 19 of the FAC, the referenced page discloses both the APR associated with each loan—an FTC- and CFPB-endorsed, all-in metric of the cost of credit that includes the interest rate and all applicable fees, including origination fees, incident to the extension of credit—and a "tooltip" that, when a prospective borrower clicks on or hovers over it, provides a detailed explanation of the APR, including the percentage and dollar amount of the origination fee and the fact that it is collected out of the borrower's loan proceeds.

Except as expressly admitted, LendingClub denies the allegations in paragraph 19.

20.     On a desktop, a small green dot with a white question mark inside appears beside the word "APR."  Defendant describes this dot as the "tooltip."  If a consumer clicks on the tooltip, a pop-up bubble appears containing a small-print disclosure such as the following: [image omitted].

**ANSWER**:     LendingClub admits that on the desktop version of the page referenced in paragraph 20, a green dot with a white question mark inside—which LendingClub describes as the "tooltip"—appears beside the APR, inviting borrowers to learn more about APR and total loan costs. APR is an all-in metric of total loan cost (including the origination fee) that the FTC endorses in the advice it provides to consumers and, indeed, instructs borrowers to use when comparing alternative loan options.   *See, e.g.*, FTC, Consumer Information, Car Title Loans, available at https://www.consumer.ftc.gov/articles/0514-car-title-loans (last visited November 8, 2018) ("When you're looking at lending products, compare the APR and the finance charge, which includes the loan fees, interest and other costs.  You are looking for the lowest APR."); FTC, Payday Loans, available at https://www.consumer.ftc.gov/articles/0097-payday-loans (last visited November 8, 2018) ("Compare the APR and the finance charge, which includes loan fees, interest and other credit costs.  You are looking for the lowest APR.").

If a prospective borrower clicks on or hovers over the tooltip, a pop-up bubble appears containing a detailed explanation of the APR, including the percentage and dollar amount of the origination fee and the fact that it is collected out of the borrower's loan proceeds.  LendingClub admits that the screenshot incorporated in paragraph 20 of the FAC is an incomplete excerpt of a previous

version of the personal loan application flow on LendingClub's platform, depicting one of many steps in the personal loan application flow.

Except as expressly admitted, LendingClub denies the allegations in paragraph 20.

21. At the bottom of the pop-up, after an explanation of the term "APR," the text mentions an up-front fee that is collected out of consumers' loan proceeds. If a consumer does not click on the tooltip, the pop-up bubble does not appear, and there is no other disclosure on this page from which a consumer could learn of the existence of the up-front fee. A consumer does not need to click on the tooltip in order to move forward with the loan application.

**ANSWER**: LendingClub admits that in the pop-up that appears when a prospective borrower clicks on or hovers over the tooltip a detailed explanation of the APR appears, including the percentage and dollar amount of the origination fee and, after that, the fact that the fee is collected out of borrowers' loan proceeds. LendingClub admits that, if a prospective borrower does not click on or hover over the tooltip, the pop-up bubble does not appear, and that a prospective borrower does not need to click on the tooltip in order to move forward with that specific step of the loan application.

LendingClub denies that "there is no other disclosure on this page from which a consumer could learn of the existence of the up-front fee." Each loan option includes a disclosure of both the interest rate and the APR. As explained above, APR is an FTC- and CFPB-endorsed, all-in metric of the cost of credit that includes the interest rate and all applicable fees incident to the extension of credit, including the origination fee associated with personal loans available through LendingClub.

Except as expressly admitted, LendingClub denies the allegations in paragraph 21.

22. On a mobile device, the loan offers page also does not mention any fees, other than the representation, "No hidden fees." An example of the mobile loan offers page appears below: [image omitted]. If a consumer were to tap on the APR, he or she would be shown a pop-up bubble similar to that shown to a consumer viewing the loan offers page on a computer who clicks on the tooltip. Otherwise, the pop-up bubble would not appear, and there is no other disclosure on this page from which a consumer could learn of the existence of the up-front fee.

**ANSWER**: LendingClub admits that the screenshot incorporated in paragraph 22 is an incomplete excerpt of a previous version of the mobile personal loan application flow on

LendingClub's platform.  LendingClub admits that, if a prospective borrower were to tap on the APR in the pictured screenshot, he or she would be shown a pop-up bubble similar to a prospective borrower viewing the page on a computer who clicks on or hovers over the tooltip, including the percentage and dollar amount of the fee and the fact that it is collected out of the borrower's loan proceeds. LendingClub admits that, if a prospective borrower does not tap on the APR, the pop-up bubble does not appear.

LendingClub denies that "there is no other disclosure on this page from which a consumer could learn of the existence of the up-front fee."  As shown in the screenshot incorporated in paragraph 22 of the FAC, the page referenced in paragraph 22 of the FAC discloses the APR associated with each loan—an FTC- and CFPB-endorsed, all-in metric of the cost of credit that includes the interest rate and all applicable fees incident to the extension of credit, including the origination fee associated with personal loans available through LendingClub's platform.

Except as expressly admitted, LendingClub denies the allegations in paragraph 22.

23.    Although Defendant tells consumers that its loans contain "No hidden fees," Defendant nevertheless charges consumers an up-front fee that is not clearly and conspicuously disclosed.  This fee is calculated as a percentage—on average, approximately 5 percent—of the consumer's requested loan amount, and often amounts to more than a thousand dollars.

**ANSWER**:    LendingClub admits that it has previously used advertisements containing the truthful statements that loans available through LendingClub have "no hidden fees."

LendingClub admits that unsecured personal loans available through LendingClub are associated with an origination fee ranging from 1% to 6% of the total loan amount (depending on the creditworthiness of the borrower, among other factors), which is deducted up-front from the proceeds disbursed to the borrower.  Based on data for the time period beginning in the second quarter of 2013 and ending in the second quarter of 2018, origination fees averaged approximately 4.86% of the total loan amount for personal loans originated through LendingClub's platform.  The origination fee can amount to more than a thousand dollars for personal loans of $18,000 or more available on LendingClub's platform.

LendingClub denies that the origination fee is not clearly and conspicuously disclosed. LendingClub has, at all times, disclosed all fees associated with the personal loans available on its platform, both (1) in a manner that complies with the Truth in Lending Act, and (2) in clear, understandable language at other logical locations on its website.

Except as expressly admitted, LendingClub denies the allegations in paragraph 23.

24. Defendant deducts the hidden up-front fee from the promised "Loan Amount" before disbursing the loan funds to the consumer. As a result, the amount of money that Defendant disburses to a consumer's bank account is always substantially smaller than the promised "Loan Amount." And because consumers must pay interest on the entire "Loan Amount," including the fee, Defendant's hidden fee leaves consumers paying interest on principal that they never received.

**ANSWER**: LendingClub admits that the origination fee is deducted up-front from personal loan proceeds disbursed to the borrower and, therefore, that the amount of money disbursed to a borrower's bank account is less than the total loan amount by the amount of the origination fee—namely, 1% to 6% of the amount of the loan. LendingClub denies that borrowers receive anything other than the "Loan Amount." Indeed, all borrowers receive that amount—a small portion of which is immediately applied towards paying the cost of the personal loan in the form of an origination fee. This loan structure has the effect of reducing the borrower's monthly payments (compared to a loan of the same size with a similar APR that does not include an origination fee) and is used in a wide array of loans, including loans offered by the U.S. government.

For the reasons explained in LendingClub's response to the allegations in paragraph 10 of the FAC, LendingClub denies that the origination fee is "hidden."

Except as expressly admitted, LendingClub denies the allegations in paragraph 24.

25. Consumers frequently complain to Defendant that they were not aware of the up-front fee that would be deducted from the full "Loan Amount" that they requested. For example, one consumer reported that he applied for $15,000 to cover relocation expenses, and was surprised to receive only $14,000—an amount insufficient to cover his relocation—after Defendant deducted a $1,000 up-front fee. Another consumer applied for a $30,000 loan in order to consolidate his credit card debt at a lower interest rate; because Defendant deducted a $1,200 up-front fee, however, the

consumer was unable to pay off his credit card debt in full, leaving him with more bills to pay than he had before.

**ANSWER**: LendingClub denies that "[c]onsumers frequently complain to [LendingClub] that they were not aware of the origination fee." Indeed, throughout the relevant time period, significantly fewer than *one-tenth-of-one-percent* of borrowers have complained to LendingClub about any aspect of the origination fee. Such a low rate of complaints cannot be accurately characterized as "frequent." LendingClub lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 25 and on that basis denies such allegations.

26. Defendant is aware that many consumers do not know about the up-front fee and expect to receive the full loan amount. Defendant's training materials for customer service representatives list "I didn't receive the full loan amount" as one of the two main post-disbursement complaints that representatives should be prepared to address. And Defendant's quarterly complaint reviews have proposed "highlighting [the] origination fee" to address complaint volumes. In addition, internal compliance reviews repeatedly cite the concealment of the fee as a significant problem for consumers. For example, one compliance review noted: "The origination fee is disclosed on the offer page tooltip, but is not readily apparent unless an applicant clicks on the tooltip. This omission could be perceived as deceptive as it is likely to mislead the consumer." One of Defendant's largest investors also warned Defendant that the up-front fee "is not clear and conspicuous and could be subject to a UDAAP claim," referring to an unfair or deceptive acts and practices claim. The investor's legal counsel also told Defendant that Defendant's ads "prominently state[] that there are 'No Hidden Fees' yet the documents we reviewed contain a large ($300 to $450) origination fee that only appears once," and warned this "relative obscurity" could make it a target in a law enforcement action.

**ANSWER**: LendingClub does not know the number or percentage of individuals being referred to with the term "many customers," and on that basis denies this allegation. As explained in LendingClub's response to paragraph 25 of the FAC, fewer than one-tenth-of-one-percent of borrowers complain to LendingClub about misunderstanding the origination fee.

LendingClub denies that its "training materials for customer service representatives list 'I didn't receive the full amount' as one of the two main post-disbursement complaints that representatives

should be prepared to address." The language quoted in paragraph 26 of the FAC appears in a 219-page "Introduction to Operations" training presentation covering many aspects of LendingClub's operations. Page 136 lists "I didn't receive the full loan amount" as a possible question that a borrower could ask about his or her application decision—along with "What is the sequence [of loan disbursement]?" and "When is my first payment?" Nothing in the cited training materials supports the FAC's allegation that complaints regarding the origination fee are "one of the two main post-disbursement complaints." Indeed, as summarized in LendingClub's response to paragraph 10 of the FAC, only approximately 3% of borrowers have contacted LendingClub with questions or issues of *any* type relating to the origination fee, including: "Is the origination fee refunded if I pay my loan off early?"; "Is the origination fee negotiable?"; "How was the origination fee calculated?"; or "Why was money deducted from my initial loan proceeds?" LendingClub does not have information at this time regarding the proportion of origination-fee related inquires accounted for by these (or other) questions.

LendingClub also denies that its "quarterly complaint reviews have proposed 'highlighting the origination fee' to address complaint volumes." LendingClub's Quarterly Business Owner Complaint Reviews for December 2015 and March 2016, cited in paragraph 26 of the FAC, specifically recognized that LendingClub "receives less BBB complaints than peers." These quarterly complaint reviews also did not identify origination fee complaints as among the "Must-Address Personal Loan Complaint Areas." Contrary to the allegations in the FAC, the quarterly business reviews did not "propos[e] 'highlighting the origination fee' to address complaint volumes," but merely identify, as an "Action Item[]," a "request to examine impact on use of pre-approval messaging and highlighting origination fee."

LendingClub denies that "internal compliance reviews repeatedly cite the concealment of the fee as a significant problem for consumers." The FAC quotes, as an example of such a "compliance review," a December 4, 2015 memorandum from an employee in LendingClub's compliance department. Although that memorandum used the words "likely to mislead the consumer" in reference to the tooltip disclosure of the origination fee, the memorandum concluded that the origination fee is "clearly disclosed" on "the Truth in Lending Disclosure," and the "review exercise did not identify any

apparent UDAAP violations." Instead, the memorandum merely "suggested enhancements" to the compliance program.

LendingClub admits that one LendingClub investor has sent an email to LendingClub with the language quoted in paragraph 26 of the FAC, specifically in reference to the tooltip appearing on the personal loan option page. LendingClub further admits that, in the same email thread, the investor's legal counsel used the language quoted in paragraph 26 of the FAC with respect to LendingClub's "solicitation materials." Neither the investor nor its legal counsel concluded that the origination fee disclosures in the personal loan application flow, as a whole, were not clear and conspicuous. Indeed, after the investor's representatives discussed their concerns with LendingClub and learned more of LendingClub's processes, the email exchange notes that the parties agreed to "have ongoing conversations but will not commit to making changes now." And, notwithstanding the statements quoted in paragraph 26 of the FAC, the investor in question ultimately invested with LendingClub without requiring any changes to the personal loan application flow. Likewise, dozens of other investors—represented by a myriad of lawyers—reviewed the same application flow and raised no questions about the adequacy of LendingClub's origination fee disclosures.

Except as expressly admitted, LendingClub denies the allegations in paragraph 26.

27.     Defendant has ignored these warnings. Rather than improving over time, Defendant's violations have become more egregious over the years: when redesigning the application flow in the winter of 2014, Defendant *increased* the prominence of the "No hidden fees" representation and *decreased* the prominence of the tooltip.

**ANSWER**:     LendingClub denies the allegations in paragraph 27. The analysis included in the December 4, 2015 memorandum and feedback from actual and prospective investors have been closely considered by LendingClub. As noted above, the vast majority of investors have not expressed any concerns relating to LendingClub's disclosures of the origination fee. In addition, during the relevant time period, LendingClub voluntarily participated in an application to the CFPB's Trial Disclosure Program created under Dodd-Frank Section 1032e, designed to explore alternative, more effective and interactive loan cost and fee disclosures. At no point during the extensive discussions

with CFPB staff were any questions raised regarding the adequacy or presentation of the origination fee disclosures included in the personal loan application flow on LendingClub's platform.

During the winter of 2015, the company redesigned the personal loan option page to improve readability and changed the tooltip into a graphical button rather than a text hyperlink. LendingClub denies that this change decreased the prominence of the tooltip.

28. On the Loan Offer page, where a consumer is presented with the "No hidden fees" representation, the accompanying bandit icon, and the "Loan Amount," the consumer may accept the offered terms by clicking a button reading "Get Loan" or "Continue." If a consumer clicks on this button, he or she is then sent to a page titled "Loan Details," similar to the example below: [image omitted]. The screen states, in large type: "Just a few more details before you get your [purpose] loan." The same representation appears on the mobile version of the "Loan Details" page.

**ANSWER**: LendingClub admits that previous versions of the personal loan option page have included the language "no hidden fees" and a smiling masked icon. As explained above, LendingClub removed this language and the icon in May 2018. LendingClub admits that, from the loan option page, a prospective borrower may proceed to the next step of the application process by clicking a button reading "Get Loan" or "Continue." If a prospective borrower clicks on this button, he or she is then sent to a page titled "Loan Details." LendingClub admits that the screenshot incorporated in paragraph 28 of the FAC is an incomplete excerpt of a previous version of the personal loan application flow on LendingClub's platform and that the mobile version displays similar content on the "Loan Details" page. Except as expressly admitted, LendingClub denies the allegations in paragraph 28.

29. Consumers who click the "Next" button are then shown a page titled "Loan Rate & Terms." An example of the desktop version of the page appears below: [image omitted].

**ANSWER**: LendingClub admits that the screenshot incorporated in paragraph 29 of the FAC is an incomplete excerpt of a previous version of the personal loan application flow on LendingClub's platform. Except as expressly admitted, LendingClub denies the allegations in paragraph 29.

30. The only place the up-front fee is disclosed on this page is the unbolded itemization that appears sandwiched between more prominent, bolded paragraphs. In most standard screen

configurations, the unbolded list appears "below the fold," such that consumers would need to scroll down in order to see it.

**ANSWER**: LendingClub denies that "[t]he only place the up-front fee is disclosed on this page" is the itemized list of the "Total Amount Requested," "Origination Fees," and "Total Amount Received." As shown in the screenshot incorporated in paragraph 30 of the FAC, the TILA disclosure, in accordance with federal regulations, discloses both the APR and total finance charges associated with the loan, both of which include the origination fee.

LendingClub admits that, in most standard screen configurations, the itemized list of the "Total Amount Requested," "Origination Fees," and "Total Amount Received" appears "below the fold," along with the "Next" button. Prospective borrowers must scroll through the entire TILA statement, including the origination fee description, to click the "Next" button and proceed with the personal loan application process. When the "Next" button is positioned at the bottom of the screen, the list itemizing the origination fee is directly in the center of the screen.

Except as expressly admitted, LendingClub denies the allegations in paragraph 30.

31. On a mobile device, if a consumer clicks the green button on the Loan Offer page, the consumer is taken to a page featuring links to the Borrower Agreement and Credit Score Notice and a large "I Agree" button that allows consumers to move forward with the loan application process. If a consumer clicks on the button, the consumer's application is complete. A version of this page that Defendant has presented appears below as it would appear on many smartphones, including iPhones and other models: [image omitted]. At numerous times, on an iPhone 5 and similar models, the Truth in Lending tab would appear below the fold.

**ANSWER**: LendingClub admits that, on a mobile device, if a prospective borrower proceeds with the personal loan application process after the loan option page, he or she is taken to the "Loan Rate & Terms" page, which contains links to the Borrower Agreement and Credit Score Notice and an "I Agree" button. If the prospective borrower clicks on the "I Agree" button, he or she proceeds to the next step of the personal loan application process. LendingClub admits that the screenshot incorporated in paragraph 31 of the FAC is an incomplete excerpt of a previous version of the mobile personal loan

application flow on LendingClub's platform.  Except as expressly admitted, LendingClub denies the allegations in paragraph 31.

32.     In the version appearing above, if, instead of clicking on the large green "I Agree" button, a consumer goes further on the screen, sees the Truth in Lending Disclosure Statement, and scrolls down, a Truth in Lending box with the loan terms would appear.  In versions in which the green "I Agree" button does not appear near the top of the screen, a consumer must also scroll down in order to see the Truth in Lending Disclosure Statement and a Truth in Lending box.  Below that, a schedule of payments appears.  If a consumer were to scroll further down, toward the bottom of the screen, between a paragraph of bolded language and another paragraph, an origination fee would be listed. The below screenshot is an example of this section of the mobile page.  [image omitted].  On many devices, information about the up-front fee and total amount received is not displayed until the consumer has scrolled down approximately four times.  A version of this page that Defendant has presented appears below in its entirety.  [image omitted].

**ANSWER**:     LendingClub admits that the screenshots incorporated in paragraph 32 are excerpts of previous versions of the personal loan application flow on LendingClub's platform that LendingClub ceased using on or around January 6, 2017.  LendingClub admits that, in the previous version of the mobile personal loan application flow incorporated in paragraph 32, the Truth in Lending Act disclosure appears below the "I Agree" button, including a Truth in Lending box with the loan terms, a schedule of payments and the itemized breakdown of the origination fee.  However, since January 2017, in order to proceed with the application on a mobile device, prospective borrowers must scroll through the entire Truth in Lending statement to push an "I Agree" button at the bottom of the page—similar to the flow presented to prospective borrowers applying for personal loans through LendingClub via desktop.

Except as expressly admitted, LendingClub denies the allegations in paragraph 32.

33.     In fact, many consumers who apply for a loan from Defendant do not know that Defendant will deduct an up-front fee from their loan proceeds.  Indeed, consumers frequently complain that they only discovered the fee after Defendant disbursed their loan proceeds, when they noticed that the amounts disbursed were smaller than they were expecting.  At least tens of thousands

of consumers contacted Defendant after their loan proceeds were disbursed to ask about the up-front fee or to ask why they did not receive the full loan amount. Many consumers who have complained that they were not aware of the up-front fee attempted to cancel their loans once they learned of the fee, preferring a loan from a competitor or no loan at all.

**ANSWER**: LendingClub does not know the number or percentage of individuals being referred to with the term "many consumers," and denies the allegation on that basis. LendingClub admits that some borrowers have complained to the company that they became aware of the origination fee only after disbursement of their loan proceeds. LendingClub tracks such complaints and, to date, fewer than 0.1% of borrowers have complained that they were not aware that the origination fee would be deducted from their loan proceeds. LendingClub admits that approximately 3% of borrowers have contacted LendingClub with questions or issues of *any* type relating to the origination fee, including: "Is the origination fee refunded if I pay my loan off early?"; "Is the origination fee negotiable?"; "How was the origination fee calculated?"; or "Why was money deducted from my initial loan proceeds?" LendingClub does not have information at this time regarding the proportion of origination-fee-related inquires accounted for by these (or other) questions. Given the total volume of unsecured personal loans obtained through LendingClub, 3% of borrowers equates to approximately 60,000 borrowers over the five year period preceding the date of the FAC. A subset of the less than 0.1% of borrowers who complained to LendingClub about the origination fee attempted to and/or did cancel their loans. Based on LendingClub's review of its complaint records, the company estimates that this subset is less than 10% of the borrowers who complained about the origination fee.

Except as expressly admitted, LendingClub denies the allegations in paragraph 33.

34. On desktops and mobile phones, after consumers agree to the loan terms and enter bank account information, they then click a "Done!" button and are taken to a screen that has stated, in large type: "Your [amount requested] loan is on the way. What's next?" The amount that Defendant promises is "on the way" is the same "Loan Amount" that Defendant promised the consumer on the Loan Offer page. For example, a consumer who was promised a $10,000 loan amount will see on this screen a representation that "Your $10,000 loan is on the way." Below these representations has

appeared a "To-Do List" of tasks such as "Confirm your email address" and "Verify your bank account information." The contents of the "To-Do List" vary for each consumer.

**ANSWER**: LendingClub admits that a previous version of the personal loan application flow on its platform included the statement "Your [amount requested] loan is on the way. What's next?" LendingClub admits that the total amount stated on that page is the same "Loan Amount" that appears on the loan option page. Prospective borrowers for whom additional information or action is required are then presented with a "To-Do List" of tasks, such as "Confirm your email address" and "Verify your bank account information." The contents of the "To-Do List" vary by prospective borrower. Except as expressly admitted, LendingClub denies the allegations in paragraph 34.

**COMMUNICATION OF APPROVAL**

35. Although Defendant has told each consumer who completed a personal loan application that his or her "loan is on the way," a consumer's application in fact must undergo two additional processes after completion in order to receive final approval. First, an application must attract sufficient investor backing, and second, an application must pass Defendant's stringent "back-end" credit review—so called to distinguish it from the lighter, "front-end" review that Defendant conducts while the consumer's application is still in progress.

**ANSWER**: LendingClub admits that, after a prospective borrower submits an initial personal loan application, he or she may be required to provide proof of information (such as income) provided earlier in the loan application process, and the application must attract sufficient investor backing and must meet creditworthiness criteria provided by LendingClub's partner bank in the "back-end" credit review in order to receive final approval. Except as expressly admitted, LendingClub denies the allegations in paragraph 35.

36. If a consumer has garnered investor funding—but before Defendant has finished the "back-end" review of their applications—Defendant has frequently represented that the consumers will receive loans. For example, Defendant has sent at least approximately 196,000 consumers an email the subject line of which reads "Hooray! Investors Have Backed Your Loan." An example of this email appears below. [image omitted].

**ANSWER**: LendingClub does not know the number or percentage of individuals being referred to with the term "frequently," and denies the allegation on that basis. LendingClub admits that, over two relatively brief time periods—between June 25, 2015 and July 17, 2015 and between September 15, 2015 and November 13, 2015—LendingClub sent approximately 196,000 prospective borrowers an email with the subject line "Investors Have Backed Your Loan," an incomplete excerpt of which is incorporated in paragraph 36. The emails were sent after investors had confirmed that they would back the loan applications, but before LendingClub had completed borrower creditworthiness review. More than 152,000 prospective borrowers who received this email were ultimately approved for loans.

In June 2016, LendingClub voluntarily changed its processes for nearly all classes of loans, such that investor backing decisions are no longer finalized until after all other phases of the loan approval process have been completed, including creditworthiness review. In other words, since June 2016, only consumers who meet all of the creditworthiness criteria set by LendingClub's partner bank would have their loan applications listed for investor backing and be notified when their loans were fully backed by investors for nearly all classes of loans.

Except as expressly admitted, LendingClub denies the allegations in paragraph 36.

37. The body of the email begins, in large, bold print, "Your Loan is 100% Backed," and continues: "Great news! Investors have backed your loan 100%. Your money is almost in your hands. You can always visit your Account Summary to view the details of your loan. Welcome to Lending Club! All the best, Lending Club." Upon receiving emails such as these and similar representations, many consumers have believed that their loans have been approved, and that they would soon receive their loan funds.

**ANSWER**: LendingClub admits that, as summarized in LendingClub's response to paragraph 36, LendingClub previously sent prospective borrowers emails containing the text quoted in paragraph 37 for a total of 88 days in 2015. At all other times during the relevant time period, the email sent by LendingClub included other language that clearly reinforced that application review was ongoing. LendingClub lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 37 and on that basis denies such allegations.

38.     In reality, however, many consumers who received such representations were subsequently rejected based on Defendant's "back-end" credit review and never received a loan from Defendant.  For example, of the at least approximately 196,000 consumers who received the above email, at least approximately 43,000 were subsequently rejected.  The "back-end" credit review is searching and often involves, *inter alia*, an additional credit inquiry, a phone call to the consumer, requests for additional documentation, and detailed review of the consumer's tax and bank records.

**ANSWER**:     LendingClub admits that approximately 43,000 prospective borrowers who received the emails described in paragraph 36 were subsequently determined to be ineligible for personal loans through LendingClub.  LendingClub admits that the creditworthiness review process can involve an additional credit inquiry, a phone call to the prospective borrower, requests for additional documentation, and review of the prospective borrower's tax and bank records.  Except as expressly admitted, LendingClub denies the allegations in paragraph 38.

39.     Defendant frequently issues back-end denials even to consumers who provide Defendant with all the documents that Defendant requests and whose applications were truthful, based upon its further evaluation of the consumer.  Defendant has also issued back-end denials to consumers based on errors by Defendant.  For example, Defendant acknowledged having incorrectly denied one consumer's application on the ground that her mailing address and residential address did not match when in fact, the consumer lived at a "rural route" address, meaning that she received mail at a post office box rather than her physical address.

**ANSWER**:     LendingClub does not know the number or percentage of individuals being referred to with the allegation that LendingClub "frequently issues back-end denials," and denies the allegation on that basis.  LendingClub admits that some prospective borrowers are denied based on creditworthiness review even if they provide requested documentation and truthful applications.  LendingClub lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 39 and on that basis denies such allegations.

40.     Defendant's practice of deceptively representing to consumers that they will receive loans is ongoing.  For example, when a consumer completes an application for an automobile refinance loan, another product offered by Defendant, in many instances Defendant's website tells the consumer

to "Get ready to save [amount] every month!" and that if he or she completes the "To-Do List," he or she will "lock-in your savings." An example of this screen appears below. [image omitted]. In truth, many consumers who see these representations are later rejected during the back-end review even if they complete all the tasks on the "To-Do List."

**ANSWER**: LendingClub admits that the screenshot included in paragraph 40 is an incomplete excerpt of a version of the auto refinancing application flow on LendingClub's platform, but denies that the screenshot "deceptively represent[s] to consumers that they will receive loans." The screenshot at issue appears as part of a "To-Do List" that, by its nature—and along with other disclosures to the consumer—signals that the application review process is ongoing. LendingClub admits that some prospective borrowers are denied loans through LendingClub even if they complete all the tasks of their "To-Do List."

Except as expressly admitted, LendingClub denies the allegations in paragraph 40.

41. Defendant was aware that many consumers believed that they were already approved for loans when, in fact, they were not. Defendant's training materials list "What does that mean? I thought I was approved" as a commonly asked question that customer service representatives should expect to hear, as shown in the screenshot below. [image omitted]. In addition, Defendant received numerous complaints from consumers who were rejected after Defendant had led them to believe that their loans were forthcoming and that they were already approved, including some who did not seek other credit or turned down offers from Defendant's competitors because they believed that they had already obtained a loan from Defendant.

**ANSWER**: LendingClub does not know the number or percentage of individuals being referred to with the allegation that "many customers believed that they were already approved," and denies the allegation on that basis.

LendingClub denies that its "training materials list 'What does that mean? I thought I was approved' as a commonly asked question that customer service representatives should expect to hear." The language quoted in paragraph 41 of the FAC appears in a 219-page "Introduction to Operations" training presentation covering many aspects of LendingClub's operations. Page 117 lists "What does that mean? I thought I was approved." as a possible question that a borrower could ask about his or

her application denial. Nothing in the cited training materials supports the FAC's allegation that this question is "commonly asked," particularly in connection with a prospective borrower's receipt of the emails described in paragraphs 36 and 37. In fact, fewer than 10 prospective borrowers have complained to LendingClub about the denial of a personal loan application after they received one of the emails referenced in paragraphs 36 and 37.

Except as expressly admitted, LendingClub denies the allegations in paragraph 41.

**DEFENDANT'S UNAUTHORIZED BANK ACCOUNT WITHDRAWALS**

42. Defendant's default method of receiving consumers' scheduled monthly payments is automatic electronic bank account withdrawal via ACH transfer.

**ANSWER**: LendingClub admits the allegations in paragraph 42. Borrowers may elect not to pay through ACH transfer if they wish.

43. In numerous instances, Defendant has withdrawn money from consumers' bank accounts without consumers' authorization, or in amounts in excess of the amount consumers authorized Defendant to withdraw.

a. In numerous instances, Defendant has charged consumers double payments without authorization, improperly withdrawing consumers' monthly payments twice in one month.

b. In numerous other instances, Defendant has automatically withdrawn consumers' monthly payment amount even after those consumers have already paid off their loans.

c. In numerous other instances, when consumers have asked Defendant to stop automatic ACH withdrawals because they wished to pay by check or use a different bank account, Defendant has disregarded those requests and continued to charge consumers via automatic withdrawal anyway.

**ANSWER**: LendingClub admits that, in spite of its rigorous processes for preventing erroneous ACH drafts, inadvertent errors—including double payments and charging of customers who cancelled automatic payments—have occasionally occurred, in very small numbers, during the course of the tens of millions of ACH payments processed by LendingClub since 2015. Unlike many other

companies that service consumer debt, LendingClub allows borrowers to change the dates on which their monthly payments are due and to pay off their loans early without a prepayment penalty.  Such changes to the borrowers' payment schedules can be made online on LendingClub's website or over the phone by contacting LendingClub.  The vast majority of the rare payment-processing errors resulted from reasonable mistakes—sometimes by LendingClub personnel, and other times by borrowers themselves or third parties—in processing such changes to borrowers' loans.

Based on LendingClub's internal tracking processes, between 2015 and 2017, LendingClub made 1,456 withdrawal errors affecting borrowers, compared with 1.8 million personal loans initiated and tens of millions of payments processed during this same time period—resulting in an error rate of far less than 1%.

Except as expressly admitted, LendingClub denies the allegations in paragraph 43.

44.    Since July 2016, consumers have reported to their banks that Defendant has made at least 3,850 unauthorized withdrawals, more than 2,000 of which occurred in the last twelve months prior to September 2018 alone, averaging hundreds of dollars per consumer.  In addition, from 2015 to 2017, hundreds of consumers contacted Defendant to complain about its unauthorized withdrawals. Most consumers only learn of Defendant's unauthorized charges when they check their bank statements, or when they learn that their accounts have been overdrawn.  The total number of Defendant's unauthorized withdrawals is likely higher than the number of reports and complaints, because not all consumers who experience unauthorized withdrawals formally report or complain.

**ANSWER**:    LendingClub lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 44 and on that basis denies such allegations.  LendingClub notes, however, that it has facilitated origination of approximately 1.4 million personal loans and processed tens of millions of payments between July 2016 and September 2018.  If, as the FAC alleges, LendingClub made 3,850 unauthorized withdrawals during this time period, LendingClub's error rate would be far less than 1%.

45.    These unauthorized withdrawals have been a persistent issue over time: in at least twenty-one of the last twenty-four months, Defendant has made more than one hundred withdrawals that consumers have reported to their banks as unauthorized, and in six of those months, Defendant has

made more than two hundred such withdrawals.  These numbers are comparable to or worse than those of three of the nation's largest loan servicers, even though those companies service three to four times as many loans as Defendant does.

**ANSWER**:   Upon information and belief, the three "largest loan servicers" referenced in paragraph 45 refer to servicers of student loans.  LendingClub denies that the rates at which these unnamed servicers experience allegations of unauthorized withdrawals is a relevant benchmark regarding whether LendingClub experiences such allegations at an unusually high rate.  First, many of the alleged instances of unauthorized withdrawals by LendingClub have been false.  The referenced loan services may not experience the same rate of false allegations, particularly because student loans (unlike personal loans issued through LendingClub) are not dischargeable, even in bankruptcy. Second, it is widely understood within the industry that higher credit-risk borrowers are more likely to falsely claim that ACH withdrawals are erroneous, and borrowers served by the referenced loan servicers may be, on average, more creditworthy than borrowers who obtain loans through LendingClub.  Third, the referenced loan servicers may not offer borrowers the flexibility to modify their payment schedule which, as noted above, is a leading cause of payment-processing errors.  If the referenced loan services do not offer such flexibility, their transactional record is not an apt comparison for a company like LendingClub that does offer such flexibility.  For these and other reasons, the records of the unnamed loan servicers referenced in paragraph 45 of the FAC may not be comparable to LendingClub's record and in no way indicate that the rate of unauthorized withdrawal allegations asserted against LendingClub is excessive or indicative of any form of unfair practice on LendingClub's part.

LendingClub lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 45 and on that basis denies such allegations.

46.   Consumers who have suffered an unauthorized withdrawal by Defendant are injured in the amount of the missing money.  And as a result of Defendant's unauthorized charges, many consumers incur additional injury, such as paying overdraft fees or being unable to pay other bills because they do not have access to the money that Defendant improperly withdrew.

**ANSWER**: LendingClub denies that inadvertent erroneous withdrawals by LendingClub have caused injury to borrowers "in the amount of the missing money." Amounts withdrawn by LendingClub—even in the rare event of erroneous withdrawals—are applied to the outstanding balance on the borrowers' loans and, thus, inure directly to the borrower's benefit, dollar-for-dollar. In addition, LendingClub has automatically processed refunds of any amounts paid in excess of outstanding balances.

LendingClub admits that the rare erroneous withdrawals by LendingClub have sometimes resulted in borrowers incurring overdraft fees. In reported instances of erroneous withdrawals by LendingClub, LendingClub's general practice is to refund the borrowers the erroneously withdrawn amount and/or any overdraft fees incurred by the borrower. Indeed, LendingClub has often refunded overdraft fees even when the allegedly unauthorized withdrawal was not caused by a LendingClub error, as a courtesy and effort to build goodwill.

LendingClub lacks knowledge or information sufficient to form a belief about the truth of the allegation that some borrowers are "unable to pay other bills because they do not have access to the money that" LendingClub erroneously withdrew and on that basis denies the allegation. Except as expressly admitted, LendingClub denies the allegations in paragraph 46.

47. Defendant's internal documents highlight the issue of taking money from consumers' bank accounts without authorization. Defendant's monthly complaint reporting reflected a growing number of complaints about the payoff process and about payment processing more generally. In addition, Defendant's own payments department self-reported increasing numbers of such transactions.

**ANSWER**: LendingClub denies the allegations in paragraph 47. LendingClub's compliance department tracks the number of complaints that the company has received from borrowers regarding payment processing. From 2015 through 2017, LendingClub received 475 complaints related to ACH withdrawals, 298 of which related to double payments, post-payment withdrawals, or post-stop payment situations described in paragraph 43 of the FAC. LendingClub initiated 1.8 million personal loans and processed tens of millions of payments during this time period. Moreover, over the same time period, the total volume of LendingClub personal loans and payments processed increased substantially. As such, even if the number of complaints increased, the rate of complaints did not.

**DEFENDANT'S GRAMM-LEACH-BLILEY ACT ("GLB ACT") VIOLATION**

48. Defendant is a financial institution subject to the GLB Act, as that term is defined by Section 509(3)(A) of the GLB Act, 15 U.S.C. § 6809(3)(A), because, among other things, Defendant services loans. 12 C.F.R. § 225.28(b)(1). Defendant collects nonpublic personal information, as defined by 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1)-(3), such as Social Security numbers and bank routing information. Because Defendant is a financial institution that collects nonpublic personal information, it is subject to the requirements of the GLB Privacy Rule, 16 C.F.R. Part 313, and Reg. P., 12 C.F.R. Part 1016.

**ANSWER**: LendingClub admits that it collects nonpublic personal information from prospective borrowers who apply for a loan through LendingClub. The remaining allegations in paragraph 48 state only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 48, except as expressly admitted.

**PRIVACY RULE AND REG. P**

49. The Privacy Rule, which implements Sections 501-503 of the GLB Act, 15 U.S.C. §§ 6801-6803, was promulgated by the Federal Trade Commission on May 24, 2000, and became effective on July 1, 2001. 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the Consumer Financial Protection Bureau ("CFPB") became responsible for implementing the Privacy Rule, and promulgated the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. Part 1016 ("Reg. P"), which became effective on October 28, 2014. Defendant's conduct is governed by the Privacy Rule prior to October 28, 2014, and by Reg. P after that date. The GLB Act authorizes both the CFPB and the Federal Trade Commission to enforce Reg. P. 15 U.S.C. § 6805.

**ANSWER**: Paragraph 49 contains only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 49.

50. Both the Privacy Rule and Reg. P require financial institutions to provide consumers with an initial and annual privacy notice. Both the initial and annual privacy notices must be "clear and conspicuous," 16 C.F.R. § 313.3(b) and 12 C.F.R. § 1016.3(b), and must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. §§ 313.4 and 313.5 and 12 C.F.R. §§ 1016.4 and 1016.5. The privacy notice must include specified elements, including the categories of

nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the security and confidentiality policies of the financial institution. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. A financial institution must provide its privacy notice so that each consumer can reasonably be expected to receive actual notice. 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. For consumers who conduct transactions electronically, a consumer can "reasonably be expected to receive actual notice" if he or she acknowledges receipt of the notice as a necessary step to obtaining the financial product or service. 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9; Privacy of Consumer Financial Information, 65 Fed. Reg. 33646-01, at 33665-66 (May 24, 2000).

**ANSWER**:    Paragraph 50 contains only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 50.

51.    Defendant failed to comply with the requirements of the Privacy Rule and Reg. P. Specifically, Defendant failed to deliver the initial privacy notice so that each customer can reasonably be expected to receive actual notice. 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. For example, until at least the end of 2016, Defendant did not require customers to acknowledge receipt of the notice as a necessary step to obtaining a particular financial product or service. 16 C.F.R. § 313.9, and Reg. P, 12 C.F.R. § 1016.9. Instead, Defendant required customers to agree only to Defendant's Terms of Use, which itself included only a link to Defendant's privacy policy. In order to reach the privacy notice that Defendant was required to provide to customers, a customer would need to click on a link that did not indicate it was related to privacy, and then further find a link to Defendant's privacy policy within the lengthy document to which the link led. Customers were not provided a clear and conspicuous privacy notice before they submitted nonpublic personal information to Defendant.

**ANSWER**: LendingClub denies that it failed to comply with the requirements of the Privacy Rule and Reg. P by "fail[ing] to deliver the initial privacy notice so that each customer can reasonably be expected to receive actual notice." At all relevant times, a link to LendingClub's Privacy Policy labeled "Privacy" has been shown, among other places, at the top of each page in the personal loan application process, next to its logo. Further, since December 2016, LendingClub has required all prospective borrowers to check a box acknowledging the Privacy Policy as a necessary step to

completing a personal loan application through LendingClub. Even before December 2016, LendingClub required prospective borrowers to check a box agreeing to its Terms of Use, which included a consent to the Privacy Policy, as a necessary step to completing a personal loan application through LendingClub.

Except as expressly admitted, LendingClub denies the allegations in paragraph 51.

52. Customers were only provided a link leading directly to the notice after they had applied for a personal loan. Defendant's own compliance group had recommended repeatedly that the company require customer acknowledgment in the years prior to the 2016 change.

**ANSWER**: LendingClub denies that "[c]ustomers were only provided a link leading directly to the notice after they had applied for a personal loan." At all relevant times, a link to LendingClub's Privacy Policy labeled "Privacy" has been shown, among other places, at the top of each page in the loan application process, next to its logo.

LendingClub admits that two memoranda dated December 4, 2015 and June 30, 2016 concluded that LendingClub's Privacy Policy delivery procedure complied with applicable regulations but "noted an opportunity for enhancement" by separately "provid[ing] a link to the Privacy Policy and a checkbox to agree to it"—a recommendation that LendingClub adopted in or around December 2016.

Except as expressly admitted, LendingClub denies the allegations in paragraph 52.

## VIOLATIONS OF THE FTC ACT

53. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

**ANSWER**: Paragraph 53 contains only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 53.

54. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**ANSWER**: Paragraph 54 contains only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 54.

55. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**ANSWER**: Paragraph 55 contains only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 55.

**Count I**

**Deception: Up-Front Fee**

56. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of unsecured loans, Defendant has represented, directly or indirectly, expressly or by implication that consumers will not be charged any hidden fees in connection with receiving a specific "loan amount."

**ANSWER**: LendingClub admits that it has previously used advertisements containing the truthful statements that loans available through LendingClub have "no hidden fees." Except as expressly admitted, LendingClub denies the allegations in paragraph 56.

57. In truth and in fact, in numerous instances in which Defendant has made these representations, consumers have been charged a hidden up-front fee that is deducted from the "loan amount."

**ANSWER**: LendingClub denies the allegations in paragraph 57.

58. Therefore, Defendant's representations set forth in Paragraph 54 of this Complaint are false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**ANSWER**: LendingClub denies the allegations in paragraph 58.

**Count II**

**Deception: Certainty of Loan Approval**

59. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of loans, after consumers completed loan applications and Defendant conducted its front-end review of their applications, but before it had made a final decision whether to

approve their loans, Defendant has represented, directly or indirectly, expressly or by implication, that those consumers would receive loans.

**ANSWER**: LendingClub denies the allegations in paragraph 59.

60. In fact, in numerous instances in which Defendant has made these representations, Defendant later made a final decision during the back-end review process not to approve the loans and consumers therefore did not receive loans.

**ANSWER**: LendingClub denies the allegations in paragraph 60.

61. Therefore, the making of the representations as set forth in Paragraph 57 of this Complaint constitutes a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**ANSWER**: LendingClub denies the allegations in paragraph 61.

**Count III**

**Unfairness: Unauthorized Charges**

62. In numerous instances, Defendant has withdrawn money from borrowers' bank accounts without borrowers' authorization, or in amounts in excess of borrowers' authorization.

**ANSWER**: LendingClub admits that, in spite of its rigorous processes for preventing erroneous ACH drafts, inadvertent errors—including double payments and charging of customers who cancelled automatic payments—have occasionally occurred, in very small numbers, during the course of the tens of millions of ACH payments processed by LendingClub. Except as expressly admitted herein, LendingClub denies the allegations in paragraph 62.

63. Defendant's actions have caused substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

**ANSWER**: LendingClub denies the allegations in paragraph 63.

64. Therefore, Defendant's practices as described in Paragraph 60 above constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

**ANSWER**: LendingClub denies the allegations in paragraph 64.

**Count IV**

**Violations of the Gramm-Leach-Bliley Act ("GLB Act")**

**Privacy Rule and Reg. P**

65.      As described in Paragraph 48, the Privacy Rule and Reg. P require financial institutions to provide customers with a clear and conspicuous privacy notice that accurately reflects the financial institution's privacy policies and practices.  Further, financial institutions must deliver the privacy notice so that each customer could reasonably be expected to receive actual notice.

**ANSWER**:      Paragraph 65 contains only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 65.

66.      Defendant is a financial institution, as defined in Section 509(3)(A) of the GLB Act, 15 U.S.C. § 6809(3)(A).

**ANSWER**:      Paragraph 66 contains only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 66.

67.      As set forth in Paragraph 49, Defendant failed to deliver the initial privacy notice so that each customer could reasonably be expected to receive actual notice.  Therefore Defendant violated the Privacy Rule, 16 C.F.R. § 313.9, and Regulation P, 12 C.F.R. § 1016.9.

**ANSWER**:      LendingClub denies the allegations in paragraph 67.

**CONSUMER INJURY**

68.      Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and the Privacy Rule.  In addition, Defendant has been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**ANSWER**:      LendingClub denies the allegations in paragraph 68.

**THIS COURT'S POWER TO GRANT RELIEF**

69.      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies

paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

**ANSWER**: Paragraph 69 contains only legal conclusions to which no response is required. To the extent a response is required, LendingClub denies the allegations in paragraph 69.

**DEFENSES AND AFFIRMATIVE DEFENSES**

Without assuming any burden of proof that it would not otherwise bear, LendingClub asserts the following defenses and affirmative defenses:

1. The FAC fails to state a claim upon which relief can be granted.

2. The FTC has failed to provide constitutionally adequate fair notice of the asserted statutory requirements for the challenged practices at issue.

3. The FAC and this lawsuit are ultra vires because they were approved only by two Commissioners, which does not constitute a quorum under the FTC Act.

4. The FTC's claims are barred because LendingClub's conduct is not unlawful in that LendingClub complied with applicable statutes and regulations.

5. The FTC is equitably estopped from bringing Count I because LendingClub relied on and complied with the FTC's and CFPB's Truth in Lending Act regulations and guidance.

6. The FTC is judicially estopped from seeking monetary remedies because the APR provided in the Truth in Lending Act disclosure in the personal loan application flow on LendingClub's platform accurately represents the APR associated with loans available through LendingClub.

7. Counts I and II fail to state a claim because the alleged misrepresentations would not have misled a reasonable consumer.

8. LendingClub's acts and statements were fair and reasonable and were performed in good faith based on all the relevant facts known to LendingClub. LendingClub acted with a good faith belief that it had good cause and/or legitimate business reasons to act as it did and did not directly or indirectly perform any acts that would constitute a violation of consumers' rights. As a consequence, the FTC is not entitled to any monetary relief whatsoever.

9.      LendingClub's statements were not material in the determination by borrowers to take out a loan via LendingClub's platform.

10.     The FTC is not authorized to seek monetary remedies pursuant to Section 5 or Section 13(b) of the FTC Act.

11.     The FTC is not authorized to seek disgorgement, restitution, or any monetary remedy that is penal, as opposed to compensatory in nature.  If the FTC is authorized to obtain such monetary remedies, the FTC is limited by the five-year statute of limitations in 28 U.S.C. § 2462.  This statute states that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."  28 U.S.C. § 2462.  In *Kokesh v. Securities and Exchange Commission*, the United States Supreme Court held that disgorgement sought by the Securities and Exchange Commission constituted a "penalty," and was therefore subject to the five-year statute of limitations.  For similar reasons, the FTC's demand for restitution is a "penalty," and "forfeiture" subject to § 2462's limit.  The FTC filed this suit on April 25, 2018, so even if restitution is an appropriate form of relief, which LendingClub denies, the FTC cannot recover restitution for the period prior to April 25, 2013.

12.     The claims in the FAC are barred because consumers have not suffered any actual injury or damage as a result of any conduct alleged as a basis of this lawsuit.

13.     The claims in the FAC are barred because any alleged injury to consumers was reasonably avoidable by consumers themselves and/or because the consumers failed to take reasonable steps to mitigate their damages, if any.

14.     The FTC's requested monetary relief, if any, is subject to offset by the refunds paid to consumers and other benefits obtained by consumers.

15.     The claims in the FAC are barred because any alleged injury to consumers was outweighed by countervailing benefits to consumers or to competition.

16.     The FTC lacks statutory authority to pursue the claims in the FAC because LendingClub is not violating or about to violate the law.

17. The FTC is not entitled to injunctive relief for the claims in the FAC because the alleged conduct is not "ongoing or likely to recur."

18. The FTC's claim for injunctive relief is barred as moot because the allegedly unfair practices, if any, have, by the FTC's own admission, ceased and are not likely to recur.

19. Count III is barred because the unauthorized withdrawals alleged in the FAC were authorized.

LendingClub reserves the right to amend this Answer to assert such other affirmative defenses as may become apparent subsequent to the filing of this Answer, whether in discovery, at trial, or otherwise.

**PRAYER FOR RELIEF**

WHEREFORE, defendant LendingClub prays that this Court enter judgment in its favor and enter an order:

A. Dismissing Plaintiff FTC's claims with prejudice;

B. Denying all relief requested in the FAC by Plaintiff FTC;

C. Awarding Defendant LendingClub's costs of suit, including reasonable attorneys' fees; and

D. Awarding LendingClub such other relief as the Court may deem just and proper.

Dated: November 13, 2018

Respectfully submitted,

By: /s/ *M. Sean Royall*

M. SEAN ROYALL (*pro hac vice*)
sroyall@gibsondunn.com
BETTY X. YANG (*pro hac vice*)
byang@gibsondunn.com
BRETT S. ROSENTHAL (*pro hac vice*)
brosenthal@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
Telephone: 214.698.3100
Facsimile: 214.571.2900

BRIAN M. LUTZ (SBN #255976)
blutz@gibsondunn.com
AVERY E. MASTERS (SBN #306703)
amasters@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8379
Facsimile: 415.374.8474

RICHARD H. CUNNINGHAM (*pro hac vice*)
rhcunningham@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1801 California Street
Denver, CO 80202-2642
Telephone: 303.298.5752
Facsimile: 303.298.5907

*Attorneys for Defendant*