M. Sean Royall (admitted *pro hac vice*)
Rachael A. Rezabek (SBN 298711)
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone: (214) 972-1770
Facsimile: (214) 972-1771
Email: sean.royall@kirkland.com
Email: rachael.rezabek@kirkland.com

Richard H. Cunningham (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 389-3119
Facsimile: (202) 389-5200
Email: rich.cunningham@kirkland.com

A. Katrine Jakola (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: kjakola@kirkland.com

Attorneys for Defendant
*LendingClub Corporation*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>   Plaintiff,<br><br>  v.<br><br>LENDINGCLUB CORPORATION, d/b/a<br>Lending Club,<br><br>   Defendant. | CASE NO: 5:18-CV-02454-JSC<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge: Hon. Jacqueline Scott Corley<br>Dept.: San Francisco Courthouse, Ctrm. E<br>Date: April 27, 2020<br>Time: 9:00 a.m. |

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF ISSUES TO BE DECIDED ................................................................2

INTRODUCTION ........................................................................................................2

STATEMENT OF UNDISPUTED FACTS .................................................................4

    A.    LendingClub's Business ................................................................4

    B.    LendingClub's Automatic Payment Option ..................................5

    C.    LendingClub's Privacy Policy Disclosures ...............................10

    D.    Procedural History ......................................................................12

LEGAL STANDARD..................................................................................................13

ARGUMENT ..............................................................................................................14

I. ....... LENDINGCLUB'S AUTOMATIC ACH PAYMENT PRACTICES ARE
NOT UNFAIR ............................................................................................................14

    A.    LendingClub's Automatic Payment Processes Do Not Cause
"Substantial Harm" .....................................................................16

    B.    Borrowers Using LendingClub Could Reasonably Avoid Erroneous
Automated Withdrawals ..............................................................20

    C.    The Benefits of LendingClub's Automatic Payment Option Far
Outweigh Its Costs for Borrowers ..............................................21

II. ...... LENDINGCLUB UPDATED ITS PRIVACY POLICY DISCLOSURES
YEARS AGO, AND THERE IS NO EVIDENCE THAT IT IS LIKELY TO
REVERT TO ITS PRIOR PRACTICES ....................................................................23

CONCLUSION ..........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Davis v. HSBC Bank Nev., NA*,
   691 F.3d 1152 (9th Cir. 2012) ........................................................................................20, 21

*Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*,
   764 F.2d 604 (9th Cir. 1985) .................................................................................................13

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
   771 F.3d 1119 (9th Cir. 2014) ...............................................................................................13

*FTC v. Accusearch Inc.*,
   570 F.3d 1187 (10th Cir. 2009) .............................................................................................23

*FTC v. Amazon.com, Inc.*,
   2:14-cv-01038-JCC (W.D. Wash. July 10, 2014) ...........................................................15, 16

*FTC v. Amazon.com, Inc.*,
   No. C14-1038-JCC, 2016 WL 10654030 (W.D. Wash. July 22, 2016) ...........................15, 23, 25

*FTC v. Crescent Publ'g. Grp. Inc.*,
   129 F. Supp. 2d 311 (S.D.N.Y. 2001).....................................................................................17

*FTC v. D-Link Sys., Inc.*,
   No. 3:17-cv-00039-JD, 2017 WL 4150873 (N.D. Cal. Sept. 19, 2017) ..............................14, 20

*FTC v. Direct Benefits Grp.*,
   2013 WL 3771322 (M.D. Fla. July 18, 2013) ........................................................................20

*FTC v. Direct Mktg. Concepts, Inc.*,
   1:04-cv-11136-GAO (D. Mass. June 1, 2004).........................................................................15

*FTC v. Direct Mktg. Concepts, Inc.*,
   589 F. Supp. 2d 285 (D. Mass. 2008) .....................................................................................16

*FTC v. Evans Prods. Co.*,
   775 F.2d 1084 (9th Cir. 1985) ............................................................................................4, 23

*FTC v. Johnson*,
   96 F. Supp. 3d 1110 (D. Nev. 2015) .......................................................................................16

*FTC v. Kennedy*,
   574 F. Supp. 2d 714 (S.D. Tex. 2008) ....................................................................................20

*FTC v. Neovi, Inc.*,
   604 F.3d 1150 (9th Cir. 2010) ..........................................................................................16, 19

*Hutchinson v. United States,*
   838 F.2d 390 (9th Cir. 1988) ...........................................................................................17

*Jewel v. Nat'l Sec. Agency,*
   No. C 07-00693 JSW, 2015 WL 545925 (N.D. Cal. Feb. 10, 2015) .............................13

*Marchetti v. Treman,*
   985 F.2d 573 (9th Cir. 1993) ...........................................................................................18

*In re Oracle Corp. Sec. Litig.,*
   627 F.3d 376 (9th Cir. 2010) ...........................................................................................13

*Torres v. Nutrisystem, Inc.,*
   289 F.R.D. 587 (C.D. Cal 2013) ......................................................................................23

*Troiano v. Supervisor of Elections Palm Beach Cty.,*
   382 F.3d 1276 (11th Cir. 2004) .......................................................................................24

*United States v. W.T. Grant Co.,*
   345 U.S. 629 (1953) .........................................................................................................23

**Statutes**

15 U.S.C. §§ 45(a), 45(n) ....................................................................................... *passim*

**Rules**

Federal Rule of Civil Procedure 56(a) ...........................................................................1, 13

GLBA Privacy Rule .................................................................................................................24

**Other Authorities**

ESIGN Act ............................................................................................................................10

FTC Policy Statement on Unfairness (1980) .....................................................................16

Gramm-Leach-Bliley Act ......................................................................................................3

J. Howard Beales, *The FTC's Use of Unfairness Authority: Its Rise, Fall, and Resurrection* .................................................................................................................16

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE** that at 9:00 a.m. on April 27, 2020, or as soon thereafter as the matter may be heard before the Honorable Jacqueline Scott Corley, United States Magistrate Judge for the Northern District of California, Defendant LendingClub Corporation ("Defendant") will and hereby does move for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) on Counts III and IV of Plaintiff Federal Trade Commission's First Amended Complaint. Summary judgment on these counts is warranted because there is no genuine dispute as to any material fact and Defendant is entitled to judgment as a matter of law.

This Motion is based on this Notice of Motion and Motion, the descriptions of the undisputed facts and legal points and authorities below, the attached Declaration of Richard H. Cunningham in Support of Defendant's Motion for Partial Summary Judgment (the "Cunningham Decl."), the papers on file in this matter, the arguments of counsel, and any other matters the Court wishes to consider.

Dated February 27, 2020                     Respectfully submitted,

                                            /s/  M. Sean Royall
                                            M. Sean Royall (admitted *pro hac vice*)
                                            KIRKLAND & ELLIS LLP
                                            1601 Elm Street
                                            Dallas, TX 75201
                                            Telephone: (214) 972-1770
                                            Facsimile: (214) 972-1771
                                            Email: sean.royall@kirkland.com

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether LendingClub is entitled to summary judgment on Count III of the First Amended Complaint considering that federal law requires the FTC to satisfy each of three statutory elements to establish that a practice is "unfair"—*i.e.*, substantial injury to consumers, not reasonably avoidable by consumers, that is not outweighed by countervailing benefits—and yet the undisputed evidence shows that in percentage terms very few borrowers who obtained loans through LendingClub were affected by erroneous unauthorized ACH withdrawals; those that were affected suffered little or no net harm; LendingClub's rate of unauthorized withdrawals was far below the relevant industry benchmarks; and LendingClub's ACH withdrawal services provided significant benefits to consumers.

2.      Whether LendingClub is entitled to summary judgment on Count IV of the First Amended Complaint where the only relief the agency seeks is an injunction, and yet it is undisputed that the practices sought to be enjoined were voluntarily discontinued well over three years ago, in December 2016, and there is no evidence suggesting a reasonable likelihood of recurrence.

**INTRODUCTION**

The FTC's First Amended Complaint ("FAC") asserts four claims.  Although LendingClub strongly believes that Counts I and II lack merit and should be resolved in its favor, the company is not moving for judgment on either claim at this time and believes both claims should be resolved by the Court at trial.  As for Counts III and IV, however, LendingClub submits that with respect to these claims there are no genuine factual disputes and the company is entitled to judgment as a matter of law.  It therefore moves for summary judgment on Counts III and IV.

Count III relates to LendingClub's practice of permitting borrowers to make loan payments directly from their bank accounts using Automated Clearing House ("ACH") withdrawals, a convenience LendingClub has provided to borrowers since before 2013, and one that reduces costs both for borrowers (who avoid the expense of obtaining, writing, and mailing checks) and for LendingClub (which avoids the cost of processing paper checks).  Count III asserts that LendingClub's policies and practices relating to ACH withdrawals are "unfair" under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), because "[i]n numerous instances, Defendant has withdrawn money

from borrowers' bank accounts without borrowers' authorization, or in amounts in excess of borrowers' authorization."  FAC ¶ 62.  However, the undisputed facts show that LendingClub maintains robust processes to avoid ACH withdrawal errors, its processes comport with all applicable industry and regulatory standards, and LendingClub's error rate is far beneath the thresholds used by the standards-setting authority in the industry to identify potentially inadequate practices.  In the latter regard, data obtained by the FTC from the National Automated Clearing House Association ("NACHA"), which regulates and administers the standards governing ACH withdrawals, show that LendingClub's monthly NACHA unauthorized return rate for ACH withdrawals averaged ██████ approximately ████ of the 0.50% threshold that NACHA currently uses to spot potentially inadequate ACH practices and ████████ the overall average error rate for NACHA members.  These figures refute the FTC's allegation that LendingClub's processes and procedures for automated ACH withdrawals are inadequate, let alone "unfair" in violation of the FTC Act.  The undisputed facts also show that when LendingClub learns that it made a mistake resulting in an erroneous ACH withdrawal, the company offers the borrower a prompt refund of the full amount of the erroneous withdrawal, plus any associated overdraft fees.  These and other undisputed facts discussed below show that the company's ACH withdrawal practices are not, as a matter of law, "unfair."

Count IV relates to LendingClub's past practices with respect to delivering consumer privacy notices and asserts that, prior to the "end of 2016," LendingClub violated the Gramm-Leach-Bliley Act ("GLBA") Privacy Rule and Regulation P by failing to "require customers to acknowledge receipt of the [company's privacy] notice as a necessary step to obtaining" a loan through the platform.  FAC ¶ 51.  LendingClub is entitled to summary judgment on this claim because there is no likelihood of this conduct recurring, making an injunction (the only relief the FTC seeks) inappropriate.  As the FAC makes clear, the FTC does not challenge LendingClub's privacy practices as of or after the "end of 2016."  *Id.*  It is undisputed that by that time—specifically, December 2016—LendingClub implemented a recommendation from its internal compliance department by voluntarily changing its privacy notice disclosure practices to its current approach, which the FTC accepts as compliant.  It is also undisputed that this change was recommended before the FTC opened its pre-complaint investigation in this matter and was completed nearly a year before the FTC first signaled

1   any concerns about this issue, and roughly a year and a half before the FTC filed its complaint in this

2   case.  Given these undisputed facts, LendingClub submits that it is entitled to summary judgment,

3   because the FTC cannot show "a likelihood of recurrence" and therefore cannot prevail on this claim

4   as a matter of law.  *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985).

5   **STATEMENT OF UNDISPUTED FACTS**

6   **A.    LendingClub's Business**

7   LendingClub is a Delaware corporation headquartered in San Francisco, California.  LC 10-

8   K, at i (2017).  Since 2007, it has operated an award-winning online peer-to-peer lending platform

9   that connects borrowers and investors.  *See* Cunningham Decl. ¶¶ 3-4.  Through LendingClub's

10  platform, consumers can apply for and obtain personal loans underwritten and issued by a third-party

11  bank, WebBank.  *See id.* at ¶ 5.  LendingClub then facilitates the purchase of interests in the loans by

12  retail and institutional investors, creating a two-sided platform.  *See, e.g.*, LendingClub 2017 Form

13  10-K, p. 4.  Although not itself a lender, LendingClub services the loans, manages customer service,

14  and acts as an intermediary between borrowers and investors.  *See id.*  To date, over three million

15  individuals have used LendingClub's platform to obtain loans worth, in aggregate, more than $43

16  billion.  *See* Cunningham Decl. ¶ 6.

17  LendingClub's business model is to provide borrowers with convenient access to loans at

18  costs lower than are often available through traditional lenders or other lending platforms.  *See, e.g.*,

19  LendingClub 2017 Form 10-K, pp. 4-5.  The unsecured personal loans facilitated by LendingClub's

20  online platform help address the needs of consumers seeking to make major purchases or refinance

21  debt, often high-cost, revolving credit card debt.  *See* Cunningham Decl. ¶¶ 7-9.  For such consumers,

22  LendingClub-facilitated loans provide lower cost, closed-end (three- or five-year term) credit they

23  can more easily repay, eliminating the burden of long-term, revolving, high-interest debt.  *See id.*  In

24  2017, the Federal Reserve Bank of Philadelphia reported that "LendingClub's consumer lending

25  activities have penetrated into areas that could benefit from additional credit supply … [and have]

26  provided credit access to consumers at a lower cost."  *Id.* at ¶ 10 (identifying article).  By creating an

27  innovative online platform connecting borrowers and investors, LendingClub has expanded the

28  unsecured credit options available to consumers nationwide.

### B.   LendingClub's Automatic Payment Option

As the servicer for personal loans facilitated through its platform, LendingClub offers borrowers the option to make loan payments by check or by automated ACH withdrawal directly from their bank accounts.  Most borrowers—more than 95%—prefer the convenience and lower cost of automated withdrawals.  *See* Cunningham Decl. ¶ 11.  The application flow on LendingClub's platform requires borrowers to select their initial payment method, and LendingClub maintains records of each borrower's consent for automated withdrawals.  *See id.* at ¶¶ 12-13.  LendingClub's policy does not permit the initiation of automated withdrawals absent that consent.  *See id.* at ¶ 13.  The terms applicable to loans available through LendingClub allow borrowers to switch payment methods at any time and provides borrowers with significant flexibility to manage the timing and amount of their loan payments to fit their preferences.  *See id.* at ¶¶ 14-16.  Among other things, borrowers can:

- make extra payments whenever they please to reduce the outstanding principal on their loan;

- change the date on which their monthly payment is due; and

- delay their monthly payment by up to 15 days beyond its due date, without penalty, in the form of a "grace delay."

*See id.*  LendingClub permits borrowers to access these options through multiple customer service access points, including by email, letter, phone, and an online self-service portal.  *See id.* at ¶¶ 17-18.

Unsurprisingly, providing customers the flexibility to change payment methods, due dates, and even delay payments without incurring a penalty adds complexity when it comes to managing payments through LendingClub's platform and, as is the case with virtually every organization that processes payments, there is always some possibility of inadvertent errors, many of them caused by actions the borrower took.  *See* Cunningham Decl. ¶¶ 19-21.  For instance, when a borrower calls to push back an automated withdrawal by a few days, on rare occasions a customer service representative may mistakenly schedule a withdrawal for the new date without canceling the previously scheduled withdrawal, resulting in a duplicate payment the borrower does not intend or expect.

1    Duplicate payments can also result from borrower errors.[1] For example, if a borrower initiates

2 a payment using LendingClub's self-service portal while another payment is already in process in the

3 ACH system, a duplicate payment can occur. *See* Cunningham Decl. ¶ 25. Likewise, if a borrower

4 mails a check to make a payment when a previously scheduled automated withdrawal is about to

5 occur, LendingClub's receipt of the check and initiation of the automated withdrawal may occur

6 almost simultaneously, resulting in duplicate payments. *See id.*[2] Of course, these types of issues

7 could be avoided if borrowers were not permitted to make additional payments or change the date or

8 method of their payments, but this would deprive borrowers of the valued flexibility these options

9 provide.

10    Recognizing the potential for human errors, LendingClub has established and maintained a

11 range of practices and procedures throughout the relevant time period to minimize their occurrence:



12    ●

13        *See* Cunningham ¶¶ 28-30.

14                                            *See id.*

15    ●

16                                            *See id.* at ¶¶ 31-32.

17                                    *See id.*

18

19 _____

20 [1] Payment issues also sometimes arise as a consequence of the payment practices of third parties. For example, JP Morgan Chase for some period of time maintained a practice of "pre-debiting"

21 automated withdrawals, in effect treating the withdrawal as occurring the day before it was scheduled to take place. *See* Cunningham Decl. ¶¶ 22-23. This practice caused some overdrafts

22 by borrowers on LendingClub's platform, who, believing Chase would debit the account on the payment due date, drew on their accounts the day before payment, resulting in overdrafts. *See id.*

23 Although it has no control over Chase's pre-debiting practice, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Cunningham Decl. ¶ 24.

24 [2] Both of the FTC's declarants who provided testimony relating to Count III described situations of this nature. FTC ▮▮▮▮▮▮▮▮▮▮▮ scheduled a payment on May 13, and later

25 scheduled another payment on May 12 without canceling the May 13 payment. *See* Cunningham Decl. ¶ 26. ▮▮▮▮▮▮▮ forgot about the May 13 payment and intended to pay only once, but

26 nothing indicated to LendingClub that he did not intend to make both payments, given that he was late on his bills and most customers who make multiple payments intend to do so. *See id.*

27 FTC Declarant ▮▮▮▮▮▮▮▮▮ intended to pay off her loan early by writing and mailing in a check, but did not notify LendingClub, so LendingClub received the payoff on the same day

28 that her monthly payment was scheduled, resulting in the duplicate payment. *See* Cunningham Decl. ¶ 27.

- ███████████████████████████████████████████
  ██████*See id.* at ¶ 33.███████████████████████
  ████████████████*See id.* at ¶¶ 33-34.█████████
  ████████████████████████████████*See id.*███
  ██████████████████████*See id.*███████████████
  ████████████████████████████████████*See id.* at
  ¶¶ 33, 35.

- ███████████████████████████████████████████
  █████████*See id.* at ¶¶ 36-37.█████████████████
  ████████████████████████████nt plans, and if they fail
  to improve within sixty days, are subject to possible termination. *See id.*

LendingClub retained Charles Grice, a consultant with more than thirty years of experience advising financial institutions, including retail banks, investment banks, and mortgage companies, on regulatory and risk management matters. *See* Cunningham Decl. ¶ 38. Mr. Grice examined the company's practices relating to ACH withdrawals and submitted an expert report in this case explaining his analyses and conclusions in detail. Based on his experience "consulting with financial institutions on electronic payment systems," "review of the LendingClub ACH transaction data and practices addressed in the FTC's First Amended Complaint," and "review of the case record," Mr. Grice concluded that "LendingClub's ACH unauthorized returns and practices accord with industry standards and regulatory compliance benchmarks from 2013 to the present." *Id.* at ¶ 39. Mr. Grice further concluded that "LendingClub has prudently managed and monitored its use of the ACH Network." *Id.* These conclusions are unrebutted and not in dispute.[3]

In light of LendingClub's use of practices that comport with industry and regulatory standards, it is unsurprising that the company's rate of unauthorized withdrawals is extremely low relative to relevant industry benchmarks. The National Automated Clearing House Association ("NACHA"), the organization that sets standards for the ACH Network and regulates automated withdrawals made using the Network, maintains data on unauthorized return rates and using such data sets thresholds to identify potentially problematic practices by members of the ACH Network. *See* Cunningham

---

[3]   Mr. Grice submitted his report on November 15, the date on which affirmative experts were due pursuant to the Court's scheduling order, and the FTC elected not to submit a rebuttal report.

Decl. ¶ 40. Currently, NACHA uses an unauthorized return rate of 0.50% as the threshold for evaluating ACH Network participants (until September 2015, NACHA used 1.00% as this threshold). *See id.* During the twenty-four month period referenced in the FAC (October 2016 to September 2018), *see* FAC ¶ 45, LendingClub initiated approximately ███████ automated withdrawals per month from borrower accounts. *See* Cunningham Decl. ¶ 41. Over the same period, NACHA characterized between ███ and ███ LendingClub-initiated withdrawals per month as unauthorized, which translates to a rate of between ██████ and ██████ or an average rate of ██████.[4] *See id.* ¶¶ at 41-42 (identifying data analyses performed by Mr. Grice). The chart below, from Exhibit 3 to Mr. Grice's Report, depicts this data.

| Month | ACH Payments | Unauthorized Return Count | Unauthorized Return Rate[5] |
|---|---|---|---|
| Apr. 2017 | ██████ | ████ | ██████ |
| May 2017 | ██████ | ████ | ██████ |
| Jun. 2017 | ██████ | ████ | ██████ |
| Jul. 2017 | ██████ | ████ | ██████ |
| Aug. 2017 | ██████ | ████ | ██████ |
| Sept 2017 | ██████ | ████ | ██████ |
| Oct. 2017 | ██████ | ████ | ██████ |
| Nov. 2017 | ██████ | ████ | ██████ |
| Dec. 2017 | ██████ | ████ | ██████ |
| Jan. 2018 | ██████ | ████ | ██████ |
| Mar. 2018 | ██████ | ████ | ██████ |
| Apr. 2018 | ██████ | ████ | ██████ |
| May 2018 | ██████ | ████ | ██████ |
| Jun. 2018 | ██████ | ████ | ██████ |
| Jul. 2018 | ██████ | ████ | ██████ |

---

[4] LendingClub's internal data shows even lower error rates, consistent with the fact that the company's internal tracking allows it to distinguish situations involving clear borrower error and fraudulent claims by borrowers that withdrawals were not authorized when in fact they were (NACHA data includes such transactions). *See* Cunningham Decl. ¶¶ 43-44. According to the company's internal tracking, from August 2014 to August 2019, the date range for which data is available, LendingClub processed approximately ████████ payments and made ████ errors that impacted consumers—these figures imply an error rate of ████████ *See id.* at ¶ 44.

[5] The notes accompanying Exhibit 3 in Mr. Grice's report explain these figures, including that the unauthorized return rates are calculated on a two-month basis consistent with NACHA guidance.

| Month | ACH Payments | Unauthorized Return Count | Unauthorized Return Rate[5] |
|---|---|---|---|
| Aug. 2018 | ██████ | ███ | ████ |
| Sep. 2018 | ██████ | ███ | ████ |
|  |  | Average: | ████ |

LendingClub's ████ average rate was about █/█ of NACHA's 0.50% threshold.   In addition, NACHA publicly reported that the average rate of unauthorized ACH returns across all transactions on the ACH Network during calendar year 2016 was 0.03%.[6]  *See* Cunningham Decl. ¶ 45.  Accordingly, LendingClub's ████ average rate of unauthorized ACH returns was ████ of the 2016 NACHA network average.

As Mr. Grice has explained, the 0.50% NACHA unauthorized ACH return threshold and 0.03% NACHA network average rate are the relevant metrics against which to assess LendingClub's ACH error rate.  *See* Cunningham Decl. Exh. 7 (Grice Rep.) at n. 268.  And notably, when NACHA in 2014 first proposed to reduce its unauthorized return threshold from 1.00% to 0.50%, the FTC's Bureau of Consumer Protection staff expressly endorsed the proposed change, stating it would "provide a useful tool for payment process, banks, and NACHA to identify conduct that falls substantially outside the norm that legitimate businesses experience."  *Id.* at ¶ 46.

Notwithstanding that LendingClub's rate of unauthorized withdrawal errors is very low, when the company becomes aware of an error, its policy and practice is to fully and promptly address it. First, LendingClub offers a refund to the borrower of the entire amount of the erroneously withdrawn payment.  *See* Cunningham Decl. ¶ 47 (identifying LendingClub interrogatory response).  Second, LendingClub also reimburses the borrower for any overdraft fees, late fees, or other fees caused by the erroneous withdrawal.  *Id.* at ¶¶ 48-51.  Finally, in instances in which the borrower does not request a refund, erroneous ACH withdrawals are credited against the outstanding loan balance, ensuring that the borrower obtains the full benefit of the payment.[7]  *Id.* at ¶ 52.

---

[6]   NACHA has not reported this information for other recent years, except for 2013 when the rate was also 0.03%.  *See* Cunningham Decl. ¶ 45.

[7]   If the borrower's loan is fully paid off, LendingClub remits any excess to the borrower automatically, irrespective of whether the borrower requests a refund.  *See* Cunningham Decl. ¶ 53.

C.      **LendingClub's Privacy Policy Disclosures**

At all relevant times, LendingClub has maintained a comprehensive Privacy Policy, and the FTC does not challenge the content of this policy or LendingClub's adherence to its terms. *See* FAC ¶¶ 48-52, 65-67. Rather, the FTC challenges the manner in which LendingClub disclosed its Privacy Policy to borrowers prior to the "end of 2016." *Id.* at ¶ 51. It does not challenge the manner in which LendingClub has disclosed its Privacy Policy from the end of 2016 forward.

Since December 2016, LendingClub has required all borrowers to click a box acknowledging that they have "read and agree to" the policy in order to advance in the loan application process. *See* Cunningham Decl. ¶¶ 54-55 (identifying LendingClub interrogatory response). A screenshot of this page is shown below (the blue text "Terms Of Use," Privacy Policy," ESIGN Act Consent," and "Credit Profile Authorization" were (and remain) links to those respective documents):



In addition, LendingClub presents a link to the Privacy Policy at the top of each separate page within the online loan application process. *See* Cunningham Decl. ¶ 54. Below is a screenshot of the "Privacy" link on the toolbar at the top of each page of the online application flow.

LendingClub also provided an additional link on the "Check Your Rate" page on LendingClub's website. Cunningham Decl. ¶ 55. Finally, once a customer is approved and a loan issues, LendingClub emails the borrower a copy of its Privacy Policy, and then also sends an annual update email each year with the then-current Privacy Policy on the anniversary of the loan. *See id.* at ¶ 56.

Prior to December 2016, LendingClub used similar disclosures of its Privacy Policy, except that instead of requiring customers to independently acknowledge receipt of the Privacy Policy, LendingClub required customers to consent to its Terms of Use, which in turn incorporated a consent to the Privacy Policy. *See* Cunningham Decl. ¶¶ 57, 59. The screenshot below (the relevant language is highlighted) shows an example of the Privacy section of LendingClub's pre-December 2016 Terms of Use.

**Privacy**

Please review the Site's Privacy Policy. By using the Site or the Service, you are consenting to the Privacy Policy and agree to have your personal data transferred to and processed in the United States. We may listen to and/or record phone calls between you and our representatives without notice to you as permitted by applicable law. For example, we listen to and record calls for quality monitoring purposes.

The December 2016 changes in LendingClub's Privacy Policy disclosure practices were initiated by LendingClub's internal compliance department, nearly two years before the company became aware of the FTC's position embodied in Count IV of the FAC. In December 2015, LendingClub's ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████. *Id.* ██████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████ *See id.* at ¶ 59. LendingClub ██████████████ ███████████████ and launched the updated disclosure process in December 2016, again before LendingClub became aware of the FTC's position. *See id.* at ¶¶ 60-61. In short, LendingClub initiated changes to its Privacy Policy disclosures practices on its own accord, independent of any action or threatened action by the FTC.

The record contains no evidence even remotely suggesting that LendingClub has considered or would ever contemplate returning to its pre-December 2016 Privacy Policy disclosure practices. And in the FTC's deposition of LendingClub's corporate designee on the topic of "policies, analyses,

1    and assessments regarding compliance with . . . the Privacy Rule and Regulation P," no such facts

2    were elicited.  *See* Cunningham Decl. ¶ 62.

3        **D.    Procedural History**

4        The FTC began investigating LendingClub in late May 2016 following the company's public

5    disclosure to investors of potential misconduct by its then-CEO unrelated to the issues in this case.

6    *See* Cunningham Decl. ¶ 63.  From July 2016 until approximately June 2017, LendingClub responded

7    to the requests for documents and information in the FTC's civil investigative demand ("CID") and

8    responded to follow-up questions from the agency.  *See id.* at ¶ 64.  In December 2017, approximately

9    six months after LendingClub's final production of information in response to the CID, the FTC sent

10   LendingClub a draft complaint and consent order communicating that the agency's staff intended to

11   recommend that the Commissioners commence an enforcement action against LendingClub.  *See id.*

12   at ¶ 65.  The draft complaint included five counts.  *See id.*  Following receipt of the draft complaint

13   and order, LendingClub engaged in extensive correspondence with the FTC, both to respond to new

14   information requests and address the claims the FTC staff was then considering.  *See id.* at ¶ 66.

15       On April 25, 2018, the FTC filed the complaint that initiated this suit.  The complaint included

16   four of the five claims previously included in the draft complaint.  In June 2018, LendingClub moved

17   to dismiss.  Dkt. No. 23.  On October 3, 2018, this Court granted that motion in part, dismissing Count

18   III with leave to amend because the FTC's complaint did not include "sufficient facts alleging

19   substantial injury."  Dkt. No. 53 at 22.  The Court did not dismiss Count IV, explaining that "the

20   complaint provides no allegations regarding any violations after 2016, but also no allegations as to

21   why the violations ceased after 2016."  *Id.* at 25.

22       In response to the Court's decision, the FTC on October 22, 2018 filed the FAC.  As regards

23   Count IV, the FAC is virtually identical to the initial complaint.  With respect to Count III, the FTC

24   added the allegations that, "[s]ince July 2016, consumers have reported to their banks that Defendant

25   has made at least 3,850 unauthorized withdrawals," and "from 2015 to 2017, hundreds of consumers

26   contacted Defendant to complain about its unauthorized withdrawals."  FAC ¶ 44.  The FTC also

27   added allegations that consumers report more than 100 or 200 unauthorized withdrawals per month,

28

which is "comparable to or worse than those of three of the nation's largest loan servicers."  FAC ¶ 45.

LendingClub filed an answer to the FAC, and in keeping with the Court's scheduling orders, *see* Dkt. Nos. 93, 126, discovery has been ongoing since October 2018.  At this time, fact and expert discovery are virtually complete.[8]

## LEGAL STANDARD

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and the dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The moving party bears the initial burden of identifying the absence of a genuine issue of material fact, but once it has met this burden the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  *Jewel v. Nat'l Sec. Agency*, No. C 07-00693 JSW, 2015 WL 545925, at *2 (N.D. Cal. Feb. 10, 2015).  The nonmoving party's "burden is not a light one," as it "must show more than the mere existence of a scintilla of evidence" or "some 'metaphysical doubt' as to the material facts at issue."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citations omitted).  If the nonmoving party does not meet this burden, the moving party is "entitled to judgment as a matter of law."  *Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*, 764 F.2d 604, 612 (9th Cir. 1985).

---

[8]   To LendingClub's knowledge, the only outstanding discovery matter relates to four documents reflecting the results of FDIC examinations/audits of WebBank (the issuer of the loans available through LendingClub's platform) occurring in 2009, 2013, 2014, and 2018.  In a privilege log produced by the FTC to LendingClub on January 29, 2020, the FTC identified these documents and stated that it was withholding them in their entirety on the basis of the "Bank Examination Privilege."  Cunningham Decl. ¶ 67 & Exh. 24 (FTC privilege log).  Shortly after receiving the log, LendingClub requested a conference of counsel and explained during the subsequent conference its belief that the privilege assertion was unjustified in its entirety or, at minimum, overbroad.  *See id.* at ¶ 67.  In response, on February 19, 2020, the FTC produced redacted copies of these documents and represented that all information relating to LendingClub was unredacted.  *See id.*  LendingClub is currently reviewing these documents, and may supplement the expert report of Mr. Charles Grice, an expert on the regulations and industry compliance standards applicable to financial institutions, to incorporate and address this newly produced evidence.

## ARGUMENT

### I.   LENDINGCLUB'S AUTOMATIC ACH PAYMENT PRACTICES ARE NOT UNFAIR

Count III alleges that "[i]n numerous instances, Defendant has withdrawn money from borrowers' bank accounts without borrowers' authorization" by "charg[ing] consumers double payments," "automatically withdraw[ing] consumers' monthly payment amount even after those consumers have already paid off their loans," and "continu[ing] to charge consumers via automatic withdrawal" after "consumers have asked [LendingClub] to stop automatic ACH withdrawals because they wished to pay by check or use a different bank account."  FAC ¶¶ 43, 62.  The FAC further alleges that "[s]ince July 2016, consumers have reported to their banks that [LendingClub] has made at least 3,850 unauthorized withdrawals" and that LendingClub's monthly number of unauthorized withdrawals was "comparable to or worse than those of three of the nation's largest loan servicers, even though those companies service three to four times as many loans as" LendingClub.  *Id.* at ¶¶ 44-45.  The FAC contends that this alleged conduct is "unfair" pursuant to Section 5 of the FTC Act, 15 U.S.C. §§ 45(a), 45(n).  The record evidence does not support this claim.

When Congress conferred authority upon the FTC to pursue enforcement actions attacking "unfair" practices, it felt the need to circumscribe the agency's charge, and to prescribe the specific elements that must be satisfied to constitute a violation.  For the FTC to establish that conduct is "unfair," it must establish each of the following three statutory requirements:  "[i] substantial injury to consumers which [ii] is not reasonably avoidable by consumers themselves and [iii] not outweighed by countervailing benefits to consumers or to competition."  15 U.S.C. § 45(n).  *See, e.g.*, *FTC v. D-Link Sys., Inc.*, No. 3:17-cv-00039-JD, 2017 WL 4150873, at *5 (N.D. Cal. Sept. 19, 2017).  The FTC cannot meet these standards here, and the undisputed facts show that LendingClub is entitled to judgment as a matter of law.

To begin with, the FAC attempts to focus this claim not on LendingClub's provision of ACH withdrawal services, but far more narrowly on "*unauthorized* ACH withdrawals."  FAC ¶¶ 43, 62 (emphasis added).  However, the pertinent question is whether LendingClub's relevant business practices may properly be viewed as constituting an "unfair "practice.  This requires a focus on the

company's relevant business practices as a whole, meaning its provision of ACH withdrawal services, understanding that errors can and do occur in connection with such services, as well as the steps the company takes to address, mitigate, and avoid such errors.  Focusing solely on errors as the relevant conduct at issue, rather than examining such errors in the context of the relevant business practices and the scale of the transactions processed as a whole, would depart radically from the statutorily prescribed balancing test contemplated by 15 U.S.C. § 45(n).  Indeed, such an approach to assessing unfairness claims would be tantamount to a strict liability rule inasmuch as it would focus solely on the undesirable effects of inadvertent, and highly infrequent, errors, without considering the considerable consumer benefits of ACH transactions, a financial transaction vehicle that is used in one way or another by the majority of Americans for things like automatic bill payments and direct paycheck deposits.

Hence, in prior cases in which the FTC has pursued unfairness claims based on the consumer impact of unauthorized billing, courts have examined the totality of the relevant facts and circumstances, including the policies and procedures surrounding the billing practices at issue.  For example, in *FTC v. Amazon.com, Inc.*, the FTC alleged that "[i]n numerous instances" Amazon "billed parents and other Amazon account holders" for in-app purchases by children "without having obtained the account holders' express informed consent" in violation of the FTC Act's prohibition on "unfair" practices.  *FTC v. Amazon.com, Inc.*, 2:14-cv-01038-JCC, Dkt. No. 1, ¶¶ 33-35 (Complaint) (W.D. Wash. July 10, 2014).  Yet when the court adjudicated the claim, it evaluated the entirety of Amazon's "business practices around in-app purchases," rather than focusing solely on the allegedly unauthorized charges.  *FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030, at *6 (W.D. Wash. July 22, 2016).  Among other things, the *Amazon* court's analysis included an examination of the disclosures and billing processes applicable to all in-app purchases and reached conclusions based on "the design of the Appstore and procedures around in-app purchases" more generally.  *Id.* at *8.  Likewise, in *FTC v. Direct Marketing Concepts*, the FTC alleged that "automatic shipments" of a dietary supplement "billed to consumers' credit or debit cards without the consumers' authorization" constituted an "unfair" practice.  *FTC v. Direct Mktg. Concepts, Inc.*, 1:04-cv-11136-GAO, Dkt. No. 1, ¶ 44 (Complaint) (D. Mass. June 1, 2004).  When evaluating the Commission's

1   motion for summary judgment on this claim, the court once again did not focus solely on the allegedly

2   unauthorized transactions, but instead examined whether, viewed as a whole, the defendant's

3   "*autoship program* had the purpose or effect of enrolling consumers without their consent."   *FTC*

4   *v. Direct Mktg. Concepts, Inc.*, 589 F. Supp. 2d 285, 305 (D. Mass. 2008) (emphasis added).   As

5   *Amazon.com*, *Direct Marketing Concepts*, and similar cases show, the unfairness standard requires

6   an examination of the programs and/or practices that lead to billing errors as a whole.   It does not

7   permit the Commission to simply isolate the errors themselves and condemn them as unfair practices.

8   That approach would improperly sidestep the balancing of considerations that is central to the

9   statutory unfairness test.   *See, e.g.*, FTC Policy Statement on Unfairness (1980) ("The Commission

10   is aware" of the "tradeoffs" inherent in business practices and "will not find that a practice unfairly

11   injures consumers unless it is injurious in its *net effects*." (emphasis added)), *available at,*

12   https://www.ftc.gov/public-statements/1980/12/ftc-policy-statement-unfairness.[9]

13       The undisputed facts show that LendingClub's practices and procedures relating to automated

14   ACH withdrawals, viewed as a whole, do not meet any of the required elements of the statutory

15   unfairness standard.

16       **A.    LendingClub's Automatic Payment Processes Do Not Cause "Substantial Harm"**

17       To meet the first element of the unfairness standard, the FTC must show that LendingClub's

18   practices relating to automated withdrawals caused "substantial harm," which, as the Court noted in

19   its motion to dismiss ruling, exists where the conduct imposes a "small harm [on] a large number of

20   people, or if it raises a significant risk of concrete harm."   Dkt. No. 53, at 23 (citing *FTC v.Neovi,*

21   *Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010), and *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1151 (D. Nev.

22   2015)) (internal quotation marks omitted).   Here, the record shows that very few unauthorized

---

[9]   *See also* J. Howard Beales, *The FTC's Use of Unfairness Authority: Its Rise, Fall, and Resurrection*, 22 J. of Pub. Pol'y & Mktg. 192 (2003) (in this article, Professor Beales, a former Director of the FTC's Bureau of Consumer Protection and a leading consumer protection law scholar, questions the appropriateness of condemning instances of "misbilling" under the unfairness prong of the FTC Act, noting that it is inevitable in large billing systems that "errors … will occur," and stressing the importance of "carefully analyz[ing] each individual case," including "the countervailing benefits" to consumers associated with the billing practices at issue).

1   withdrawals occur, and that when LendingClub learns of such errors, it promptly and fully remediates

2   them.

3           As noted above, NACHA data shows that LendingClub initiated between ▉ and ▉ ACH

4   withdrawals per month that borrowers reported to their banks as unauthorized.  *See* pp. 8-9, *supra*.

5   Over the same period, LendingClub initiated approximately ▉▉▉ ACH withdrawals per month,

6   on average.  *See id.*  These data show that LendingClub's average monthly NACHA unauthorized

7   return rate was ▉▉▉ and that its *highest* rate in any month for which data is available was less than

8   ▉▉▉   *See id.*

9           It is beyond reasonable debate that this rate is low in comparison to the relevant benchmarks.

10  NACHA's threshold for "problematic originating practices"—which the FTC itself endorsed in

11  commentary to NACHA, *see* p. 9, *supra*—is 0.50%.  LendingClub's ▉▉▉ ACH error rate

12  is ▉▉▉▉▉ than this threshold and also falls significantly beneath the 0.03% NACHA

13  network average for unauthorized ACH returns.  Mr. Grice explained that these are the appropriate

14  benchmarks against which to evaluate LendingClub's rate of ACH withdrawal errors.  *See* p. 9, *supra*;

15  *see also FTC v. Crescent Publ'g. Grp. Inc.,* 129 F. Supp. 2d 311, 315-16, 322 (S.D.N.Y. 2001) (using

16  thresholds specified by the credit card networks to evaluate the rates at which consumers dispute

17  charges on their accounts).  Moreover, Mr. Grice explained why the FAC's comparison between

18  LendingClub's error rate and that of three student loan services, *see* FAC ¶ 45, is inapt, "given that

19  LendingClub and the student loan services make different types of products available to consumers

20  and service different types of borrowers."  Cunningham Decl. Exh. 7 (Grice Rep.) at ¶ 166.[10]  The

21  FTC offered no rebuttal to Mr. Grice's testimony.  Accordingly, the undisputed record establishes

22  that LendingClub's rate of ACH errors is far beneath the relevant standards.  *See, e.g.*, *Hutchinson v.*

23  *United States*, 838 F.2d 390, 393 (9th Cir. 1988) ("when [a] defendant supports [a] motion for

---

[10]  In any case, because the FTC did not produce information regarding the total number of ACH withdrawals initiated by these three student loan servicers, a comparison of their error rates to LendingClub's error rate is impossible.  *See* Cunningham Decl. Exh. 7 (Grice Rep.) at ¶ 166. Hence, there are no facts in the record supporting the FTC's notably vague assertion in the FAC that the ACH error rates of the student loan services are lower.  *See* FAC ¶ 45 ("These numbers," referring to LendingClub's alleged ACH error count over a six-month period, "are comparable to or worse than those of three of the nation's largest loan servicers, even though those companies service three to four times as many loans as [LendingClub] does.").

summary judgment with the declarations of experts, a plaintiff who has presented no expert evidence concerning the required standard of care has failed to make sufficient showing that there are genuine factual issues for trial"); *Marchetti v. Treman*, 985 F.2d 573, *1-2 (9th Cir. 1993) (affirming summary judgment for defendant in light of plaintiff's "failure to submit any expert evidence to refute [defendant's] expert testimony," stating, "in a motion for summary judgment, expert declarations must be met by expert declarations").

It is also uncontroverted (and beyond reasonable dispute) that examining the *rate* of unauthorized withdrawals, as opposed to the *number* of such withdrawals, is the appropriate way to evaluate whether such withdrawals are indicative of procedural inadequacies. As Mr. Grice explained:

> Evaluating the *volume* (i.e., simple counts) of LendingClub's unauthorized returns does not provide any meaningful insights about the appropriateness of LendingClub's use of the ACH Network. What matters to NACHA and other stakeholders reviewing ACH data, and thus what I typically evaluate during my supervision of bank examinations, is the *rate* of unauthorized returns—the number of unauthorized returns within a given period relative to the total number of ACH payments originated during the same period—rather than simply observing the count of ACH unauthorized returns.

Cunningham Decl. Exh. 7 (Grice Rep.) at ¶ 163 (emphasis in original).

The logic for focusing on the rate of unauthorized withdrawals relative to the raw number of such withdrawals is straightforward: looking at the raw number alone would erroneously imply that organizations like LendingClub that initiate a large volume of ACH withdrawals maintain less effective practices simply due to their size, even when their practices are, in fact, extremely effective at preventing erroneous unauthorized withdrawals. *See* Cunningham Decl. Exh. 7 (Grice Rep.) at ¶ 163 (unrebutted testimony that "the larger the number of transactions performed by a financial institution, the higher the number of unauthorized returns that may arise," meaning that "to get an accurate understanding of the likelihood of unauthorized returns to arise, it is necessary to evaluate the number of unauthorized returns per volume of ACH payments rather than a simple count of unauthorized returns in isolation"). Hence, the rate, rather than raw count, is the appropriate measure by which to assess the efficacy and adequacy of LendingClub's practices and procedures regarding

ACH withdrawals, and there is no genuine dispute that LendingClub's rate of erroneous unauthorized ACH withdrawals is very low—indeed, much lower than the benchmark used by the relevant standard-setting authority in the industry and lower than the average rate among all other NACHA network members.

LendingClub's low rate of ACH errors is strong evidence in itself that the company's policies and procedures relating to ACH transactions and avoiding unauthorized withdrawals are appropriate and robust, and is independently sufficient to establish as a matter of law that LendingClub's business practices are not "unfair." Examining LendingClub's error prevention practices directly likewise reveals their thoroughness and reasonableness. As explained above, LendingClub employs procedural cross-checks to catch and correct erroneous payments before they occur. *See* pp. 6-7, *supra*. LendingClub trains its customer service representatives and monitors its employees, including monthly spot checks. *See id.* Employees who perform poorly receive coaching, and if they fail to improve, are fired. *See id.* LendingClub has every incentive to maintain such robust policies and procedures. Unauthorized ACH withdrawals not only create a poor borrower experience (something that is antithetical to LendingClub's business interests), but in addition impose business costs on LendingClub associated with tracking, investigating, and remediating each unauthorized transaction. *See* Cunningham Decl. ¶ 68.

Although LendingClub's efforts have resulted in an error rate much lower than the NACHA average, *see* pp. 8-9, *supra*, mistakes inevitably occur within LendingClub and all comparable organizations. When the company becomes aware of such mistakes, it is uncontested that LendingClub's policy is to offer the borrower a full refund. *See id.* LendingClub also reimburses overdraft fees, insufficient funds fees, late fees, and other costs incurred by borrowers caused by the erroneous withdrawal. *See id.*

These facts, which have not been contested by the FTC, show that LendingClub's automated ACH processes do not impose a "small harm [on] a large number of people" nor "a significant risk of concrete harm" on a smaller group of people. Dkt. No. 53 at 23 (quoting *Neovi, Inc.*, 604 F.3d at 1157) (internal quotations omitted). Unlike other FTC unfairness cases in which the FTC, to satisfy the substantial injury requirement, has stressed that all or substantially all of the consumers using the

challenged product or service suffer an injury, in this case LendingClub's error rate is remarkably low, meaning that "a large number of people" were not harmed. *See FTC v. Direct Benefits Grp.*, 2013 WL 3771322, at *13 (M.D. Fla. July 18, 2013) (finding substantial injury where "[e]ach consumer who was enrolled in the [defendants'] discount programs" suffered harm) (emphasis added). Moreover, there was not a "significant risk of concrete harm" to even the small percentage of affected consumers. As discussed above, *supra* at p. 9, LendingClub's policy and practice is to refund erroneous payments and reimburse overdraft fees or other charges paid by the borrower as the result of an ACH withdrawal error, such that the "net" harm to affected consumers was in most cases non-existent. And, as the FTC has demonstrated from its own past cases, it is the "net" harm, if any, that matters.[11] *See, e.g.*, *Direct Benefits Grp.*, 2013 WL 3771322, at *13 (finding substantial injury where "*after accounting for* returns, refunds, and chargebacks" there was still a total net consumer harm of $9.5 million) (emphasis added); *see also id.* at *10 (emphasizing not the total but rather "the *net revenue* to Defendants" after deducting for refunds, etc.) (emphasis added). Where, as here, there is no material risk of concrete consumer injury, much less harm to large numbers of consumers, courts have not hesitated to find that the "substantial harm" requirement is not satisfied as a matter of law. *See, e.g.*, *D-Link Sys.*, 2017 WL 4150873, at *5 (dismissing FTC complaint for pleading "a mere possibility of injury at best" and contrasting cases "that have survived motions to dismiss" where "hundreds of thousands of consumers" allegedly incurred millions of dollars in aggregate harm).

### B. Borrowers Using LendingClub Could Reasonably Avoid Erroneous Automated Withdrawals

To establish the second statutory requirement for an unfairness claim, the FTC must show that the alleged harm "is not reasonably avoidable by consumers themselves." 15 U.S.C. § 45(n). Here, the undisputed evidence shows that LendingClub provides all borrowers with the option to pay

---

[11] Courts consider the impact of the defendant's refund practices under both the "substantial injury" and "reasonable avoidability" prongs. *Compare FTC v. Kennedy*, 574 F. Supp. 2d 714, 720 (S.D. Tex. 2008) (evaluating refund under the substantial injury prong) *with Davis v. HSBC Bank Nev., NA*, 691 F.3d 1152, 1168-69 (9th Cir. 2012) (evaluating refund under the avoidability prong). In either approach, if the defendant's refund practices remediate the injury caused by the challenged practice, such that there is no substantial net loss to consumers, the legal standard for unfairness is not met, even without analysis of whether the benefits of the practice outweigh the harm pursuant to the third prong of the unfairness standard. *See, e.g.*, *Davis*, 691 F.3d at 1168-69 (holding that an injury is reasonably avoidable because a refund fully repaid the annual fee if consumer cancelled credit card within 90 days).

through automated ACH withdrawals or by check, and they can change their choice at any time. *See* p. 5, *supra*. This option provides borrowers with the opportunity to make a "free and informed choice" to avoid any risk of suffering an erroneous ACH withdrawal. *Davis*, 691 F.3d at 1168. While no borrower knows at the time they select to pay by ACH withdrawal whether they may experience an erroneous withdrawal, like any reasonable consumer, borrowers using LendingClub's platform should be aware that errors can and do occur with automated payment systems. Because LendingClub's error rate here is lower than the 0.03% average unauthorized return rate for ACH transactions, the risk borrowers are subject to when they select LendingClub's automatic payment option is no greater than borrowers "have reason to anticipate." *Id.* at 1168-69. The indisputable fact that consumers have the ability to protect themselves against possible ACH withdrawal errors prevents the FTC from satisfying the second statutory element of an unfairness claim.

In addition, the fact that borrowers can obtain refunds through an accessible and reasonable process permits borrowers to "mitigat[e] the injury after the fact" and reasonably avoid substantial injury. *See id.* at 1168-69 (citation omitted).[12] In *Davis*, the Ninth Circuit held that the availability of a complete refund "provided 'the means to avoid' the alleged harm," preventing any claim of unfairness. *Id.* at 1169 (harm was avoidable where consumers had the option to avoid the annual fee by canceling credit card within 90 days). And Davis stressed that in this regard "[t]he question" was not "whether subsequent mitigation was convenient or costless, but whether it was 'reasonably possible.'" *Id.* Here, as in *Davis*, the facts show that borrowers who did experience an erroneous withdrawal had the opportunity to be fully reimbursed not only for the withdrawal amount but also for any overdraft fees, late fees, and the like that may have resulted from the erroneous withdrawal. *See*, p. 9, *supra*. In these circumstances, the alleged harm to consumers is "reasonably avoidable" as a matter of law, requiring dismissal of the FTC's unfairness claim.

## C. The Benefits of LendingClub's Automatic Payment Option Far Outweigh Its Costs for Borrowers

Finally, to pursue a statutory unfairness claim the FTC also must show that there are no "countervailing benefits to consumers or to competition" that "outweigh[]" the alleged harm. 15

---

[12] As addressed in footnote 11, *supra*, refunds are relevant to, and analyzed under, both the "substantial injury" and "reasonable avoidability" prongs of the unfairness test.

U.S.C. §45(n).  Here the undisputed facts show that LendingClub's automatic payment option provides several consumer benefits.  To begin with, automated withdrawals save borrowers the cost of obtaining checks and postage to mail those checks to LendingClub, and the time associated with writing and sending checks.  *See* Cunningham Decl. Exh. 7 (Grice Rep.) at ¶ 46.  Scheduled automated ACH withdrawals also help to ensure borrowers make monthly payments on time, avoiding any late fees. *See id.* at ¶ 159.  Automated withdrawals are also less costly for LendingClub to process relative to checks, and the cost savings contributes to LendingClub's overall efficiency, giving the company greater freedom to invest in new product offerings or other aspects of its business that benefit consumers.  *See, e.g.*, Cunningham Decl. ¶ 69.

The flexible payment options that borrowers using LendingClub's platform enjoy provide further benefits as well.  The ability to change monthly payment dates, and to delay making payments during a 15-day "grace period," permits borrowers to align their payments to their personal cash-flow.  This again permits borrowers to avoid late payment fees and decreases the risk of default.  *See* Cunningham Decl. Exh. 7 (Grice Rep.) at ¶ 171.  That borrowers using LendingClub enjoy the freedom to prepay (up to and including the full loan principal) without cost or penalty allows them to avoid future interest costs and to refinance their loans at any time.  These are significant consumer benefits, even though the operational complexity associated with offering these options marginally increases the risk of human errors.  *See id*.  The FTC has presented no evidence or expert testimony questioning these benefits to consumers.

The statutory test for unfairness contemplates that these undisputed benefits must be weighed against the asserted consumer harm, but here, to the extent there is any net consumer harm associated with LendingClub's automated ACH withdrawal practices, it is minimal.  As noted above, errors are very infrequent and LendingClub maintains robust refund and remediation practices that eliminate any harm when errors do occur.  If the borrower's bank account balance is sufficient to cover the erroneous ACH withdrawal, the borrower is not "out" the amount of the withdrawal at all because the amount of the erroneous payment is applied directly to the borrower's outstanding loan balance.  *See* Cunningham Decl. ¶ 70.  The cost-benefit balancing here is thus very straightforward— consumers benefit from LendingClub's automated ACH withdrawal option, while any harm caused

by the option is very small, if it exists at all.  Because the relevant facts in support of that conclusion are all undisputed, summary judgment is also appropriate due to the FTC's inability to satisfy this third statutory requirement.

## II.  LENDINGCLUB UPDATED ITS PRIVACY POLICY DISCLOSURES YEARS AGO, AND THERE IS NO EVIDENCE THAT IT IS LIKELY TO REVERT TO ITS PRIOR PRACTICES

Count IV alleges that LendingClub violated the GLBA's Privacy Rule and Regulation P because the company "failed to deliver [its] initial privacy notice so that each customer could reasonably be expected to receive actual notice."  FAC ¶ 67.  As the Court noted in its ruling on LendingClub's motion to dismiss, these allegations pertain solely to LendingClub's disclosure practices prior to "the end of 2016."  Dkt. No. 53, at 25.  Although the conduct challenged by this claim ended nearly three and a half years ago, the FTC seeks an injunction and no other form of relief. *See* Cunningham Decl. ¶ 71 (identifying FTC's Fourth Amended Initial Disclosures clarifying that the FTC's claim for monetary relief relates only to Count I).

It is well established that the FTC can obtain an injunction only for conduct that is "ongoing or likely to recur."  *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985).  Because there is no dispute that the conduct at issue in Count IV is not "ongoing," the only question is whether it is "likely to recur," *id.*, and on this the FTC bears the burden of proof.  *See, e.g.*, *Amazon.com*, 2016 WL 10654030, at *5 (noting that, to avoid summary judgment, the FTC must establish a likelihood of recurrence).[13]  In order to satisfy this burden, the FTC must show that there is a "cognizable danger of recurrent violation" and "something more than the mere possibility."  *FTC v. Accusearch Inc*., 570 F.3d 1187, 1201 (10th Cir. 2009) (citing *United States v. W.T. Grant Co*., 345 U.S. 629, 633 (1953)). The undisputed facts show that the FTC cannot satisfy that burden here.

The record shows that LendingClub adopted the December 2016 Privacy Policy disclosure changes based on a recommendation from the company's internal compliance group first circulated

---

[13]  The "likely to recur" standard set forth in *Evans Products* applies to requests for injunctive relief. Although it need not reach this issue, the Court could alternatively dismiss Count IV as moot.  As discussed in the Court's motion to dismiss ruling, Dkt. No. 53, p. 25, a claim is moot "if subsequent events show that the activities could not reasonably be expected to recur."  *Torres v. Nutrisystem, Inc.*, 289 F.R.D. 587, 595 (C.D. Cal 2013).  LendingClub submits that the undisputed evidence more than satisfies this standard.

in December 2015, nearly six months before the FTC opened its pre-complaint investigation and two years before the FTC sent LendingClub a draft complaint that included the equivalent of Count IV of the FAC.  *See* p. 11, *supra*.  LendingClub then implemented those changes in December 2016, nearly a year before the FTC indicated a belief that LendingClub's privacy policy disclosure practices failed to comply with the GLBA Privacy Rule, and roughly a year and a half before the FTC filed its complaint.  *See* pp. 10-12, *supra*.

Where, as here, the defendant discontinued the allegedly non-compliant practices prior to the FTC taking any action, the FTC's burden to show a likelihood of recurrence is particularly demanding.  *Evans Products* itself confirms this point.  There, the Ninth Circuit concluded that the challenged conduct was not likely to recur, placing emphasis on the fact that Evans's alleged misconduct ceased "*long before* the FTC's complaint was filed." 775 F.3d at 1088 (emphasis added).  The same is true in this case, and the passage of time here between the voluntary cessation of the challenged practices and the FTC's complaint (approximately 16 months) was comparable to that in *Evans Products*.

There also is no evidence in the record suggesting that LendingClub has, at any point, contemplated returning to its pre-December 2016 disclosure practices.  There is no documentary evidence developed during discovery that supports such a return.  And during the deposition of LendingClub's corporate witness on the topic of "compliance with Privacy Rule and Regulation P," the FTC did not elicit any facts even remotely suggesting that the company has ever contemplated reverting to its pre-December 2016 practices.  *See* pp. 11-12, *supra*.  This weighs heavily against a likelihood of recurrence.  *See, e.g.*, *Troiano v. Supervisor of Elections Palm Beach Cty.*, 382 F.3d 1276, 1285 (11th Cir. 2004) (affirming lower court's dismissal on mootness grounds where policies in question were changed before the lawsuit was filed and had been enforced consistently and concluding that such facts provided "ample evidence" of an "intent" not to reintroduce such policies "in the future").

In ruling upon LendingClub's motion to dismiss, the Court suggested that where the conduct being challenged "has stopped," it would be inappropriate for the FTC to pursue its claim absent "a good faith belief that it is likely to recur."  Dkt. No. 53, p. 21.  Whatever the FTC may have believed

1    when it chose to renew Count IV's challenge to LendingClub's pre-December 2016 Privacy Policy

2    disclosure practices in the FAC, at summary judgment the question is whether "the FTC has

3    established, *with evidence*, a cognizable danger of a recurring violation." *Amazon.com*, 2016 WL

4    10654030, at *5 (emphasis added). Because the FTC has failed to meet this burden, it cannot obtain

5    injunctive relief, and this is proper grounds for summary judgment in LendingClub's favor.

## CONCLUSION

For the reasons stated above, LendingClub respectfully requests summary judgment on Counts III and IV of the FTC's First Amended Complaint.

DATED: February 27, 2020

Respectfully submitted,
KIRKLAND & ELLIS LLP

*/s/ M. Sean Royall*

M. Sean Royall (admitted *pro hac vice*)
Rachael A. Rezabek (SBN 298711)
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone: (214) 972-1770
Facsimile: (214) 972-1771
Email: sean.royall@kirkland.com
Email: rachael.rezabek@kirkland.com

Richard H. Cunningham (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 389-3119
Facsimile: (202) 389-5200
Email: rich.cunningham@kirkland.com

A. Karine Jakola (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: kjakola@kirkland.com

Attorneys for Defendant
*LendingClub Corporation*

1

**<u>CERTIFICATE OF SERVICE</u>**

On February 27, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

*/s/ M. Sean Royall*