ALDEN F. ABBOTT
General Counsel
KATHARINE ROLLER
LEAH FRAZIER
JASON SCHALL
HELEN CLARK
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C.  20580
Phone:  (312) 980-5605
Facsimile:  (415) 848-5184
Email:  kroller@ftc.gov; lfrazier@ftc.gov;
jschall@ftc.gov; hclark@ftc.gov
*Attorneys for Plaintiff Federal Trade Commission*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>     Plaintiff,<br><br>     v.<br><br>LENDINGCLUB CORPORATION,<br><br>d/b/a Lending Club,<br><br>     Defendant. | **Case No. 3:18-cv-02454**<br><br>**PLAINTIFF'S NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM IN SUPPORT THEREOF**<br><br><u>Hearing:</u><br><br>Date: April 27, 2020<br>Time: 9:00 a.m.<br>Courtroom: F<br>Judge: Hon. Jacqueline Scott Corley |

1

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2

PLEASE TAKE NOTICE THAT on April 27, 2020, at 9:00 a.m., or as soon thereafter as

3

the matter may be heard before the Honorable Jacqueline Scott Corley, in Courtroom F, 15th

4

Floor, of the United States District Court for the Northern District of California in the San

5

Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, Plaintiff

6

Federal Trade Commission ("FTC"), will and does move this Court, pursuant to Rule 56 of the

7

Federal Rules of Civil Procedure, for an order granting summary judgment in the FTC's favor on

8

all counts of the FTC's First Amended Complaint.

9

The FTC's Motion is based on this Notice of Motion and Motion, the accompanying

10

Memorandum of Points and Authorities, the concurrently filed Declaration of Katharine Roller

11

with attached Exhibits, any other matters of which the Court may take judicial notice, other

12

documents on file in this action, and any oral argument of counsel.

13

Dated: February 27, 2020

14

/s/ Katharine Roller
KATHARINE ROLLER

15

Federal Trade Commission
230 S. Dearborn Street Room 3030

16

Chicago, IL 60604-1505
Phone: (312) 960-5605

17

Facsimile: (415) 848-5184
Email: kroller@ftc.gov

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................................... 1

I.    Defendant Falsely Told Consumers They Would Receive a Specific Loan Amount With "No Hidden Fees." ................................................................................................. 1

   A.   Defendant's Online Application Flow ................................................................ 1

   B.   Defendant's Advertisements ............................................................................. 6

   C.   The Loan Amount and "No Hidden Fees" Claim Affected Consumers' Behavior ........... 7

   D.   Consumers Complained About the Up-Front Fee ................................................. 8

   E.   Defendant Knew It Was Deceiving Consumers ................................................. 10

   F.   Defendant Collected More Than $2 Billion in Up-Front Fees ............................... 15

II.   Defendant Told Consumers They Were Approved, Then Rejected Them. ................... 15

   A.   The Online Application Told Consumers Their Loans Were "On The Way." ............. 15

   B.   Email Messages Told Consumers Their Loans Were "100% Backed." ...................... 17

   C.   Defendant Rejected Loans That Were "On The Way" Or "100% Backed." ................ 18

   D.   Defendant's Approval Misrepresentations Harmed Consumers ............................. 19

III.  Defendant Made Unauthorized Withdrawals From Consumer Accounts ..................... 19

   A.   Defendant's Unauthorized Withdrawals Have Caused Substantial Injury. .................. 20

   B.   Since at Least 2015, Defendant Has Charged Consumers Twice for the Same Payment. 21

   C.   Defendant Took Unauthorized Payments from Consumers Paying Off Early. ............. 24

   D.   Defendant Took Payments From Consumers Before Their Due Date ......................... 24

   E.   Additional Evidence Indicates Systemic Problems With Unauthorized Charges ......... 25

IV.   Defendant Failed to Adequately Provide an Initial Privacy Notice. ........................... 26

SUMMARY JUDGMENT STANDARD ...................................................................... 26

ARGUMENT ....................................................................................................... 27

I.    Count I: Defendant Deceived Consumers About Loan Terms. ................................. 27

A.   Defendant Misrepresented That Consumers Would Receive a Specific Loan Amount With "No Hidden Fees." ...................................................................... 27

B.   Defendant's Representation Was Likely to Mislead Consumers Acting Reasonably. .. 28

    a.   Defendant's claim was likely to mislead because it was false ............................ 28

    b.   Additional facts demonstrate that Defendant's representation was likely to mislead—and did in fact mislead—many consumers ...................................... 30

C.   Defendant's Representations Were Material ................................................. 32

II.   Count II: Defendant Deceived Consumers About Loan Approval ............................... 34

A.   Defendant Represented That Consumers Were or Would Be Approved. ..................... 34

B.   Defendant's Statements Were Likely to Mislead Consumers Acting Reasonably. ....... 35

C.   Defendant's Representations About Loan Approval Were Material. ........................... 37

III.   Count III: Defendant Withdrew Money from Accounts Without Consent. .................... 37

A.   Defendant's Unauthorized Withdrawals Substantially Injure Consumers. .................... 37

B.   Consumers Could Not Reasonably Avoid the Unauthorized Withdrawals. .................. 39

C.   The unauthorized withdrawals are not outweighed by countervailing benefits. ............ 39

IV.   Count IV: Defendant Violated the GLB Act and Implementing Rules Because It Did Not Disclose or Provide Its Privacy Policy to Applicants. ....................................... 40

V.   Defendant Is Liable for Injunctive and Equitable Monetary Relief. .............................. 40

A.   Injunctive Relief Preventing Future Violations Is Warranted. ....................................... 41

B.   Defendant Must Repay the Hidden Fees It Took From Consumers. ............................. 42

CONCLUSION ............................................................................................................ 45

1

**TABLE OF AUTHORITIES**

2

**Cases**

3   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 27

4   *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................... 27

5   *FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) ............................................ 43

*FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080 (C.D. Cal. 1994)............................ 43

6   *FTC v. Amazon.com, Inc.*, 2016 WL 10654030 (W.D. Wash. July 22, 2016) ..................... 39, 40

7   *FTC v. AMG Servs., Inc.*, 2016 WL 5791416 (D. Nev. Sept. 30, 2016), *aff'd sub nom FTC v.*

8      *AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018) ...................................... 45, 46, 47, 48

9   *FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, (D. Nev. 2014) ........................................ 30, 46

10  *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012) ........................ 32, 45, 46

11  *FTC v. Cyberspace.com*, 453 F.3d 1196 (9th Cir. 2006).......................................... passim

*FTC v. Dantuma*, 748 F. App'x 735 (9th Cir. 2018) .............................................. 48

12  *FTC v. DiscountMetalBrokers Inc.*, 2017 WL 6940502 (C.D. Cal. Oct. 13, 2017) .................... 43

13  *FTC v. EDebitPay, LLC*  2011 WL 486260 (C.D. Cal.  Feb. 3, 2011)........................................ 47

14  *FTC v. EDebitPay, LLC*, 695 F.3d 938 (9th Cir. 2012)........................................................ 47

15  *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993)............................................ 27, 45, 46

16  *FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) ...... 28, 46

17  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) .............................................. 43

18  *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010) .................................. 40, 41, 45

*FTC v. Infinity Grp. Servs.*, 2010 WL 11515164 (C.D. Cal. Sept. 9, 2010)................................ 38

19  *FTC v. Ivy Capital, Inc.*, 2013 WL 1224613 (D. Nev. Mar. 26, 2013) ............................ 37, 45, 48

20  *FTC v. J.K. Publ'ns, Inc.*, 2000 WL 35594143 (C.D. Cal. Aug. 9, 2000) ...................... 33, 40, 41

21  *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp 2d. 1052 (C.D. Cal. 2012)............... 29, 45

22  *FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238 (M.D. Fla. 2016) .............................. 38

23  *FTC v. Lights of Am.*, 2012 WL 13064911 (C.D. Cal. Apr. 25, 2012)................................ 34

24  *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009)........................................ 28

*FTC v. Mortg. Relief Advocates LLC*, 2015 WL 11257575 (C.D. Cal. July 1, 2015)................ 38

25  *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104 (S.D. Cal. 2008) ............................................ 39, 41, 46

26  *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010)................................................ 39, 41

27  *FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994 (D. Nev. 2019) .................................... 43, 46, 47

28  *FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)........................................ 34, 43

*FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008) ....... 28

*FTC v. Sage Seminars*, 1995 WL 798938 (N.D. Cal. Nov. 2, 1995) ............................................ 44

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) .................................................. 27, 28, 30, 45, 46

*FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012) ......................................... 31, 32

*FTC v. Wellness Support Network, Inc.*, 2014 WL 644749 (N.D. Cal. Feb. 19, 2014) ............... 45

*FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) ................................................................... 33

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) ............................ 31

*In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984) ..................................................... 31, 34, 38

*In re Int'l Harvester*, 104 FTC at 1064 n.12 ............................................................................. 39

*In re Thompson Med. Co.*, 104 F.T.C. 648 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986) .......... 28

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992) ....................................................................... 34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................ 27

*Public Utilities Comm'n v. FERC*, 100 F.3d 1451 (9th Cir. 1996) ............................................ 44

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) ................................................ 37

*Rivera v. Philip Morris, Inc.*, 395 F.3d 1142 (9th Cir. 2005) .................................................... 27

*U.S. v. Offices Known as 50 State Distrib. Co.*, 708 F.2d 1371 (9th Cir. 1983) .................... 33, 40

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) ............................................................. 43

**Statutes**

15 U.S.C. § 53(b) ...................................................................................................................... 45

12 U.S.C. § 1843(k) ................................................................................................................... 42

15 U.S.C. § 45 ..................................................................................................................... 27, 39

15 U.S.C. § 6803(a) ................................................................................................................... 42

15 U.S.C. §§ 6801-03 ................................................................................................................ 42

**Rules**

12 C.F.R. § 1016.3(*l*) .................................................................................................................. 42

12 C.F.R. § 1016.4(a) ................................................................................................................ 42

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

I. **Defendant Falsely Told Consumers They Would Receive a Specific Loan Amount With "No Hidden Fees."**

1. From at least 2012 until after this lawsuit was filed, Defendant has stated that consumers will receive a specific loan amount with "no hidden fees." *See* Parts I.A and I.B.

2. When consumers receive their loan proceeds, however, the funds are hundreds or thousands of dollars short of the promised loan amount, because Defendant charges borrowers an up-front fee (called an "origination fee," "marketplace fee," or "program fee") averaging approximately 4.65% of the consumer's loan amount, deducted from borrowers' loan proceeds before those proceeds are disbursed to borrowers' bank accounts. Amended Answer ("Answer"), Dkt. 81, at ¶ 10, 23.

3. Borrowers are obligated to pay the entire loan amount and thus must "repay" the amount they never received and pay interest on it. Answer ¶ 24.

4. More than ▮▮▮▮ borrowers contacted Defendant to ask why they did not receive the full loan amount or to express confusion or anger about the missing money. *See* Part I.D.

5. Defendant was aware that many consumers did not know about the fee, and that this posed a risk to the company under "unfair, deceptive, or abusive acts or practices" ("UDAAP") laws. *See* Part I.E.  Employees, *infra* ¶¶ 60-63; 72-75, business partners, *infra* ¶¶ 71-76; Answer ¶ 26, and auditors, *infra* ¶ 76; Answer ¶ 26, all told Defendant that it should not advertise "no hidden fees" without clearly and conspicuously disclosing the up-front fee.

6. Defendant continued representing that consumers would receive a specific loan amount with no hidden fees until February 2019, and continued expressly stating "no hidden fees" until after the FTC filed this lawsuit in April 2018. PX 203 at 13-15.

A. **Defendant's Online Application Flow**

7. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX 195.

8. On Defendant's homepage, for most of the relevant time period, consumers seeking a personal loan were prompted to enter their desired loan amount in a box labeled "How much do you need?" Due to the up-front fee, consumers would not, however, receive the full amount they entered. Similarly, the homepage said that consumers could receive loans "up

1  to $40,000." Defendant admitted ████████████████████████

2  ████████████████████████████████████████ " PX 15.



9.      The next page of the application has prompted consumers to enter personal

information with the statement: "Get a custom rate for your **$10,000** loan in **1 click**."

10.     The next page is called the "Loan Offer" page:



11.     At the top of the page, Defendant advertised a specific "Loan Amount," the only

item in bold type on the page. To the right, under a smiling masked bandit, Defendant stated,

"No hidden fees." The up-front fee is not mentioned on this page.

12.     Around January 2018, Defendant redesigned this page, but the "No hidden fees"

1   claim and bandit remained, and the fee was still omitted. PX 203 at 11.

2        13.    On the desktop version of the Loan Offer page, next to the small-print word

3   "APR," there is a small green dot—called the "tooltip"—with a white question mark inside.

4   Only if consumers clicked on or hovered over this dot would they see a pop-up explaining how

5   the APR is calculated, and, further down, that Defendant charges each consumer an up-front

6   fee that is deducted from the consumer's loan proceeds.



7

8

9

10

11

12       14.    On the mobile version of this page, the tooltip was presented differently. Instead,

13  if a consumer tapped on the APR—not the word "APR," but the rate itself—the pop-up text

14  would appear. (There is no "hover" ability on a mobile device.)

15

16

17  

18

19

20

21

22

23

24

25

26

27       15.    ███████████████████████████████████████████████████████

28  ████████, PX 49, and ████████████████████████████████████   PX 48.

16.     The fee disclosure "remains hidden" if the tooltip is not activated. PX 194.

17.     Defendant was aware that ███████████████████████████

██████████ *Cf.* PX 194 183:7-22; PX 51. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████ PX 193 77:24-25 and 78:12-15.

18.     Defendant's data regarding tooltip activation—desktop or mobile—███

████████████████████████████████████████ *Compare* PX 33

████████████████████████████ *with* PX 202 ██████████████████

████ *and* PX 50 ██████████████████████[1] ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████.

19.     Earlier versions of the Loan Offer page were materially the same: ███████

████████████████████████████████████████████████████

████████████████████████ PX 1-4.

20.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ PX 52. To consumers, however, Defendant only showed the version of

the page that omitted the fee. PX 203. Similarly, the Loan Offer page for Defendant's *business*

loans has listed the up-front fee. PX 190, PX 191. ████████████████████████████

████████████████████████████████████████████████

████████████████ PX 47. Defendant did not do so. PX 1-6.

21.     If applicants clicked "Get Loan," they arrived at a page requesting additional

personal information, and then reached the Loan Rate & Terms page, also called the "TILA" or

"TIL" page. An exemplar appears in PX 3 at Page 5. At the top of the page is the grey Federal

Box, which lists certain required items such as the APR and the total of payments.

---

[1] Defendant measures only activations—clicks or hovers—of the tooltip, not the number of
consumers who read the text. *See* PX 33; PX 50; PX 202.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22.    More than halfway down the page Defendant lists the "Total Amount Requested," "Origination Fees," and "Total Amount Received." This itemization appears between two unrelated paragraphs, with no heading or typographical emphasis. Indeed, it appears in unbolded type but the preceding paragraph is bolded. *See* PX 194 62:19-63:2. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23.    The itemization also appears "below the fold"—meaning that applicants must scroll down—even on a desktop display. Answer ¶ 30. On many mobile devices, consumers would have to scroll down approximately three times to see the itemization. PX 7 ¶ 10.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. PX 53.

24.    From the middle of 2013 to January 6, 2017, the mobile version of Defendant's loan application featured a large, green "I agree" button at the top of the TILA page. See PX 4 at page 5. Pressing this button permitted consumers to move forward with their application without ever seeing any of the TILA disclosures. Answer ¶ 32

25.    Although Defendant has made small cosmetic changes to this page, the desktop version has remained materially the same since 2013. PX 204 at 10-12, 18.

26.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX 48 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX 199 118:4-9 ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX 16 ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

27.    The page after the TILA page requests the applicant's bank account information, after which applicants are taken to the "Account Summary" or "To-Do List" page. PX 204.



28.     The top of this page stated "Your $[amount] loan is on the way. What's next?" The stated amount was not "on the way"; due to the $500 up-front fee, in this example only $9,500 would reach the consumer's bank account.

29.     Defendant's website also includes a "Rates and Fees" page located outside (and not linked from) the loan application flow. *See* Exs. 1-6. To reach the page, instead of clicking the "Check Your Rate" link to apply for a loan, consumers browsing the home page would need to navigate to the "Personal Loans" page and then navigate to the "Rates & Fees" page from there. Dkt. No. 30-1.

30.     ▆▆▆ of consumers who completed an application visited the page, which mentioned the up-front fee. PX 205. From at least July 2018 on, those who visited the page would only learn of the up-front fee if they scrolled below the fold. Dkt. No. 30-1.

**B.  Defendant's Advertisements**

31.     At least ▆▆▆ of borrowers came to Defendant's website after reading one of Defendant's mail advertisements, PX 206, and Defendant mailed ▆▆▆▆▆ advertisements per month, *see, e.g.*, PX 58 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

32.     Many mail advertisements, until at least September 2018, featured the "no hidden fees" claim. *See, e.g.*, PX 63; PX 54-57; PX 59;.

33.     Many mail advertisements featured mock checks payable to a consumer for round numbers such as $40,000. *See, e.g.*, PX 60-62.

34.     Other mail advertisements stated—among a list of loan terms such as "Amount" and "Rate"—"FEES: there are no hidden fees or prepayment penalties." *See, e.g.*, PX 63.

35.     In all of these mail advertisements, the up-front fee was disclosed only in small-print footnotes or on the back of the page. PX 54-56, 63.

36.     Many of Defendant's email advertisements also included the "no hidden fees" claim, *see, e.g.*, PX 65-67, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *See, e.g.*, PX 64.

37.     At least ▆▆▆ of borrowers applied for a loan through Defendant after clicking a link in an email advertisement. PX 206.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-02454-JSC

38.     Defendant also made the "no hidden fees" claim and "up to $40,000" claim in banner advertisements widely accessible online, Answer ¶ 14; PX 68, and in sponsored posts on finance websites and blogs. One such blog post stated, "[O]nce you're approved, your money goes straight into your account, with no hidden fees." Answer ¶ 14; PX 69.

**C. The Loan Amount and "No Hidden Fees" Claim Affected Consumers' Behavior.**

39.     ███████████████████████████████████████████████████████

████████████████████████. PX 72.  In addition, ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

40.     Defendant's head of marketing acknowledged that ████████████████

██████████████████████████████ PX 195 29:11-18; *see also* PX 196; PX 180 75:20-76:3 ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

41.     Consumers who complained often specifically mention the "no hidden fees" statements and the promised loan amount in their complaints. *See, e.g.*, PX 246, Cases 6682685, 7289579; PX 7 at Ex. A, Ref. Nos. 94934232, 95202207, 99546933, 95391186.

42.     Defendant's representations that consumers would receive specific loan amounts also affected consumers' decisions about whether—and how much—to borrow from Defendant. PX 246; PX 7 at Ex. A; PX 11 ¶ 7; PX 74; PX 76.

43.     For example, many consumers needed a specific amount to cover the cost of a specific expense or purchase, such as a medical bill or moving expenses. PX 10 ¶ 7; PX 7 at Ex. A. *See, e.g.*, PX 246, Cases 126209, 02388652, 02943451. Others needed a specific amount to pay off existing debts. PX 12 ¶ 7; PX 73; PX 75; PX 78; PX 246.

44.     ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-02454-JSC

7

1  ██████████████████████████████████████████████████████

2  ████████ PX 15 ████████████████████████████████████████

3  ██████████████████████ PX 15. No disclaimer was ever added. PX 7 ¶ 11.

4  **D. Consumers Complained About the Up-Front Fee.**

5  45. ████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████

7  ███ PX 228.

8  46.  Between September 2015 and March 2018, Defendant sent the form response

9  ████ times. PX 207. Defendant agrees the number of complaints about this issue can be

10 extrapolated from the number of times the form response was sent, multiplying that number by

11 four since email contacts make up approximately 25% of all consumer contacts to Defendant.

12 Answer ¶ 10 n.3. This suggests that the number of consumers who contacted Defendant to ask

13 why they did not receive the full loan amount during that two-and-a-half-year period is at least

14 ████. *See* examples of consumer call transcripts, PX 73-78, 80-82

15 47.  In addition, Defendant determined ████████████████████████

16 ██████████████████████████████████████████████████████

17 ███████████████████████████████████████ PX 204.

18 48.  Both the ██████ figure and the ██████ figure are undercounts. Not all consumers

19 take the time to contact the company. PX 220 63:3-13; PX 13 ¶ 11; PX 213 at 63-64. And

20 Defendant also discouraged borrowers from contacting the company in favor of looking for

21 answers themselves on the company website – for example, by removing "Contact Us" links

22 on Defendant's website. PX 195 82:2-83:18.

23 49. ████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████

25 ██████████████████████████████████████████████████████

26 PX 83; PX 246. So defined, Defendant received hundreds of additional "complaints" regarding

27 the up-front fee, in addition to the foregoing "inquiries," including complaints from consumers

28 after this suit was filed. PX 246.

50.    Additional consumers complained to governmental or nonprofit agencies. PX 7 at Ex. A.

51.    ███████████████████████████████████████, *e.g.*, PX 86; PX 85, ████████████████████████████████████████████ ███████████████████[2] PX 82.

52.    ███████████████████████████████████.[3]

53.    ███████████████████████████████ ███████████████████████. *See* PX 94 ████████████████ ██████████████████████████████████████████ ██████████████████████████████ One training document lists "I didn't receive the full loan amount" as a frequently asked question, PX 93; Answer ¶ 26, ███████████████████████████ ████████████████████████████████████ ████████████████████ PX 95. ██████████████████ ██ PX 79 ████████████████████████████

54.    ████████████████████████████████ ███████████████████████████ ███████████████ PX 96, and ███████████████ ████████████████████████████████ ████████████ PX 229.

---

[2] Defendant acknowledged that ███████████████████ ██████████████ PX 84.

[3] *See, e.g.,* ███████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████████████████

55. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█ PX 100 at 5. ████████████████████████

████████████████████████████████████

████████████████████████████████ PX 99.

*See also* PX 97, PX 98, Answer ¶ 26 (Quarterly complaint reviews recommending

"highlighting origination fee" to address complaint volumes).

56. Defendant has argued that consumers dissatisfied with the up-front fee could have

canceled their loans. But ████████████████████████

████████████████████████████████████

████████████████████████████████████

█ PX 70. ██████████████████████████

████████████████████████████████████

██████████████████ PX 102. One of Defendant's compliance

employees observed, "LendingClub will allow a borrower to cancel a funded loan," but "[i]t's

not something that's advertised to customers." PX 192; *See also* PX 101.

57. ████████████████████████████████, PX

103, a time period in which many consumers may not have checked their bank statements. PX

12 ¶ 6. In addition, consumers could only cancel if they still had all of the loan proceeds on

hand, PX 220 124:3-7, but many consumers may have spent some portion of the proceeds

before discovering the fee, or may have wished to cancel but needed to use the proceeds for a

time-sensitive expense such as moving costs, PX 10 ¶ 13.

58. In spite of these obstacles, many consumers did cancel their loans because they

were upset about the origination fee. *See, e.g.*, PX 7 ¶ 9; PX 195; PX 104; PX 93; PX 108.

**E. Defendant Knew It Was Deceiving Consumers.**

59. ████████████████████████████████

████████████████████████████████████

1

2   PX 48.

3   60.

4

5   PX 106.

6   61.

7

8   PX 88.

9   62.

10   PX 19.

11   63.

12

13   PX 107.

14   64.

15

16   PX 20.

17

18   PX 20.

19   65.

20

21

22

23

24   . PX 18.

25   66.

26

27

28





PX 21.

67.

PX 22;  PX 23;  PX 109; PX 218; PX 110; PX 23; PX 24; PX 111.

PX 193 89:10-12, 15-17.

68.

PX 193 70:1-10; *see also*

*supra* ¶ 34

PX 26.

PX 25.

69.

. PX 218

PX 218.

. *See* PX 112

70.

PX 28; *see also* PX 27; PX 193.

71.



PX 113.

72.                                          . *See, e.g.*, PX 115

PX 114

73.    Indeed,

a.

PX 117.

b.

PX 47.

c.



74.

PX 30 (emphasis added).

PX 119.

75.

PX 193.

76.    Third parties also warned Defendant. *See* PX 32

; Answer ¶ 26 ("obscurity" of fee disclosure "could

make it a target" in a law enforcement action); PX 31

); PX 216 (

1   ████████████████████████████); PX 121 (█████████

2   ████████████████████████████████████████████████

3   ██████████████████████); PX 217 ██████████████████

4   ████████████████████████████████████

5       77.     Defendant did not remove the claim "no hidden fees" and the masked bandit from

6   the Loan Offer page until ███████████████████, PX 122, ████████████████

7   ██████████████████████████████████████, PX 189, and

8   did not disclose the up-front fee on the Loan Offer page until February 28, 2019, more than ten

9   months after this suit was filed, PX 34. ████████████████████████

10  ██. PX 193 115:10-14; PX 199 59:24-60:2

     **F.  Defendant Collected More Than $2 Billion in Up-Front Fees.**

11

12      78.     From April 25, 2013 through February 28, 2019, Defendant issued ████████

13  personal loans and collected $███████ in hidden up-front fees from consumers on these

14  loans. PX 8 ¶ 13, Table 2.

15      **II.     Defendant Told Consumers They Were Approved, Then Rejected Them.**

16      **A.  The Online Application Told Consumers Their Loans Were "On The Way."**

17      79.     After consumers consent to a credit check and supply their social security

18  numbers and other personal information, the application flow makes statements such as

19  "Congratulations! You qualify for a loan" and "Your money will be deposited in this account."

20  PX 203; PX 204 at 15-16; PX 35; PX 127; PX 126.

21      80.     After agreeing to the loan contract on the TILA page and providing their bank

22  account information, consumers arrive at the final page of the application flow, called the "To-

23  Do List" or "Account Summary" page. Until November 2017, on top of the Account Summary

24  page, in large type, Defendant stated: "Your $[amount] loan is on the way. What's next?" PX 3

25  at 9. Many consumers mention this representation in complaints to Defendant stating they

26  believed their applications were or would be approved. *See, e,g.*, PX 247, Cases 01842074,

27  4065435; PX 7 at Ex. A, Ref. No. 66552018, 78921833.

28      81.     Below the "on the way" representation, the page featured a series of graphics

called the "progress bar," including a green checkmark next to the word "FUNDING" and the statements "Investors are backing your loan," "DONE!" and "Your funds will be deposited into your bank account." Many consumers mention the progress bar in complaints, having believed their applications were or would be approved. PX 247; PX 7 at Ex. A.

82.     In the next section, a "To-Do List" of items may appear, often asking consumers to confirm information already provided to Defendant, such as their email address or bank account information. Answer ¶ 34. ████████████████████████████████████ ███████████████████████████████. PX 35 ████████████████ ████████████████████████████████████████. ████████████████████████████. The To-Do List items are followed by a "Loan Number."

83.    ████████████████████████████████████████ ████████████████████████████████████████ ███████████. PX 125. The next slide states: ████████████████ ████████████████████████████ *Id.* (emphasis in original).

84.    ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ PX 29. *See also* PX 124 ████████████████████████ (emphasis in original)).

85.    Defendant ████████████████████████████ ████████████████████████████████

        a.    ████████████████████████████████████
              ████████████████████████████████████
              ████████████████

        b.    ████████████████████████████████████
              ████████████████████████████
              ██████████

        c.    ████████████████████████████████████

1

d. ███████████████████████████████

███████████████████████████████ PX 37.

86. ████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

but this change was never made.  PX 3 at 10; PX 5 at 12.

**B.  Email Messages Told Consumers Their Loans Were "100% Backed."**

87. ███████████████████████████████████

███████████████████████ PX 209.

88.    One version of this email (Version 1) was sent to approximately 196,000 consumers, Answer ¶ 38, and featured the subject line ██████████████████ ████████████████████████████████████ ████████████████████ PX 128.

89.    Consumers who opened the email were told in large type at the top: "Your Loan is 100% Backed." Defendant stated: "Hi [name of consumer], Great news! Investors have backed your loan 100%. Your money is almost in your hands. You can always visit your Account Summary to view the details of your loan. Welcome to Lending Club!" Answer ¶ 37.

90. ██████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████ PX 128.

91. ████████████████████████████████████

████████████████████████████████████

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-02454-JSC

████████████████████████████████████████████████

████████████████████████████████ PX 187.

92.   A ███████████████████████████████████████

████████████████████████████████ PX 128.

93.   ███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

94.   Consumers who complained that they thought they were approved or would be approved specifically mentioned "100% Backed" language. *See, e.g.,* PX 247, Cases 4247972, 4162205, 4406492, 02913096; PX 7 at Ex. A, Ref. Nos. 66552018, 72899599, 72900393.

95.   ███████████████████████████████████████

█████████████████████████████████████████████

███████████████ PX 123. ███████████████████████

████████████████████████████████████████████

███████████████████████ PX 129. █████████████████

██████████████████████ PX 128.

96.   ███████████████████████████████████████

█████████████████████████████████████████████

███████████████ PX 36. ████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

**C. Defendant Rejected Loans That Were "On The Way" Or "100% Backed."**

97.   After consumers completed their applications, and after Defendant made representations that their loans were "on the way" or "100% backed," Defendant conducted a "back-end" approval process that often involved requests for—and evaluation of—items such as tax documents, bank statements, and identity documentation. Answer ¶ 28.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-02454-JSC

98.    Over time, Defendant has rejected between ███████ of applicants who reach the back-end review process.[4]

99.    For example, Defendant rejected approximately 43,000 consumers who received the Version 1 email, *i.e.*, 21.9% of those who received it. Answer ¶ 38.

100.    Applicants can be rejected during back-end review even if they complete every item on their To-Do Lists, Answer ¶ 40, and even if they were truthful on their applications, Answer ¶ 39. *See* PX 133 ███████████████

101.    Many consumers complained about being denied after they had seen Defendant's representations about loan approval. PX 247; PX 7 at Ex. A; PX 125 ████████████ ███████████████████████████████████

102.    One of Defendant's training presentations lists "My loan was removed… What does that mean? I thought I was approved" among questions that customer service agents should expect to receive. Answer ¶ 41; PX 125. ████████████████ ███████████████████████████████████ ██████████████████ PX 229.

**D.  Defendant's Approval Misrepresentations Harmed Consumers.**

103.    ███████████████████████████ ██████████████████████████████ ████████████ PX 193 169:22–171.

104.    Many consumers forewent or withdrew applications to other lenders, believing they had already secured loans from Defendant. *See, e.g.*, PX 247, Cases 8875313, 4640730, 5433096, 02644060, 5432401. Many consumers moved forward with specific purchases for which they had sought loan funds or otherwise spent money due to Defendant's statements that their loan proceeds were "on the way" or "almost in [their] hands." *See, e.g.*, PX 247, Cases 6561790, 9426583; PX 7 at Ex. A; PX 35 (focus group found that applicants "make plans" based on Defendant's statements, and in many cases, "They've already spent the money.").

**III.    Defendant Made Unauthorized Withdrawals From Consumer Accounts.**

---

[4] *See* PX 130 ██████████████████); PX 116 ███████████; PX 132 (███████████; PX 133 ███████; PX 131 ███████████

**A. Defendant's Unauthorized Withdrawals Have Caused Substantial Injury.**

105.    Defendant has charged consumers without authorization. *See, e.g.*, *infra*, ¶¶ 109, 111-112. For example:

a. ███████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████

b. ████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████).

c. ███████████████████████████████████████
████████████████████████████████████████
███████. *See, e.g.*, PX 214, Cases 02450295, 02615132, 02866187.

106.    Defendant's unauthorized withdrawals have also caused consumers to incur overdraft and NSF fees. Answer ¶ 46.[5] ████████████████████████████
█████████████████████████████████PX 138.

107.    ██████████████████████████████████████████PX 214, Case 6326561 ██████████████████████████████████
██████████████████████████████████████). *See also* LC0154831, Cases 6265180, 6187182, 01849068, 01876434, 7170663, and 5797362.

108.    In other instances, Defendant has required additional documents such as bank statements from consumers requesting refunds, or Defendant has taken days or weeks to provide refunds. *See, e.g.*, PX 7 ¶ 8 (consumer "spent well over 40 hours on the phone" with at least five agents and waited more than two weeks); ██████████████████████████
███████████████████████.[6]

---

[5] *See also* █████: PX 14 ¶ 10-12; █████████████████████████
████████████████████

[6] *See also* ██████████████PX 14 ¶ 11-14; █████████████████
███████████████

109.   Between August 2016 and June 2019, consumers contacted their financial institutions to dispute Defendant's unauthorized ACH withdrawals ████ times,[7] totaling at least ████████[8] PX 8 at Ex. B.

110.   Another lender serviced loans for ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ PX 8 ¶ 9-10, Ex. B. Another lender serviced loans for ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████. Id. Another lender serviced loans for ███████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████. Id.

111.   ███████████████████████████████████████████

████████████████████████████████████████████████████

██.[9] PX 9 ¶ 11(a). ████████████████████████████████. Id. at ¶ 14(b).

112.   ██████████████████████████████████████████

████████████████████████████████████████████████████

██████████[10] Id. at ¶ 8(d).

**B.  Since at Least 2015, Defendant Has Charged Consumers Twice for the Same**



[7] One reporter of unauthorized withdrawals, the Clearinghouse, reports only entities "generating a high rate of consumer unauthorized returns, over 50 daily, 50 weekly and 200 monthly." PX 221. Otherwise, the entities' return levels will be reported as zero.

[8] The total number of Defendant's unauthorized withdrawals is likely higher than the number of complaints and reports, because, ███████████████████, not all consumers who experience unauthorized withdrawals formally complain or report. ██████; *see also* PX 213 at 63-64.

[9] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

[10] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████ PX 9 ¶ 8(a).

**Payment.**

113.   Defendant claims that consumers can make changes to their payments, such as rescheduling the payment date. Answer ¶ 43.

114.   Defendant, however, has received complaints that it has not changed the payment date when the consumer reschedules it, and instead has added a new payment date while leaving the previous payment date intact. *Id. See also* PX 182.

a. ███████████████████████████████
███████████████████████████████
████████████████████████████████
█████████████████████████████
████████████████████████████

b. ███████████████████████████████
████████████████████████████████
███████████████████████████
███████████████████████████
████████████████████████████████
█████████████████████████

115.   ████████████████████████████. PX 145.

116.   ███████████████████████████
████████████████████████████████
████████████████████████████████
█████████████████████████████████
██████████████████████████████████
████████████████

117.   █████████████████████████████
████████████████████████████████
████████████████████████████████
███████████████████████████████
████████████████████████████████

118. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

119. ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ PX 200 157:17-158:15; 159:16-20.

120. ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

121. ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

122. ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮[11]

---

[11] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

**C.  Defendant Took Unauthorized Payments from Consumers Paying Off Early.**

123. ███████████████████████████████████████████

███████████████████████████████ *See* PX 161; PX 214, Cases 01934733, 01772116,

4200608, 4518241, 6793333, 5645258, 5837749.

124.  A ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████ *Id.*

125. ████████████████████████████████████████

██████████████████████████████████████████████

████████ PX 182.

**D.  Defendant Took Payments From Consumers Before Their Due Date.**

126. ███████████████████████████████████████

████████████████████████. PX 224. ████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

█████[12] PX 224; PX 226; PX 201 69:2-5; Dahdah Personal Dep. 16:22-24.

127.  A ██████████████████████████████████████

██████████████████████████████████████████████

████████████████████ PX 224.

128. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████. PX 224.

129. ███████████████████████████████████████

████████████████████████████████████████████████

────────────────

[12] ███████████████████████████████████████████████

███████████████████████████. PX 231.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-02454-JSC



130.

131.

PX 226.

132.

. PX 201 70:10-15; PX 219; PX 214, Case 11616772.

**E.  Additional Evidence Indicates Systemic Problems With Unauthorized Charges.**

133.

PX 44; PX 176.

PX 44 at 12.

134.

PX 227.

PX 144.

135.

PX 41.

PX 166.

1

2

3 ████████████████ PX 180 101:14-15; 99:11-24.)

4     **IV.**    **Defendant Failed to Adequately Provide an Initial Privacy Notice.**

5     136.   Defendant is a financial institution that, among other things, services consumer

6 loans and collects nonpublic personal information from prospective borrowers. ████████

7 Answer ¶ 48, ████████████

8     137.   Until at least December 2016, the only information disclosure Defendant gave to

9 customers prior to collecting information during the application flow contained a checkbox

10 with links to its terms of use and credit report authorization (and, in later months, an ESIGN

11 Act consent).  This checkbox did not mention privacy in any way; nor did any of the provided

12 links contain the privacy notice. ████████████████ Answer ¶ 11. ████████████

13 ████████████████████████████████████

14 ████████████ PX 235 at 1-10 (Sept. 2013); PX 236 (████████████); PX 233 at

15 17-24 (████████ PX 237 at 1-8 (████████████ PX 238 (████████████

16 █; PX 239 ████████████

17     138.  ████████████████████████

18 ████████████████████████████████

19 ████████████████████████████████

20 ████████████████████████████████████

21 ████████████████████████. PX 243; PX 244;

22 PX 245; *see also* PX 47.

23     139.   In May 2016, the FTC sent a CID to Defendant inquiring about its privacy

24 disclosures.  Roller Decl. ¶ 248.  In December 2016, after receipt of the CID and after the

25 compliance recommendations discussed above, Defendant changed the checkbox to provide a

26 direct link to its privacy policy, labeled "Privacy Policy."  Answer ¶ 11.

27 **SUMMARY JUDGMENT STANDARD**

28     Summary judgment must be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). A genuine dispute means "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Material facts are "those which might affect the outcome of the suit[,]" *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005), determined by reference to substantive law. *Liberty Lobby*, 477 U.S. at 248.

**ARGUMENT**

    **I.**    **Count I: Defendant Deceived Consumers About Loan Terms.**

    To establish an FTC Act deception claim, *see* 15 U.S.C. § 45, the FTC must show "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). The FTC need not prove that consumers actually relied on the misleading representation, but rather, a "presumption of actual reliance" arises if the defendant's misrepresentations were "widely disseminated." *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605-06 (9th Cir. 1993).

    **A.**    **Defendant Misrepresented That Consumers Would Receive a Specific Loan Amount With "No Hidden Fees."**

    To decide whether a defendant made a challenged representation, a court must first review what consumers saw. *See FTC v. Gill*, 71 F. Supp. 2d 1030, 1043-44 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001). The court looks at the overall "net impression" created by a defendant, which may be "likely to mislead . . . even though the solicitation also contains truthful disclosures." *FTC v. Cyberspace.com*, 453 F.3d 1196, 1200 (9th Cir. 2006).  Extrinsic evidence that an advertisement conveys a particular claim is not required when, as here, the claim is conspicuous and self-evident. *In re Thompson Med. Co.*, 104 F.T.C. 648, 788-89 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 958 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008). Courts routinely resolve this issue at summary judgment. *See, e.g.,*

1    *Cyberspace.com*, 453 F.3d at 1199-201; *Gill*, 71 F. Supp. 2d at 1034, 1038, 1043-44; *FTC v.*

2    *Medlab, Inc.*, 615 F. Supp. 2d 1068, 1077-79 (N.D. Cal. 2009); *Stefanchik*, 559 F.3d at 928.

3       It is undisputed that throughout its advertisements and in its online loan application,

4    Defendant promised consumers a specific loan amount—for example, $10,000—with "no hidden

5    fees." Statement of Undisputed Material Facts ("SMF") ¶¶ 8-12, 27-28, 32-38. Defendant began

6    its application by asking consumers, "How much do you need?" on a homepage that also

7    advertised loans "up to $40,000," SMF ¶ 8, and continued by promising consumers they could

8    "[g]et a custom rate for your **$[amount]** loan." SMF ¶ 9. On the "Loan Offer" page, Defendant

9    displayed a bolded offer of a specific "Loan Amount," coupled with a "No hidden fees"

10    representation next to a smiling masked bandit. SMF ¶ 10-12. No mention of the up-front fee

11    appears on these pages. *Id.* When consumers finished the application, they were greeted with a

12    statement that, for example, "Your $10,000 loan is on the way." SMF ¶ 28.

13       Many consumers arrived at Defendant's loan application already having seen

14    misrepresentations about fees and loan amount in Defendant's advertisements, including "No

15    hidden fees" representations in Defendant's mail, email, and online advertisements and mock

16    checks made out to consumers for round numbers such as $40,000 in Defendant's mail

17    advertisements. SMF ¶¶ 32-38. The clear net impression that borrowers take away from these

18    representations in Defendant's application and advertisements is, in the words of █████████

19    ████████████████████████████████████████████████████████████

20    ██████████████████████████████████████. SMF ¶ 38.

21      **B. Defendant's Representation Was Likely to Mislead Consumers Acting**
               **Reasonably.**

22

23        **a. Defendant's claim was likely to mislead because it was false.**

24       A representation is likely to mislead consumers when it is false. *FTC v. John Beck*

25    *Amazing Profits, LLC*, 865 F. Supp 2d. 1052, 1067 (C.D. Cal. 2012). Here, Defendant

   represented that consumers would receive a specific loan amount with "no hidden fees," but no

26    consumer ever received that specific loan amount, because Defendant deducted a hidden up-front

27    fee from each consumer's loan proceeds. SMF ¶ 3. For example, a consumer who was told that

28    her "$10,000 loan is on the way" would receive on average only $9,532 due to Defendant's

1 deduction of the hidden fee. *Id.* And a consumer who received ██████████████

2 ██████████████████████████████ SMF ¶ 44, but would instead receive an average of

3 ████ less, because of the hidden fee. SMF ¶ 3.

4   Defendant's up-front fee was hidden: the only way for consumers to find it was to search

5 for fees in obscure and counterintuitive places after having been told by Defendant explicitly that

6 there was no need to do so. SMF ¶¶ 11-19, 22-26, 29-30, 35.

7   • On the "Loan Offer" page, the up-front fee "remains hidden" behind a link in the

8    form of a small dot, a question mark or, on a mobile device, in the form of the

9    advertised APR. SMF ¶¶ 13-14, 16, 19. Internal documents show that ████

10    ███████████████████████████████████████████

11    SMF ¶¶ 15, 18.

12   • On the TILA page, the up-front fee is hidden below the middle of the page, below

13    the fold and between two unrelated paragraphs, on a page full of other, more

14    prominent disclosures. SMF ¶¶ 22-25. On mobile devices, until 2017, the fee was

15    also hidden below a large, green "I agree" button. SMF ¶ 24. Many consumers

16    ███████████████████████████████ SMF ¶ 26.

17   • On Defendant's website, the up-front fee is hidden on its obscure "Rates & Fees"

18    page, which is not linked either from the home page or any page in its application

19    flow. SMF ¶ 29. Only ████ of applicants ever saw the page. SMF ¶ 30.

20   • On Defendant's mail advertisements, the up-front fee is hidden in a small-print

21    footnote on the back of the page. SMF ¶ 35.

22   Thus, whether concealed behind an unobtrusive green dot, SMF ¶¶ 11-19, buried below

23 the fold amid unrelated and more prominent disclosures, SMF ¶¶ 22-26, or banished to a page

24 inaccessible from the online application flow, SMF ¶¶ 29-30, the few mentions of the fee that did

25 appear were secreted away in places where consumers would not notice them or would not think

26 to look. Consumers acting reasonably under the circumstances were not required to go in search

27 of hidden fees that they had been told, repeatedly, did not exist. *See Stefanchik*, 2007 WL

28 1058579, *5 (W.D. Wash. Apr. 3, 2007); *FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1350-

51 (D. Nev. 2014) (online loan application was "likely to mislead borrowers acting reasonably under the circumstances" because inconspicuous disclosure of loan fees was "hidden from borrowers"). This is particularly true where Defendant made the claim expressly. "Reasonable consumers are not required to doubt the veracity of express representations . . . ." *Stefanchik*, 2007 WL 1058579, at *5.

### b. Additional facts demonstrate that Defendant's representation was likely to mislead—and did in fact mislead—many consumers.

Although Defendant's loan flow itself establishes that the claim was false, and thus likely to mislead consumers, additional facts support this conclusion. The FTC need only prove that Defendant's representation was *likely* to mislead consumers, *Stefanchik*, 559 F.3d at 928-29, not that Defendant intended to mislead them, *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988), or that consumers were, in fact, misled, *Cyberspace.com*, 453 F.3d at 1201. Nevertheless, proof of actual deception is "highly probative" to show that a practice is likely to mislead consumers acting reasonably. *Cyberspace.com*, 453 F.3d at 1201. And evidence that a defendant *intended* to convey a particular net impression creates a presumption that consumers acted reasonably in believing it. *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1272 (M.D. Fla. 2012) (citing *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, at *47 (1984)).



Defendant's own assessments reflect that ███████████████████████████████
███████████████████, SMF ¶¶ 68-69, 71 █████████████████████████████
████████, and was ███████████████████████ SMF ¶¶ 70-71 (████████████
█████████████████████████████████████████████████████). In particular, Defendant believed—with good reason—that ███████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████ ¶¶ 66-71
████████████████████████████████████████████████████████████████
██████████████████████████████████, Defendant chose to make loan amount and "no hidden fees" representations ███
█████████████████████. SMF ¶¶ 60-65, 72-75 (*e.g.*, ██████████████████████

1 ██████████████████████████████████████████████████.

2      Likewise, ████████████████████████████████████

3 ████████████████████████████████████████████ SMF ¶¶ 53-55;

4 60 ███████████████████████████████ But Defendant was also ██████████

5 ███████████████████████████████████████ SMF ¶¶ 64, 71

6 ██████████████████████████████████████████████████████████████

7 ██████████████████████████████████████████████████████

8 ██████████████████████████████████████ So Defendant persisted in making

9 misleading representations and hiding the fee even in the face of explicit complaints and

10 warnings from consumers (SMF ¶¶ 45-55; 59-61), ██████████ (SMF ¶¶ 71, 76), ████████

11 SMF (¶ 76), and ██████████ (SMF ¶¶ 60-63), including ████████████ SMF ¶¶ 73, 74)

12 and ████████████ (SMF ¶ 75) ████████████████████████████████████████████

13 ██████████████████████████████

14      ████████████████████████████████████████████

15 ██████████ SMF ¶¶ 60-65 ████████████████████████████████████████

16 ████████████████████████████████), 72-75 (████████████████████████████████

17 ████████████, but Defendant ██████████████████████████████████████████

18 SMF ¶¶ 66-68, even though it created versions of the loan offer page for ████████████ and

19 business customers that showed the up-front fee alongside other loan terms, SMF ¶ 20. Similarly,

20 ██████████████████████████████████████████████████████████████████████

21 ████████████████████████████████████████ SMF ¶ 17. The evidence shows

22 that Defendant intended to convey to consumers that they would receive their entire loan amount

23 with no hidden fees, and need not search for such fees. It was therefore reasonable for consumers

24 to believe just that, and act accordingly. *Wash. Data Res.*, 856 F. Supp. 2d at 1272.

25      The evidence also shows that, due to Defendant's misrepresentations, many consumers

26 believed that they would receive the full promised loan amount with "no hidden fees," and were

27 thus were actually misled. More than ██████ borrowers contacted Defendant to ask why they had

28 not received the full loan amount – so many that ████████████████████████████████████████





1  ███████████████████████████████. SMF ¶¶ 45-48. Hundreds more filed formal

2  complaints, ████████████████ with third parties, SMF ¶¶ 49-50, or ████████████

3  █████████████████████████████████████████ SMF ¶¶ 51-

4  52. *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1072-75 (C.D. Cal. 2012), *aff'd in*

5  *part, vacated in part on other grounds*, 815 F.3d 593 (9th Cir. 2016) (finding consumer

6  complaints numbering in the thousands "highly probative evidence" of deception over

7  defendant's argument that the complaining consumers were "an infinitesimally small

8  percentage" of its customers); *FTC v. Wilcox*, 926 F. Supp. 1091, 1099 (S.D. Fla. 1995) (same).

9  And such complaints are the tip of the iceberg. SMF ¶ 48; *U.S. v. Offices Known as 50 State*

10  *Distrib. Co.*, 708 F.2d 1371, 1374-75 (9th Cir. 1983) (hereinafter *Offices Known*) (noting that

11  actual consumer complaints represent only the "tip of the iceberg"); *FTC v. J.K. Publ'ns, Inc.*,

12  2000 WL 35594143, *15 (C.D. Cal. Aug. 9, 2000) ("[T]here are undoubtedly injured

13  [consumers] who will never file a complaint . . . .").

14        Defendant's ████████████████████████████████████

15  ████████████████████████████████████. SMF ¶¶ 53-55. Its

16  ███████████████████████████████████████

17  ██████████████████████████████████████████

18  ███████████████████████████████████ SMF ¶ 53.

19  ██████████████████████████████████████████

20  ████████████████████████████████████████

21  ███████████ SMF ¶ 54. In addition, ███████████████████████

22  ██████████████████████████████████████████

23  █████████████████████████████████████

24  ███████████████ SMF ¶ 55.

25        This ample proof of actual deception, although not necessary, is "highly probative" of the

26  fact that Defendant's loan amount and "no hidden fees" representations were "likely to mislead

27  consumers acting reasonably under the circumstances." *Cyberspace.com*, 453 F.3d at 1201.

28        **C.  Defendant's Representations Were Material.**

1    Representations are material if they involve "information that is important to consumers
2    and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.com*,
3    453 F.3d at 1201 (quoting *Cliffdale*, 103 F.T.C. at 165). Further, claims are presumed material
4    when they are express, *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1095-96 (9th Cir. 1994),
5    "concern[] a central characteristic of the product," *FTC v. Lights of Am.*, 2012 WL 13064911, at
6    *4 (C.D. Cal. Apr. 25, 2012), or "where there is evidence that the seller intended to make the
7    claim," *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992); *see also FTC v. Lights of Am.*,
8    2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013).

9    The FTC is entitled to all three presumptions of materiality here. Defendant made express
10   claims concerning the two most central characteristics of Defendant's loans: how much money
11   consumers would receive, and how they would pay for it. *See* Part I.A., *supra*. And there is
12   ample evidence that Defendant intended consumers to understand that they would receive the
13   full loan amount with "no hidden fees." *See* Part I.B, *supra*.

14   Even aside from the presumptions, however, the undisputed facts demonstrate that the
15   claim was material. ██████████████████████████████████████████████
16   ████████████████████████████████████████████
17   ███████████████████████. SMF ¶ 39; *see also* SMF ¶ 40 (████████████████████
18   ████████████████████████████████████████████
19   ████████████████████████████████████████████████
20   ████████████████████████████). Explicit statements by consumers
21   that they would have chosen differently if not for Defendant's misleading representations ██████
22   ████████████████████████████████████████████
23   ████████████████████████████████████████████
24   ████████████████████████████ SMF ¶ 54; *see also* ¶ 41-42.  Many
25   other consumers complained that they needed the promised loan amount to cover a specific
26   expense or refinance a debt of a specific amount, SMF ¶ 43. Indeed, ████████████████████
27   ██████████████████████████████████████
28   ████████████████████████████████████████████████

1  ████████████████████████████. SMF ¶¶ 56-58.

2  **II.    Count II: Defendant Deceived Consumers About Loan Approval**

3  **A. Defendant Represented That Consumers Were or Would Be Approved.**

4  The same FTC Act analysis from Count I applies here, and there is no genuine issue of

5  material fact as to the first prong of deception: that Defendant made the challenged claim.

6  Defendant's loan application strung consumers along with representations that they were

7  or would be approved, from "Congratulations! You qualify for a loan" to "Your money will be

8  deposited in this account," even though Defendant, at that point, could still reject their

9  applications. SMF ¶¶ 79, 97-100. On the "Account Summary" page, Defendant told consumers

10  in large type across the top, "Your $[amount] loan is on the way." SMF ¶ 80. This page also

11  featured a "Loan Number," even though consumers did not yet have a loan, SMF ¶ 82, a green

12  checkmark next to the word "FUNDING" and the statement "Investors are backing your loan,"

13  as well as a large "DONE!" representation next to a statement that "Your funds will be deposited

14  into your bank account." SMF ¶ 81. At the stage in the process at which Defendant made these

15  representations, consumers' loans were not in fact "on the way," funding of consumers' loans

16  was not in fact complete, consumers' loans were not in fact "DONE!", and there was no

17  guarantee that any funds would be deposited into consumers' bank accounts. SMF ¶¶ 97-100.

18  After consumers' applications were complete, but before their loans were approved, SMF

19  ¶¶ 97-99, Defendant continued to tell consumers, this time by email, that they had been or would

20  be approved, SMF ¶ 87-93. Defendant sent various versions of the "100% Backed" email to

21  more than ██████ consumers, none of whom had been approved when the email was sent. SMF

22  ¶¶ *Id.*, 97-99. Defendant's congratulatory statements that: "Your Loan is 100% Backed,"

23  "Hooray! Investors Have Backed Your Loan," "Great news! Investors have backed your loan

24  100%," and "Your money is almost in your hands" conveyed that consumers were approved or

25  were certain to receive approval, and conveyed a "net impression" of approval even in the

26  versions that also included text reminding consumers to finish any tasks on their To-Do Lists.

27  SMF ¶¶ 88-96. *See Cyberspace.com*, 453 F.3d at 1200 (The "net impression" of an

28  advertisement may be "likely to mislead . . . even though the solicitation also contains truthful

1  disclosures.").

2      Beyond the text of Defendant's statements to consumers, ███████

3  █████████████████████████████████████████████████████

4  █████████████████████████████████████████████████████

5  █████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████        SMF ¶ 84.        ██████████████████████████

8  █████████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████    SMF ¶¶ 85, 95.█

12  █████████████████████████████████████████████████████

13  █████████████████████████    SMF ¶ 95.

14      **B.  Defendant's Statements Were Likely to Mislead Consumers Acting Reasonably.**

15      The representations discussed in Part II.A. were misleading because they were false.

16  Although Defendant represented to consumers that their applications were approved or would be

17  approved, consumers were not yet approved, and many were rejected, including approximately

18  43,000 consumers to whom Defendant sent Version 1 of the 100% Backed email. SMF ¶¶ 97-99.

19  Consumers behaved reasonably upon reading the direct language of Defendant's loan approval

20  messaging because they had no reason to think that Defendant was still reviewing their "on the

21  way" or "backed" loans for creditworthiness.  But consumers could be—and often were—

22  rejected even if they completed all of the items on their To-Do Lists, and even if all information

23  in their applications matched the information supplied in the requested documentation.[13] SMF ¶

24  ─────────────

25  [13] The items on the list overwhelmingly asked consumers merely to verify information already
   provided, such as their email address or bank account number; a reasonable consumer would

26  believe (and complaints indicate many consumers *did* believe) that the To-Do List was purely

27  ministerial. SMF ¶ 82. "Disclaimers or qualifications in any particular ad are not adequate to
   avoid liability unless they are sufficiently prominent and unambiguous to change the apparent
   meaning of the claims and to leave an accurate impression. Anything less is only likely to cause

28  confusion by creating contradictory double meanings." *Removatron Int'l Corp. v. FTC*, 884 F.2d
   1489, 1497 (1st Cir. 1989).

100.  Defendant conducts a searching "back-end" review process *after* completion of consumers'

applications, and ███████████████████████████████████████████████████████████

███████████ SMF ¶ 97-98.

Although no additional facts are necessary to satisfy the second prong of deception—that

reasonable consumers were likely misled—facts demonstrating actual deception and Defendant's

knowledge thereof also exist here. Such evidence supports a finding that a claim was likely to

mislead. *Cyberspace.com*, 453 F.3d at 1201 (noting "Defendants' internal e-mails and

documents show that they were aware that many of their customers" were deceived); *FTC v. Ivy*

*Capital, Inc.*, 2013 WL 1224613, *9 (D. Nev. Mar. 26, 2013) (noting "defendants were aware

of" complaints about their practices), *aff'd in part, vac'd in part*, 616 F. App'x 360.

Many consumers complained—many specifically quoting the "100% Backed" or "loan is

on the way" language—and Defendant acknowledged ███████████████████████████

██████████████████████████████████████████████████████████████ SMF ¶

101. █████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████. SMF ¶ 102. ████████████████████████

███████████████████████████ SMF ¶¶ 85, 95. ███████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ SMF ¶ 96.

The record also contains a surfeit of evidence showing that Defendant ██████████

█████████████████████████████████████████████████████████

(emphasis in original) ██████████████████████████. SMF ¶¶ 83-84. █████████

████████████████████ it was put on notice by consumers (SMF ¶¶ 80-82, 94, 96, 101), a ███

█████████████████████████████████████████████████ that its representations

were misleading, but ████████████████████████████████████████. SMF ¶¶ 80,

95. And Defendant █████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-02454-JSC

1  ████████████████████████████████████████████████ SMF ¶ 85.

2      Thus, although proof of actual deception is not necessary, the undisputed evidence of

3  actual deception here is highly probative of the fact that Defendant's approval representations

4  were "likely to mislead" reasonable consumers. *See Cyberspace.com*, 453 F.3d at 1201.

5      **C.  Defendant's Representations About Loan Approval Were Material.**

6      Representations are material if they involve "information that is important to consumers

7  and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.com*,

8  453 F.3d at 1201 (quoting *Cliffdale*, 103 F.T.C. at 165). Courts frequently find representations

9  material when they concern a consumer's likelihood of achieving a desired result – here, the

10 certainty of being approved for a loan. *See, e.g.*, *FTC v. Infinity Grp. Servs.*, 2010 WL 11515164,

11 *6 (C.D. Cal. Sept. 9, 2010); *FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1275 (M.D. Fla.

12 2016); *FTC v. Mortg. Relief Advocates LLC*, 2015 WL 11257575, *4 (C.D. Cal. July 1, 2015).

13     It is beyond dispute that Defendant's loan approval representations were material to

14 consumers in that they were "likely to affect their . . . conduct regarding[ the] product."

15 *Cyberspace.com*, 453 F.3d at 1201. In their complaints, many consumers specifically state as

16 much or describe actions taken due to Defendant's representation, such as making purchases or

17 turning down other loan offers. SMF ¶ 104.

18     **III.     Count III: Defendant Withdrew Money from Accounts Without Consent.**

19     The undisputed evidence proves each element of the FTC's unfairness claim. An unfair

20 practice or act is one that (1) causes or is likely to cause substantial injury to consumers, (2) is

21 not reasonably avoidable by consumers themselves, and (3) is not outweighed by countervailing

22 benefits to consumers or to competition. *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010)

23 ("*Neovi I*") (citing 15 U.S.C. § 45(n)).

24     **A.  Defendant's Unauthorized Withdrawals Substantially Injure Consumers.**

25     Under the FTC Act, consumers suffer a substantial injury when they are "injured by a

26 practice for which they did not bargain." *Neovi I*, 604 F.3d at 1157. Courts have repeatedly held

27 that billing customers without permission causes injury under the FTC Act. *See FTC v.

28 Amazon.com, Inc.*, 2016 WL 10654030, *8 (W.D. Wash. July 22, 2016) (collecting cases). A

practice can cause substantial injury "if it raises a significant risk of concrete harm"—which can include a "very severe harm to a small number" of people—or if it causes "a small harm to a large number of people." *In re Int'l Harvester*, 104 FTC at 1064, 1073 n.12, *available at* 1984 WL 565290 at \*90 & n.55. *See also Neovi I*, 604 F.3d at 1157-58. Defendant's unauthorized withdrawals caused substantial injury by either measure.

Defendant's unauthorized withdrawals raised a significant risk of concrete harm, including by imposing very severe harm. It has charged consumers ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ . (SMF ¶¶ 105-106, 112-134).

The time spent by consumers pursuing refunds of unauthorized withdrawals and fees constitutes additional substantial injury. *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1115 (S.D. Cal. 2008) ("*Neovi II*") ; *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010). ████████████████████████████████████████████████████████████████ ████████████████████████████ . SMF ¶¶ 107-108. ██████████████████ ████████████████ *Id.* ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ SMF ¶114.b. *See also* ¶ 114.a

While such severe harm is sufficient to establish significant risk of concrete harm, Defendant also has caused harm to a large number of people. ████████████████ ████████████████████████████████████████████████████████████████ ████████ SMF ¶109. ██████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ SMF ¶ 111-112. ████████████████████████████████████████████████ ██████████████████████████████████████████████████ . SMF ¶ 126-132. These are necessarily undercounts for a number of reasons: not

1    all consumers complain or seek relief, SMF ¶ 109 n.8, and not all of Defendant's unauthorized

2    ███████████████████████████████ SMF ¶ 111 n.9. *See Amazon*, 2016 WL

3    10654030 at *8 ("Amazon's argument conflates complaints with the total universe of injury.");

4    *Offices Known*, 708 F.2d at 1374-75; *J.K. Publ'ns, Inc.*, 2000 WL at 35594143, *15.

## B. Consumers Could Not Reasonably Avoid the Unauthorized Withdrawals.

6    Consumers whose bank accounts are accessed without authorization "suffer[]

7    unavoidable injuries." *Neovi I*, 604 F.3d at 1158. Courts have repeatedly held that "the burden

8    should not be placed on defrauded consumers to avoid charges that were never authorized to

9    begin with." *Inc21.com*, 745 F. Supp. 2d at 1004 (citing cases).

10   Consumers cannot reasonably avoid Defendant's charging them without authorization,

11   nor could they avoid the injury of ████████████████████████████████

12   ████████. SMF ¶ 106, 113-114, 115-116, 123, 126-127. To the extent consumers were able to

13   obtain refunds, SMF ¶ 107, they could not reasonably avoid ██████████████

14   █████████████████████████████████████████████████████

15   ████. *Neovi I*, 604 F.3d at 1158.

## C. The unauthorized withdrawals are not outweighed by countervailing benefits.

17   The countervailing benefits prong of the unfairness standard "is easily satisfied 'when a

18   practice produces clear adverse consequences for consumers that are not accompanied by an

19   increase in services or benefits to consumers or benefits to competition.'" *Neovi II*, 598 F. Supp.

20   2d at 1116 (quoting *J.K. Publ'ns*, 99 F. Supp. 2d at 1201). Courts have repeatedly found either

21   that unauthorized billing has no countervailing benefits at all, or that any such benefits are

22   outweighed by the harm of taking money from consumers without their consent. *See, e.g.*, *Neovi*

23   *I*, 604 F.3d at 1158-59; *Amazon.com*, 2016 WL10654030 at 10-11; *J.K. Publ'ns*, 99 F. Supp. 2d

24   at 1203; *Inc21.com*, 745 F. Supp. 2d at 1004.

25   As in other unauthorized billing cases, consumers receive no countervailing benefits from

26   Defendant's practice of charging them without authorization. There is no cognizable benefit to

27   charging ███████████████████████████████████████████████

28   ██████████████. The cost of the practice, on the other hand, is significant and concrete,

including lost access to ███████████████████████████████████

███████████.[14] Where, as here, "a practice produces clear adverse consequences for consumers

that are not accompanied by an increase in services or benefits to consumers or by benefits to

competition," this element of unfairness is "easily satisfied." *Neovi II*, 598 F. Supp. 2d at 1116.

### IV.   Count IV: Defendant Violated the GLB Act and Implementing Rules Because It Did Not Disclose or Provide Its Privacy Policy to Applicants.

The GLB Act and its implementing regulations, the Privacy Rule, 16 C.F.R. § 313, and

Regulation P, 12 C.F.R. § 1016, apply to Defendant because it is a financial institution[15] that

collects customers' nonpublic personal information, 15 U.S.C. §§ 6801-03; 16 C.F.R. § 313.1;

12 C.F.R. § 1016; SMF ¶ 136.

Defendant violated the Privacy Rule's requirement that a financial institution disclose its

privacy practices to consumers.  16 C.F.R. § 313.6; 12 C.F.R. § 1016.6.  The statute and

regulations require the financial institution to provide a "clear and conspicuous" notice of its

privacy policies and practices no later than the establishment of a customer relationship.  15

U.S.C. § 6803(a); 16 C.F.R. § 313.4; 12 C.F.R. § 1016.4(a).  Additionally, the implementing

rules require the institution to provide the initial notice "so that each consumer can reasonably be

expected to receive actual notice."  16 C.F.R. § 313.9(a); 12 C.F.R. § 1016.9(a).

Defendant satisfied neither requirement.  SMF ¶ 137.  Indeed, Defendant's violation was

evident ████████████████████████████████.  SMF ¶ 138.  Defendant first included

a mention of, and link to, its privacy policy within the application flow █████████████████

███████████████████████████████████████ it received a CID from the

FTC in May 2016 inquiring about its privacy disclosure practices.  SMF ¶ 139.

### V.   Defendant Is Liable for Injunctive and Equitable Monetary Relief.

Pursuant to Section 13(b) of the FTC Act, this Court may grant permanent injunctive

relief for violations of any provision of law enforced by the FTC, and has broad equitable

---

[14] Defendant's unauthorized withdrawal rate is higher than other large lenders. SMF ¶ 1.109-1.110.

[15] *See* 16 C.F.R. § 313.3(k)(1) (defining "financial institution" as an institution engaged in financial activities described in 12 U.S.C. § 1843(k)); 12 C.F.R. § 1016.3(*l*)(same); 12 C.F.R. § 225.28(b)(1) (implementing 12 U.S.C. § 1843(k) and describing "servicing loans" as a financial activity).

1    authority "to grant any ancillary relief necessary to accomplish complete justice." *FTC v. H.N.*

2    *Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982); *see also Pantron*, 33 F.3d at 1102. Such relief

3    includes equitable monetary relief such as restitution, rescission of contracts, or disgorgement.

4    *See Pantron*, 33 F.3d at 1102.

5             **A.  Injunctive Relief Preventing Future Violations Is Warranted.**

6             Pursuant to Section 13(b) of the FTC Act, "[a] permanent injunction is justified if there

7    exists 'some cognizable danger of recurrent violation,' or 'some reasonable likelihood of future

8    violations.'" *FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994, 101314 (D. Nev. 2019) (quoting

9    *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Gill*, 71 F. Supp. 2d at 1047.

10   "In determining the likelihood of recurring violations, the court may consider past unlawful

11   conduct as well as the 'totality of the circumstances.'  Where the 'violation has been predicated

12   upon systematic wrongdoing, rather than isolated occurrences, a court should be more willing to

13   enjoin future conduct.'" *FTC v. DiscountMetalBrokers Inc.*, 2017 WL 6940502, at *7 (C.D. Cal.

14   Oct. 13, 2017) (quoting *Gill*, 71 F. Supp. 2d at 1047); *see also OMICS*, 374 F. Supp. 3d at 1014.

15            The Ninth Circuit has held that "it is actually well-settled 'that an action for an injunction

16   does not become moot merely because the conduct complained of was terminated, *if there is a*

17   *possibility of recurrence*, since otherwise the defendants would be free to return to their old

18   ways.'"  *FTC v. Affordable Media*, 179 F.3d 1228, 1237 (9th Cir. 1999) (emphasis in original)

19   (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1087 (C.D. Cal. 1994).

20   Similarly, cessation of misconduct after learning of an investigation does not rebut likelihood of

21   recurrence. *See, e.g.*, *FTC v. Sage Seminars*, 1995 WL 798938, at *6 (N.D. Cal. Nov. 2, 1995).

22            The reasonable likelihood of Defendant violating the law absent injunctive relief is high.

23   Defendant misrepresented the core features of its loan product (the amount consumers will get

24   and what they will pay) for years, despite a high number of complaints and ▮▮▮▮▮▮▮▮▮▮▮

25   warnings.  Defendant ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, SMF ¶¶ 59-75, and

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, SMF ¶ 77.  Indeed, despite ▮▮▮▮▮▮▮▮▮▮▮▮

28   complaints since at least ▮▮▮▮ it continued misrepresenting the fee deducted from consumers'

1  loan amounts ███, raking in ███████████ in hidden fees in ██████████

2  ███ SMF ¶ 78.[16] Defendant also charged consumers without authorization ███, despite

3  ██████████████████████████████████████████

4  ██████████, SMF ¶¶ 105-135, misrepresented that consumers were approved in the face

5  of similar ██████ complaints, SMF ¶¶ 80-102, and violated the GLB Act despite

6  ████████████████, SMF ¶¶ 137-139.

7       Accordingly, Parts I-III of the FTC's proposed order would restrain Defendant from

8  further violations of the law.  Part I.A. would require Defendant to refrain from making

9  misrepresentations in the course of marketing or offering an extension of credit, including with

10 respect to the existence and amount of Defendant's fees and the approval status of loan

11 applications.  Similarly, Part I.B. would require Defendant to clearly disclose the dollar amount

12 of any up-front fees associated with a loan, along with the total dollar amount disbursed to the

13 consumer.  Part II would prohibit Defendant from withdrawing funds from consumers' accounts

14 without their express, informed consent. Part III would require Defendant to comply with the

15 GLB Act. The balance of the FTC's proposed order contains monetary relief, discussed below,

16 and monitoring and recordkeeping provisions common in FTC law enforcement matters.[17]

17           **B.  Defendant Must Repay the Hidden Fees It Took From Consumers.**

18       As demonstrated above, Defendant represented that consumers would receive a specific

19 loan amount with no hidden fees, but then charged a hidden fee.  The Court should order

20 Defendant to return that fee.

21       The Ninth Circuit authorizes and instructs district courts to order consumer restitution

22 against those who violate the FTC Act.  *Stefanchik*, 559 F.3d at 931-32.[18]  This unwinds, insofar

---

23 [16] These facts are also sufficient to dispose of Defendant's "mootness" defense (Affirmative
24 Defense No. 8), because the standard for mootness is even higher than a mere likelihood of
   recurrence. *Public Utilities Comm'n v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996).  Thus, facts
25 proving a likelihood of recurrence necessarily disprove a mootness defense, and the FTC is
   entitled to summary judgment on this defense.

26 [17] *See, e.g., FTC v. AMG Servs., Inc.*, 2016 WL 5791416, *16-18 (D. Nev. Sept. 30, 2016), *aff'd
   sub nom FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018); *John Beck Amazing
27 Profits*, 865 F. Supp. 2d at 1016; *Ivy Capital*, 2013 WL 1224613 at *3; *FTC v. Wellness Support
   Network, Inc.*, 2014 WL 644749, at *20-22 (N.D. Cal. Feb. 19, 2014).

28 [18] *See also AMG Capital*, 910 F.3d at 426 ("We have repeatedly held that § 13 'empowers
   district courts to grant any ancillary relief necessary to accomplish complete justice, including

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-02454-JSC

as possible, the manner in which "[t]he seller's misrepresentations tainted the customer's purchasing decision." *Figgie*, 994 F.2d at 606.  Importantly, it is the "fraud in the selling, not the value of the thing sold," that makes Defendant's gains unjust and entitles consumers to reimbursement.  *Id.*  There is a "two-step burden-shifting framework . . . for calculating restitution awards under § 13(b)." *Commerce Planet*, 815 F.3d at 603.  The FTC must first set forth a reasonable approximation of restitution. *Id.* "If the FTC makes the required threshold showing, the burden then shifts to the defendant" to show that the approximation is overstated. *Id.* at 604. "Any risk of uncertainty at this second step fall[s] on the wrongdoer whose illegal conduct created the uncertainty." *Id.* (internal quotation mark omitted).  It is appropriate and routine for courts to grant monetary relief at the summary judgment stage.[19]

Under the first step of the FTC Act monetary redress framework, the FTC need only show "that the amount it seeks in restitution reasonably approximates the defendant's unjust gain, which is measured by 'the defendant's net revenues, not the defendant's net profits.'"[20] *AMG Capital*, 910 F.3d at 427 (quoting *Commerce Planet*, 815 F.3d at 603).  In many cases, "the defendant's unjust gain 'will be equal to the consumer's loss.'" *Commerce Planet*, 815 F.3d at 603.  When approximating the amount of unjust gains or consumer harm, the FTC is not required to prove each consumer's individual reliance on the defendant's misrepresentations; rather, "a presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *Figgie*, 994 F.2d at 605-06.[21]  Here, this presumption squarely applies:

restitution.'") (quoting *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016)); *Figgie*, 994 F.2d at 605.

[19] *See, e.g.*, *AMG Capital*, 910 F.3d at 428 (affirming summary judgment order granting FTC $1.3 billion in equitable monetary relief); *FTC v. Inc21.com Corp.*, 475 F. App'x 106, 108-09 (9th Cir. 2012); *Neovi I*, 604 F.3d at 1159-60; *Stefanchik*, 559 F.3d at 931-32.

[20] *See also FTC v. OMICS Grp. Inc.*, 374 F. Supp. 3d 994, 1014 (D. Nev. 2019) ("Consumer loss is calculated by 'the amount of money paid by the consumers, less any refunds made.'"); *FTC v. Stefanchik*, 559 F.3d at 931 ("We are unpersuaded by the defendants' assertion that they should not be liable for the full amount of Atlas' sales."); *FTC v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001) ("In the absence of proof of 'actual damages,' the court properly used the amounts consumers paid as the basis for the amount Defendants should be ordered to pay for their wrongdoing.").

[21] *See also Commerce Planet*, 815 F.3d at 604 ("The FTC proved that Commerce Planet made

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                 Case No. 3:18-cv-02454-JSC

1   Defendant's material misrepresentation is set forth in Part I, *supra*, there is no genuine dispute

2   that Defendant's misleading advertisements and loan application documents were widely

3   disseminated, and the FTC only seeks relief for consumers who borrowed from Defendant.

4        Where, as here, the FTC Act violation stems from charging consumers a misleading or

5   undisclosed fee, courts commonly award the return of the fee.  In *FTC v. AMG Services, Inc.*, the

6   defendants represented that their payday loans would cost one finance charge, but charged most

7   consumers multiple finance charges.  29 F. Supp. 3d 1338, 1345, 1351 (D. Nev. 2014), *aff'd*, 910

8   F.3d 417 (9th Cir. 2018).  The district court ordered, and the Ninth Circuit affirmed, monetary

9   relief at summary judgment in the full amount that all consumers paid above the stated loan

10  cost—$1,317,753,577.  *AMG Servs.*, 2016 WL 5791416, at *12-13, *aff'd*, 910 F.3d 417.

11  Similarly, in *FTC v. OMICS*, the defendant ran purported academic journals that solicited articles

12  for publication and charged authors hidden fees.  *OMICS*, 374 F. Supp. 3d at 1012.  The court

13  ordered monetary relief in the entire amount of hidden fees the authors paid.  *Id.* at 1015-16.  In

14  *FTC v. EDebitPay, LLC*, the court found that that the defendants deceived consumers into paying

15  inadequately disclosed fees for prepaid credit cards.  2011 WL 486260, at *3-8 (C.D. Cal.  Feb.

16  3, 2011).  The court awarded return of all the fees (minus refunds), *id.* at *13, and the Ninth

17  Circuit affirmed, 695 F.3d 938, 945 (9th Cir. 2012).

18       Here, Defendant charged a hidden origination fee on each consumer's loan, and interest

19  on the entire amount, including on the hidden fee.  Defendant's net revenue from the hidden fee

20  alone from April 2013 through February 2019 is ▓▓▓▓▓▓.  SMF ¶ 78.  To account for

21  consumers who may have unearthed the fee despite Defendant's claims, the FTC's calculation of

22  Defendant's unjust gain and harm to consumers is ▓▓▓▓▓▓  Although there is no

23  evidence in the record quantifying the number of consumers who may have hunted for and found

24  the hidden fee, this calculation accounts for the percentage ▓▓▓ of borrowers who viewed

25

26

27  material misrepresentations . . . and that the misrepresentations were widely disseminated.  As a
    result, the FTC was entitled to a presumption that all consumers who purchased [the product] did
28  so in reliance on the misrepresentations.").

Defendant's Rates and Fees page.  SMF ¶ 30.  In addition to that conservative allowance for the Rates and Fees page "disclosure,"[22] this measure of consumer loss includes only five years of loan activity preceding the complaint—though no limitations period applies[23] and Defendant's misconduct stretched back before this time period. It also excludes the interest Defendant collected on the hidden up-front fee over the life of each loan—though Defendant charged interest on the amounts it never provided to its borrowers.  The FTC also does not include any calculation of unjust gains attributable to Defendant's deception with respect to certainty of loan approval (Count II) or unfair payment processing (Count III).

In sum, the FTC has reasonably approximated Defendant's unjust gain and harm caused to consumers in the amount of ███████████  To the extent Defendant points to evidence showing that this approximation overstates consumer loss, the FTC will address any such evidence in its reply and, if needed, adjust its calculation to aid resolution of this case by summary judgment.[24]

**CONCLUSION**

The FTC respectfully requests that the Court grant summary judgment in its favor on all four Counts and enter the proposed order.

Dated:  February 27, 2020                    /s/ Katharine Roller
                                              KATHARINE ROLLER
                                              LEAH FRAZIER
                                              JASON SCHALL
                                              HELEN CLARK
                                              Federal Trade Commission
                                              600 Pennsylvania Avenue, N.W.
                                              Washington, D.C. 20580

---

[22] The different versions of the Rates and Fees page disclose the origination fee to a limited extent.  (SMF ¶¶ 29-30.)  Given that the Rates and Fees page was located outside the application flow, and that Defendant made repeated misrepresentations regarding the loan amount in its advertising and within the application flow that that were only obliquely "corrected" by the language on the Rates and Fees page, the Court could in its discretion disallow a reduction in the redress amount for those page visits.

[23]      *FTC v. Dantuma*, 748 F. App'x 735, 739 (9th Cir. 2018) (FTC Act contains no statute of limitations); *FTC v. AMG Servs. Inc.*, 2017 WL 1704411, *5 (D. Nev. May 1, 2017).

[24] Prejudgment interest is recoverable for FTC restitution awards; the FTC requests leave to calculate prejudgment interest as of the date of any judgment awarded in its favor. *Ivy Capital*, 2013 WL 1224613, at *17, *aff'd in part and vacated on other grounds*, 616 F. App'x at 361.

1

Phone:  (312) 960-5605, (202) 326-2187, 202 326-
2251, 202 326-2273
Facsimile:  (202) 326-3768
Email:  kroller@ftc.gov; lfrazier@ftc.gov;
jschall@ftc.gov; hclark@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT          Case No. 3:18-cv-02454-JSC

1

**CERTIFICATE OF SERVICE**

2       I, Katharine Roller, certify that on February 27, 2020, I electronically filed the foregoing

3   Plaintiff's Notice of Motion, Motion for Summary Judgment, and Memorandum in Support

4   Thereof with the Clerk of Court using the CM/ECF system, which will send notification of such

5   filing to counsel of record.

6                                                                 By: /s/ Katharine Roller

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28