M. Sean Royall (admitted *pro hac vice*)
Rachael A. Rezabek (SBN 298711)
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone: (214) 972-1770
Facsimile: (214) 972-1771
Email: sean.royall@kirkland.com
Email: rachael.rezabek@kirkland.com

Richard H. Cunningham (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 389-5000
Facsimile: (202 389-5200
Email: rich.cunningham@kirkland.com

Katie Jakola (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: kjakola@kirkland.com

Attorneys for Defendant
*LendingClub Corporation*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | CASE NO: 3:18-CV-02454-JSC |
| Plaintiff, | ) ) | **DEFENDANT LENDINGCLUB CORPORATION'S OPPOSITION TO PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) ) | |
| LENDINGCLUB CORPORATION, d/b//a Lending Club, d/b//a Lending Club, | ) ) ) | |
| Defendant. | ) ) ) ) | Judge: Hon. Jacqueline Scott Corley Dept.: San Francisco Courthouse, Ctrm. E Date: April 27, 2020 Time: 9:00 a.m. |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...............................................................................................................1

LEGAL STANDARD.........................................................................................................5

ARGUMENT .....................................................................................................................6

I.    COUNT I INVOLVES THE CENTRALLY DISPUTED FACTS OF THIS CASE
AND CANNOT PROPERLY BE RESOLVED ON SUMMARY JUDGMENT..............6

    A.    "Facial Review" Is Inappropriate Where, as Here, Consumer
Misunderstanding Rates Are Disputed ......................................................6

    B.    The FTC Ignores Its Obligation to Prove That a Significant Minority of
Reasonable Consumers Were Deceived .....................................................8

    C.    A Large and Varied Body of Evidence Shows That the Disclosures of the
Origination Fee on LendingClub's Website Were Both Adequate and
Effective .....................................................................................................9

        1.    Very Low Complaint and Inquiry Rates..................................10

        2.    Consumer Testing ...................................................................11

        3.    Industry-Leading Consumer Satisfaction ...............................12

        4.    High and Growing Repeat Customer Rates .............................12

        5.    Overwhelmingly Positive Borrower Ratings and Reviews ......12

        6.    Consumer Financial Protection Bureau ("CFPB") Review and Project
Catalyst ..................................................................................13

        7.    Federal Deposit Insurance Corporation ("FDIC") Review.......14

        8.    Third-Party Compliance Reviews............................................15

    D.    The FTC's Motion Is Premised Almost Entirely on Out-of-Context Quotes
and Anecdotes, Highlighting the Material Dispute Between the Parties...............15

II.    COUNT II RAISES A HOST OF FACT DISPUTES THAT PRECLUDE
SUMMARY JUDGMENT FOR THE FTC ......................................................22

    A.    The FTC's Description of the Challenged Disclosures Is Incomplete .................22

        1.    The Account Summary / To-Do List Page in the Loan Application
Flow .......................................................................................23

2. The "100% Backed" Emails ........................................................25

B. Substantial Factual Disputes Exist Regarding the Net Impression of Applicants Exposed to the Challenged Communications ......................................27

C. Likelihood of Recurrence Is Yet Another Fact Issue..............................................28

III. LENDINGCLUB'S ACH WITHDRAWAL PRACTICES ARE NOT "UNFAIR" AND THE FTC IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT III...30

A. The FTC Inaccurately Portrays the Material Facts .................................................31

B. The Facts Do Not Support the Required Elements of an Unfairness Claim..........32

IV. THE FTC IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO COUNT IV ......37

A. The Challenged Conduct Is Not Likely to Recur....................................................37

B. LendingClub's Pre-December 2016 Disclosures Were Lawful............................38

V. THE FTC'S MONETARY RELIEF DEMAND IS LEGALLY AND FACTUALLY INSUPPORTABLE AND NOT AN ISSUE THAT CAN BE RESOLVED ON SUMMARY JUDGMENT ...............................................................................................40

A. The FTC's Own Cited Authorities Show That Its Requested Monetary Relief Is Unfounded and That Summary Judgment Here Would Be Improper ...............40

B. No Issue in This Case Implicates More Material Fact Disputes Than the Important Question of Monetary Relief, Which Cannot Properly Be Resolved on Summary Judgment ...........................................................................................42

CONCLUSION..................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpi Int'l, Ltd. v. Anga Supply, LLC*,
No. 13-CV-04888-HSG, 2015 WL 2170040 (N.D. Cal. May 8, 2015)..........................................5

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................................................5, 9

*Bulthuis v. Rexall Corp.*,
789 F.2d 1315 (9th Cir. 1985) ...............................................................................................6

*Cliffdale Assocs., Inc.*,
103 F.T.C. 110 (1984)...................................................................................................7, 22

*Davis v. HSBC Bank Nev., NA*,
691 F.3d 1152 (9th Cir. 2012) .............................................................................................34

*ECM BioFilms, Inc. v. FTC*,
851 F.3d 599 (6th Cir. 2017) ............................................................................................8, 9

*Fanning v. FTC*,
821 F.3d 164 (1st Cir. 2016)................................................................................................8

*Firestone Tire & Rubber Co. v. FTC*,
481 F.2d 246 (6th Cir. 1973) ...............................................................................................9

*In the Matter of Franklin's Budget Car Sales, Inc., also DBA Franklin Toyota/Scion, a Corp..*,
No. 102-3094, 2012 WL 5375157 (Oct. 3, 2012)..........................................................40

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
771 F.3d 1119 (9th Cir. 2014) .............................................................................................5

*FTC v. Accusearch Inc.*,
570 F.3d 1187 (10th Cir. 2009) ...............................................................................29, 37, 38

*FTC v. Amazon.com, Inc.*,
No. C14-1038-JCC, 2016 WL 10654030 (W.D. Wash. 2016)............................................ *passim*

*FTC v. AMG Capital Mgmt., LLC*,
910 F.3d 417 (9th Cir. 2018) .............................................................................................41

*FTC v. AMG Servs., Inc.*,
29 F. Supp. 3d 1338 (D. Nev. 2014)....................................................................................40, 41

*FTC v. AMG Servs., Inc.*,
  No. 2:12-cv-00536-GMN-VCF, 2016 WL 5791416 (D. Nev. Sept. 30, 2016)......................40, 41

*FTC v. Commerce Planet, Inc.*,
  815 F.3d 593 (9th Cir. 2016) ......................................................................................40, 42, 43

*FTC v. Commerce Planet, Inc.*,
   878 F. Supp. 2d 1048 (C.D. Cal. 2012) ................................................................................10, 42

*FTC v. Cyberspace.Com LLC*,
  453 F.3d 1196 (9th Cir. 2006) ......................................................................................2, 12, 22

*FTC v. DirecTV, Inc.*,
  No.15-cv-01129-HSG, 2016 WL 5339797 (N.D. Cal. Sept. 23, 2016).............................. *passim*

*FTC v. DirecTV, Inc.*,
  No. 15-cv-01129-HSG, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018).............................. *passim*

*FTC v. Evans Prods. Co.*,
  775 F.2d 1084 (9th Cir. 1985) ......................................................................................29, 38

*FTC v. Gill*,
  71 F. Supp. 2d 1030 (C.D. Cal. 1999) ..............................................................................2, 3, 21

*FTC v. Inc21.com Corp.*,
  745 F. Supp. 2d 975 (N.D. Cal. 2010) ....................................................................33, 34, 35, 36

*FTC v. JK Publ'ns Inc.*,
  99 F. Supp. 2d 1176 (C.D. Cal. 2000) ..................................................................................2

*FTC v. John Beck Amazing Profits, LLC*,
  865 F. Supp. 2d 1052 (C.D. Cal. 2012) ..............................................................................2, 9

*FTC v. Medlab, Inc.*,
  615 F. Supp. 2d 1068 (N.D. Cal. 2009) ..............................................................................2, 6

*FTC v. Neovi, Inc.*,
  604 F.3d 1150 (9th Cir. 2010) ........................................................................................ *passim*

*FTC v. QT, Inc.*,
  448 F. Supp. 2d 908 (N.D. Ill. 2006) ..................................................................................6

*FTC v. Stefanchik*,
  559 F.3d 924 (9th Cir. 2009) ........................................................................................1, 6

*FTC v. Wilcox*,
  926 F. Supp. 1091 (S.D. Fla. 1995) ..................................................................................2

*In re Heinz W. Kirchner*,
  63 F.T.C. 1282 (1963)................................................................................................8

*Leslie v. Grupo ICA*,
198 F.3d 1152 (9th Cir. 1999) ...................................................................21

*POM Wonderful, LLC v. FTC*,
777 F.3d 478 (D.C. Cir. 2015) ....................................................................8

*Rubio v. Capital One Bank*,
613 F.3d 1195 (9th Cir. 2010) ...............................................................7, 15

*In re Standard Oil Co. of Cal.*,
84 F.T.C. 1401 (1974) ...............................................................................28

*Swafford v. IBM Corp.*,
408 F. Supp. 3d 1131 (N.D. Cal. 2019) ..............................................16, 22

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) ......................................................................9

*In the Matter of Taxslayer LLC*,
FTC Dkt. No. C-4626 (2017) ....................................................................40

*In re Telebrands Corp.*,
140 F.T.C. 278 (2005) .................................................................................9

*In re Thompson Med. Co.*,
104 F.T.C. 648 (1984) ...............................................................6, 7, 11, 12

*United States v. W.T. Grant Co.*,
345 U.S. 629 (1953) ..................................................................................29

**Statutes**

12 C.F.R. §1016.1, *et seq.* ...........................................................................38

12 C.F.R. § 1016.4(a) ...................................................................................38

12 C.F.R. § 1016.9(a) .............................................................................38, 39

12 C.F.R. § 1016.9(b)(1)(B)(iii) ..................................................................39

16 C.F.R. §313.1, *et seq.* .............................................................................38

16 C.F.R. § 313.4 .........................................................................................38

16 C.F.R. § 313.9(a) ...............................................................................38, 39

16 C.F.R. § 313.9(b)(1)(iii) ..........................................................................39

65 Fed. Reg. 33646 (May 24, 2000) .............................................................39

1

15 U.S.C. § 45(n) ........................................................................................................32

2

**Rules**

3

Fed. R. Civ. P. 56(a) .....................................................................................................5

4

**Other Authorities**

5

FTC Policy Statement on Deception...............................................................................7, 8

6

7

8

Julapa Jagtiani & Catharine Lemieux, Fintech Lending:  Financial Inclusion, Risk
    Pricing, and Alternative Information (Research Dep't, Fed. Reserve Bank of
    Philadelphia, Working Paper No. 17-17, 2017)..............................................................1

Made in the USA, An FTC Workshop (Sept. 26, 2019)......................................................9

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Defendant LendingClub is an industry-leading company with a top-rated product offering that has helped millions of Americans to escape high-interest credit card debt and to achieve greater financial stability.[1]   The company enjoys low consumer complaint rates, exceedingly high ratings and reviews, and high repeat customer rates.   The FTC has brought this federal lawsuit challenging an origination fee as "hidden" even though it was disclosed on an unavoidable Truth-in-Lending Act ("TILA") disclosure and in several other places and even though a broad array of evidence—including real-world surveys of actual borrowers—shows nearly all borrowers understood the fee (Count I).   The FTC's other claims challenge conduct that the company ceased long ago (Counts II and IV) and ACH withdrawal practices that comport entirely with industry standards (Count III). The agency now seeks summary judgment on every single one of its claims.   This is hardly a case in which the FTC is entitled to summary judgment.   In arguing otherwise, the FTC misapplies the law, misstates the facts, and ignores the substantial evidence refuting its allegations.   LendingClub, not the FTC, is entitled to summary judgment on Counts III and IV, and the company should not be deprived of an opportunity at trial on Counts I and II to vigorously defend itself, disprove the key elements of the FTC's claims, and fully restore its good name.   For multiple, independent reasons, summary judgment in the FTC's favor is inappropriate.

*First*, in moving for summary judgment the FTC has relied on cases involving patently deceptive shams and schemes.   This plainly is not such a case and the facts here are not remotely analogous to the cases cited by the FTC in its motion.   One of the FTC's most frequently cited cases involved marketing of a bogus "method" that "guaranteed" consumers "substantial wealth" by "working only five to ten hours per week," and no "competent affirmative evidence" was offered to contest the FTC's deception claims.   *FTC v. Stefanchik*, 559 F.3d 924, 926-27 (9th Cir. 2009).   Another

---

[1]   Indeed, in 2017 researchers from the Federal Reserve Banks of Philadelphia and Chicago reported that "consumers pay smaller spreads on loans from LendingClub than from traditional lending channels" and that "fintech lenders" such as LendingClub "fill credit gaps" in areas where banks are less available and "provide credit to credit worthy borrowers that banks may not be serving." *See* Julapa Jagtiani & Catharine Lemieux, Fintech Lending:  Financial Inclusion, Risk Pricing, and Alternative Information at 35-36 (Research Dep't, Fed. Reserve Bank of Philadelphia, Working Paper No. 17-17, 2017), *available at* https://www.philadelphiafed.org/-/media/research-and-data/publications/working-papers/2017/wp17-17.pdf.

involved a similar get-rich-quick scheme promising consumers they could "quickly and easily earn substantial amounts of money with little financial investment," including by purchasing homes "for pennies on the dollar" and easily flipping them "for full market value." *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1059, 1067, 1070 (C.D. Cal. 2012).  Another involved sham weight loss pills marketed as a means to achieve "permanent" "rapid, substantial weight loss without diet or exercise." *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1077-78 (N.D. Cal. 2009).  In another, the scheme involved sending small checks without disclosing, except in "fine print . . . on the reverse side of the check," that cashing them activated a monthly internet service that "99 percent did not realize they had contracted for."  *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200-01 (9th Cir. 2006).  In another, where again "the operative facts" were "substantially undisputed," the defendant "prey[ed] on consumers with bad credit histories" falsely claiming to "permanently" remove negative credit histories.  *FTC v. Gill*, 71 F. Supp. 2d 1030, 1033 (C.D. Cal. 1999).  And in yet another, the case involved "14 adult-content Internet websites" marketed through "fictitious" companies in a scheme to obtain credit card information and process fraudulent charges totaling tens of millions, and summary judgment was granted because defendants "essentially concede[d] that they engaged in unfair business practices" and "filed no opposition" to the FTC's motion. *FTC v. JK Publ'ns Inc.*, 99 F. Supp. 2d 1176, 1181, 1202 (C.D. Cal. 2000). *See also FTC v. Wilcox*, 926 F. Supp. 1091, 1096-1100 (S.D. Fla. 1995) (defendant sent 50 million "patently false" solicitations offering a valuable "guaranteed award" or "significant amount of money," and charged a processing fee to claim the cash or awards, yet those who responded received "little or nothing in return").  In cases like these, the FTC brought to light illicit schemes run by rogue actors who were caught defenseless.  Courts granted summary judgment for the FTC, but only because "the operative facts [we]re substantially undisputed, and the heart of the controversy [wa]s the legal effect of such facts." *Gill*, 71 F. Supp. 2d at 1035. This case does not remotely fit that mold.

**Second**, the FTC ignores the extensive evidence LendingClub will present at trial regarding the origination fee charged in connection with loans through LendingClub, evidence that creates significant disputed issues of material fact.  For example, although LendingClub facilitated more than ▮▮▮▮ loans during the relevant period, it only received complaints about the origination fee at a

rate of ▮▮▮ LendingClub's Net Promoter Score (a cross-industry metric for measuring consumer satisfaction, often abbreviated NPS) is double that of the banking and credit card industries. And LendingClub's customers consistently give the company positive reviews. *See* Section I.C., *infra*. In addition, LendingClub will present at trial expert survey evidence demonstrating that only 2.3% of borrowers misunderstood the origination fee and would have understood it if LendingClub had used the FTC's preferred disclosures. *Id.* These facts clearly prevent summary judgment. They are also similar to the facts in another case the FTC brought in this district—*FTC v. DirecTV, Inc.*—where the FTC complained, among other things, that the company's advertising did not adequately disclose that consumers would be charged for premium channels following a three-month free trial offer or that the customer was making a two-year commitment. *See, e.g.*, *FTC v. DirecTV, Inc.*, No.15-cv-01129-HSG, 2016 WL 5339797, at *1-3 (N.D. Cal. Sept. 23, 2016).[2] The court in that case made clear that, although "the contents of the website" in question were not disputed, summary judgment was inappropriate because "the inferences to be drawn from those contents" were "vigorously disputed, and that dispute" went to "the heart of th[e] case." *Id.* at *3. And the court also rejected several of the FTC's claims at trial after the FTC's presentation of evidence, and the agency subsequently abandoned the remainder of its claims. *See generally FTC v. DirecTV*, No. 15-cv-01129-HSG, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018); *see also* Stipulation Voluntarily Dismissing the Action, *FTC v. DirecTV*, No. 15-cv-01129-HSG (N.D. Cal. Oct. 19, 2018), Dkt. No. 427. The FTC's claims here are similarly deficient.

**Third**, the FTC presents an inaccurate and materially incomplete version of the evidence regarding its origination fee claim. It repeats numerous times that ▮▮▮ LendingClub customers inquired about the origination fee. *See* Mot. at 1, 8, 31. But the record shows that the inquiry *rate* was only ▮▮▮. And it is undisputed that some of the inquiries the company received actually reveal

---

[2] The *DirecTV* case also makes clear that the Court must consider extrinsic evidence even where the facial contents of the challenged online representations are undisputed. *DirecTV*, 2016 WL 5339797, at *3. Although the FTC asserts here that the Court should ignore such evidence, it made the same argument in the *DirecTV* case—and lost. *FTC v. DirecTV, Inc.*, FTC Mot. for Partial Summ. J., Dkt. No. 176, at 10-11 (N.D. Cal. Sept. 22, 2016) (Exh. 1 to the Declaration of Richard H. Cunningham (hereinafter "Cunningham Decl.")). (All exhibit references are to the Cunningham Decl. unless otherwise noted.); *see also generally FTC v. DirecTV, Inc.*, No. 15-cv-01129-HSG, 2016 WL6947503 (N.D. Cal. Nov. 26, 2016).

that the customer was aware of and understood the origination fee.  As noted above, actual complaints about the origination fee were much lower.  The FTC asserts that it is undisputed that two institutional investors—Jeffries and Union Bank—"warned" LendingClub of potential disclosure problems.  *Id.* at 14.  However, the FTC fails to disclose that, upon further review of the entire LendingClub application process and flow, both became "comfortable" that the disclosures were compliant and proceeded to become large investors in the loans LendingClub facilitates.  The FTC quotes a document generated by LendingClub's compliance team, and in its motion highlights language suggesting the company's origination fee disclosures "could be perceived as deceptive."  Mot. at 14.  Yet the FTC does not tell the Court the conclusion of the compliance review: "This review exercise *did not identify any apparent UDAAP violations*."  PX 30 (emphasis added).  These are just a few examples.  Only at a trial can these factual disputes be fully aired and decided.[3]

**Fourth**, the FTC is likewise not entitled to summary judgment on its other claims related to LendingClub's statements about loan approval status (Count II), ACH withdrawal practices (Count III), and disclosures of its privacy policy (Count IV).  The FTC misstates the facts relating to LendingClub's statements relating to loan approval, including by ignoring portions of the statements that explain that the borrower must complete the items on their "To-Do List" prior to obtaining final loan approval, and ignores that the challenged practices ceased in 2017 or earlier.  With regard to LendingClub's ACH-related practices, the FTC discusses a supposedly "large number" of erroneous ACH withdrawals, but ignores that LendingClub's ACH return rate is significantly lower than the average for companies that participate in the ACH network, and orders of magnitude below the FTC-endorsed industry benchmark used to identify potential compliance problems.  More fundamentally, the FTC focuses on the wrong thing in attempting to make out an "unfairness" claim based on ACH errors the company has made.  It attempts to define the "adverse consequences" themselves (*i.e.*, mistaken withdrawals) as the relevant "business practice," eliminating any realistic consideration of the clear consumer benefits derived from ACH withdrawals.  This is directly at odds with the case

---

[3]  Likewise, there are significant legal and factual disputes regarding any measure of consumer harm.  The FTC's proposed monetary remedy, *see* Mot. at 44-45, is improper because, among other things, it does not account for the majority of consumers who were in no way misled about the origination fee and far exceeds any conceivable consumer harm.  *See infra* at Section IV.

1  law.  *See, e.g.*, *FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030, at *6, *8 (W.D.

2  Wash. 2016) (analyzing as the relevant business practice "Amazon's billing practices around in-app

3  purchases," as opposed to instances of "unauthorized billing" that were the source of the alleged harm).

4  As explained in LendingClub's Motion for Partial Summary Judgment (Dkt. No. 143), these facts

5  warrant summary judgment in LendingClub's favor.  Similarly, there is no evidence suggesting that

6  the long-abandoned privacy policy dissemination practices challenged by Count IV are likely to recur,

7  which precludes summary judgment for the FTC while also confirming the merits of LendingClub's

8  cross-motion for summary judgment.  *See id.* at 5-9, 23-25.  The Court should deny the FTC's motion.

9  There is no legal precedent for it, and there are numerous genuine fact disputes that can only be

10  resolved at trial.

11  **LEGAL STANDARD**

12  Summary judgment is only proper if the pleadings, discovery, and affidavits show that there is

13  "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of

14  law."  Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  *See*

15  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  At summary judgment, "[t]he evidence of

16  the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 269.

17  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from

18  the undisputed facts."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th

19  Cir. 2014) (internal quotation marks omitted); *see also DirecTV*, 2016 WL 5339797, at *3 (summary

20  judgment inappropriate where the contents of a website are undisputed but the "inferences to be drawn

21  from those contents are vigorously disputed").

22  To defeat summary judgment, it is not necessary for the opposing party to show that any

23  dispute will be resolved in its favor.  *See, e.g.*, *Alpi Int'l, Ltd. v. Anga Supply, LLC*, No. 13-CV-04888-

24  HSG, 2015 WL 2170040, at *1 (N.D. Cal. May 8, 2015).  The opposing party need only present

25  "sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve

26  the parties' differing versions at trial."  *Id.*  Expert opinion "may defeat summary judgment if it appears

27  the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the

28  affidavit."  *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1318 (9th Cir. 1985).

1

## <u>ARGUMENT</u>

2

**I.   COUNT I INVOLVES THE CENTRALLY DISPUTED FACTS OF THIS CASE AND CANNOT PROPERLY BE RESOLVED ON SUMMARY JUDGMENT**

3

4

The FTC's motion accurately acknowledges that, to prevail on deception claims such as Count

5

I, it must show "'first, there is a representation, omission, or practice that, second, is likely to mislead

6

consumers acting reasonably under the circumstances, and third, the representation, omission, or

7

practice is material.'"  Mot. at 27 (quoting *Stefanchik*, 559 F.3d at 928).  The motion fails as to Count

8

I because the FTC misstates the type of evidence the Court must consider, ignores the applicable legal

9

standard, and overlooks the significant evidence that LendingClub's origination fee-related practices

10

were not likely to mislead reasonable consumers, which creates numerous issues of disputed fact to

be resolved at trial.

11

12

**A.   "Facial Review" Is Inappropriate Where, as Here, Consumer Misunderstanding Rates Are Disputed**

13

The FTC asserts that the Court can resolve the parties' dispute on Count I simply by performing

14

a facial review of LendingClub's website, without consideration of extrinsic evidence.  *See* Mot. at

15

27.  Facial review may be appropriate where the claims at issue are obviously false or where there are

16

literally no disclosures of a fee.  *See, e.g.*, *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 960-61 (N.D. Ill.

17

2006) (facial review appropriate where there was no substantiation for claims that a bracelet offered

18

"immediate, significant, or complete pain relief"); *Medlab*, 615 F. Supp. 2d at 1079 (facial review

19

appropriate for claims such as "Not Even Total Starvation Can Slim You Down and Firm You Up

20

This Fast—This Safe!").

21

However, such analysis is plainly inappropriate where, as here, there are clear and unavoidable

22

disclosures,[4] and the dispute between the parties is whether those disclosures are adequate to avoid

23

customer confusion.  For example, as one of the cases cited by the FTC, *Thompson Medical*, states,

24

"[w]hether or not a particular disclosure [is] clear and prominent is a question for whose answer we

25

often would seek information *in addition to* that from the ad itself." 104 F.T.C. 648, 789, n.9 (1984)

26

(emphasis added).  In *Thompson Medical*, the agency evaluated advertisements both with and without

27

disclosures and acknowledged that the advertisements with disclosures created "conflicting messages"

28

---

[4]   Screenshots of these disclosures are included as Exh. 2 to the Cunningham Decl.

that required the agency to "examine extrinsic evidence to determine what net impression(s) the entire ad could reasonably be interpreted as giving to consumers." *Id.* at 789.  The Commission further acknowledged that if an advertiser offers extrinsic evidence regarding the net impression taken from that advertisement, the agency "[is] *obliged* to consider it." *Id.* at 794 (emphasis added).  Indeed, "in *all instances*" where the FTC evaluates whether a specific communication is deceptive, "the Commission will *carefully consider any extrinsic evidence* that is introduced").  *FTC Policy Statement on Deception* at 2, appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 175 n.4 (1984) ("Deception Statement") (emphasis added).

Courts in this circuit have similarly declined to decide cases based solely on a facial analysis of advertisements in cases involving disclosures that were shown or, at a minimum, were clearly available to consumers.  In *DirecTV*, the FTC argued at summary judgment that the court should perform a facial analysis to determine whether DirecTV's website adequately disclosed to consumers that they would be charged for premium channels following the end of the free three-month introductory offer.  *See* FTC Mot. for Partial Summ. J. at 10, *FTC v. DirecTV*, No. 15-cv-01129-HSG, (N.D. Cal. Sept. 22, 2016), Dkt. No. 176.[5]  In that case, neither party disputed the contents of the website, ads, or disclosures relating to the free premium channels.  *Id.* at 11.  The parties, however, intensely disputed the adequacy of those disclosures and the reasonable inferences to be drawn from them.  Much like this case, the FTC asserted that the disclosures were hidden behind "tiny" hyperlinks and "generically labeled" tooltips that consumers would be unlikely to see.  *Id.* at 6.  DirecTV, on the other hand, asserted that extrinsic evidence from consumer survey results, as well as low complaint rates, demonstrated that DirecTV's disclosures were sufficient and qualified as clear and conspicuous.  *See* DirecTV's Opp. to the FTC's Mot. for Summ. J. at 12-13, *FTC v. DirecTV*, No. 15-cv-01129-HSG, (N.D. Cal. Oct. 6, 2016), Dkt. No. 188-3.[6]  The court denied the FTC's request for a facial review of the advertisements at summary judgment on the basis that "divergent inferences reasonably [could] be drawn from [DirecTV's] website." *DirecTV*, 2016 WL 6947503, at *2.  *See also Rubio v.*

---

[5]  *See* Exh. 1.
[6]  *See* Exh. 3.

1    *Capital One Bank*, 613 F.3d 1195, 1200 (9th Cir. 2010) (explaining that "empirical evidence is helpful

2    in determining what [disclosures] a reasonable consumer will understand and readily notice").

3           Notwithstanding its arguments to the contrary, the FTC's motion confirms that the Court must

4    look at extrinsic evidence to evaluate the disclosures in this case.  The agency devotes more than a

5    dozen pages to discussing a broad range of evidence extending well beyond the facial content of

6    LendingClub's advertisements and website—*e.g.*, consumer feedback and complaints, Mot. at 8-10,

7    internal company emails and memoranda, *id.* at 10-14, and third-party audits, *id.* at 14-15—claiming

8    that this extrinsic evidence supports summary judgment.

9           LendingClub agrees that the Court must examine extrinsic evidence to adjudicate Count I and

10   to determine whether LendingClub's origination fee-related practices were likely to mislead

11   reasonable consumers.  As summarized below, LendingClub strongly disputes the FTC's portrayal of

12   the relevant material facts, which omits many key facts and mischaracterizes LendingClub's

13   documents and other parts of the evidentiary record.

14   **B.     The FTC Ignores Its Obligation to Prove That a Significant Minority of**
         **Reasonable Consumers Were Deceived**

15          The FTC conspicuously avoids describing the level of alleged consumer deception it must

16   prove.  This silence is deafening.  The Deception Statement, which has been in place since the early

17   1980s, explains that deception is analyzed from the perspective of persons whom the "representation

18   or practice affects or is directed primarily"—here, individuals who apply for and obtain a personal

19   loan through LendingClub's platform—and that to be deceptive a challenged practice must mislead

20   "*a significant minority of reasonable customers*."   Deception Statement at 1, 10, n.20 (emphasis

21   added).  Courts likewise apply this standard.  *See, e.g., ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 610

22   (6th Cir. 2017) (applying standard); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015)

23   (same); *Fanning v. FTC*, 821 F.3d 164, 171 (1st Cir. 2016) ("Liability may be imposed if at least a

24   significant minority of reasonable consumers [would be] likely to take away the misleading claim.")

25   (internal quotation marks omitted); *In Re Heinz W. Kirchner*, 63 F.T.C. 1282, 1290 (1963) ("A

26   representation does not become 'false and deceptive' merely because it will be unreasonably

27   misunderstood by an insignificant and unrepresentative segment of [consumers] . . . .").

28

Neither the FTC nor the courts have set a bright-line percentage of customers that qualify as a "significant minority," but it is clear that the percentage cannot be lower than ten percent, after excluding consumers who do not act "reasonably" in that they fail to read or understand even indisputably compliant disclosures. *ECM BioFilms,* 851 F.3d at 610-11 (citing 10% as low end); *In re Telebrands Corp.*, 140 F.T.C. 278, 325 (2005) (between "10.5%" and "17.3%" of consumers misled); *Firestone Tire & Rubber Co. v. FTC*, 481 F.2d 246, 249 (6th Cir. 1973) (it would be "hard to overturn the deception findings of the Commission if the ad . . . misled 15% (or 10%) of the buying public"); *John Beck Amazing Profits, LLC*, 865 F. Supp. 2d at 1070, n.88 ("evidence showing that 10.5% to 17.3% of copy-test respondents took away the message at issue is sufficient"). This is likewise consistent with the FTC's public statements that defined "significant minority" as 10.5% or more. *See* Made in the USA, An FTC Workshop, at 9 (Sept. 26, 2019).[7] Based on extensive research, there does not appear to be any case finding deception where fewer than 10.5% of consumers (net of control) did not see or understand the disclosures at issue.

The FTC presumably omits any discussion of this core component of the legal standard because the agency is keenly aware that evidence will show that the overwhelming majority of LendingClub customers fully understood the origination fee. As explained below, LendingClub will present extensive evidence at trial that less than 3% of borrowers misunderstood the origination fee, but would have understood it had LendingClub used the FTC's preferred disclosures. The FTC will argue this percentage is higher. But this dispute alone, which goes to the heart of the allegations in Count I, makes summary judgment entirely inappropriate.

### C.   A Large and Varied Body of Evidence Shows That the Disclosures of the Origination Fee on LendingClub's Website Were Both Adequate and Effective

At this stage, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Moreover, "if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W.*

---

[7]   *Available at*
https://www.ftc.gov/system/files/documents/public_events/1531858/made_in_the_usa_workshop_slides_9-26-19.pdf.

*Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630-31 (9th Cir. 1987).  The evidence set forth below, while by no means an exhaustive recitation of the facts LendingClub intends to present at trial, amply demonstrates that there are numerous material disputed facts going to key issues pertinent to Count I and that this claim cannot appropriately be decided on summary judgment.

### 1.   Very Low Complaint and Inquiry Rates

LendingClub, in the ordinary course of business, tracks both consumer complaints (defined as an "expression of dissatisfaction" or communication of "suspicion of wrongful conduct") and consumer inquiries (defined as a "request for information or assistance" not constituting a complaint). Exh. 4 at 14-15.  The FTC presents the raw numbers of such instances, and asserts that approximately ███ complaints and inquiries over a period of several years is clear evidence of deception.  Mot. at 8.

What the FTC omits is how the complaint and inquiry numbers compare to the volume of transactions LendingClub facilitated over the same period.[8]  More than ███ loans were originated through LendingClub's platform from 2013 to 2019, and discovery has shown that the *rates* at which LendingClub received complaints and inquiries indicating borrower misunderstanding of the origination fee were exceedingly low—███ and ███, respectively.  Exh. 5 at 36-37, Exh. 6 (Wind Rep.) at 86; Exh. 7 (Carlin Rep.) at 70-71.  Particularly in light of the fact that LendingClub provides borrowers numerous easy ways to contact the company to complain or ask questions, *see* Exh. 8 (Hines Tr.) 21:8-22, there is no reason to expect that this evidence in any way understates the level of consumer misunderstanding.  *See* Exh. 9 (Wind Reb. Rep.) ¶¶ 88-89 (explaining that recent research has shown that consumers are likely to raise complaints, questions, and concerns in an online environment providing low-friction communication methods).  Among other things, this undisputed evidence of exceedingly low complaint and inquiry rates, which is corroborated by other evidence discussed below, strongly refutes a core element of what the FTC must prove—namely, that a

---

[8]   Courts evaluate consumer complaints in the context of the volume of business at issue.  For example, in *Commerce Planet*, a case the FTC's motion cites repeatedly, the court noted that the defendant received approximately 1,000 phone complaints a week, at a time when the defendant made sales to approximately 500,000 customers over a three-year period.  *See* 878 F. Supp. 2d at 1089, 1092.

"significant minority of reasonable consumers" (*i.e.*, at least 10.5%, *see* pp. 8-9, *supra*) were misled by the challenged disclosures.

### 2. Consumer Testing

LendingClub retained Dr. Jerry Wind, a prominent survey expert and Wharton School professor of marketing, to conduct two consumer experiments using actual LendingClub borrowers to evaluate the effectiveness of the origination fee disclosures on the company's website in a real-world environment. Exh. 6 (Wind Rep.) at 1, 3. In each experiment, Dr. Wind employed a "test/control" methodology comparing the rate of consumer understanding of the origination fee following exposure to the disclosures challenged in the FTC's complaint (test) to consumer understanding rates after exposure to disclosures conforming with the approach outlined by the FTC's draft consent order (control). *Id.* at 21.

The survey's most pertinent question asked respondents: "*[w]as the amount of money deposited into your bank account the amount that you expected after you obtained your loan approval?*" *Id.* at 35. A "yes" response to this question indicated that the borrower understood that there was an origination fee that would be deducted from the requested loan amount. *See id.* On the other hand, a "no" response suggested that the borrower may not have understood that an origination fee would be deducted from the requested loan amount. The results of the experiments showed, among other things,[9] that the difference in understanding between the test and control groups was 2.1% to 5.1% depending on the exact disclosures tested and methodologies deployed. *See id.* at Tables 7-8, 13, 16-18. The experiment that is most closely relevant to Count I shows a net misunderstanding rate of 2.3%, meaning that understanding of the origination fee only increased 2.3% when using the FTC's preferred disclosures over the disclosures the FTC challenges in Count I. *See id.* ¶¶ 100-02. All of these figures fall far below the minimum 10.5% "significant minority" threshold discussed above. *See* Made in the USA, An FTC Workshop, at 9. Given that the courts and the FTC itself afford "great weight" to "consumer survey research," *Thompson Medical*, 104 F.T.C. at 789, this evidence even standing alone precludes summary judgment on Count I.

---

[9]   The experiments also showed very high levels of borrower satisfaction, *see* Exh. 6 (Wind Rep.) at 42-43, 76-78, and similar rates of "conversion" (defined as the percentage of applicants who ultimately become borrowers) across all test and control groups, *see id.* at 38, 76.

### 3.    Industry-Leading Consumer Satisfaction

For many years, LendingClub has tracked its Net Promoter Score ("NPS"), a standardized, cross-industry metric for measuring customer satisfaction.  Exh. 6 (Wind Rep.) ¶ 124.  The banking and credit card industries have average NPS scores in the range of 30-40.  *Id. at* ¶ 125.  Meanwhile, LendingClub has consistently maintained an NPS score between 71 and 80, far exceeding industry benchmarks.  *Id.*  LendingClub's consistently high NPS score strongly suggests that significant numbers of borrowers were not misled about the origination fee.  The fee averages ███████, and it would be implausible for borrowers who felt misled or deceived about the fee to, at the same time, express a high degree of satisfaction with LendingClub.  *See, e.g.*,  *DirecTV*, 2018 WL 3911196, at *18 (citing DirecTV's high NPS score as evidence that consumers were not deceived by the company's advertisements).

### 4.    High and Growing Repeat Customer Rates

The high and steadily growing number and percentage of repeat LendingClub customers is further evidence that LendingClub consumers are overwhelmingly satisfied, rather than deceived.  LendingClub's records show that approximately ███ of borrowers who obtained loans through the LendingClub platform in 2016 had previously borrowed through LendingClub.  Exh. 6 (Wind Rep.) at 92.  By the first quarter of 2019, this percentage had risen to ███  *Id.*  Borrowers who felt misled about a fee that averages ██████ per loan are not likely to borrow again from LendingClub, particularly in light of the myriad other online and traditional lending options available to consumers in the marketplace.  *See, e.g.*, Exh. 7 (Carlin Rep.) at Exh. 7 (identifying 14 additional personal loan lenders).  *See also DirecTV*, 2018 WL 3911196, at *18 (evidence of increasing consumer loyalty supported finding of no deception); *cf. Cyberspace*, 453 F.3d at 1201 (evidence that "less than one percent" of consumers used the defendant's product supported finding of deception).

### 5.    Overwhelmingly Positive Borrower Ratings and Reviews

LendingClub and multiple independent third parties collect ratings and reviews from borrowers.  The FTC cites this evidence by quoting snippets from a handful of negative reviews provided to LendingClub.  *See* Mot. ¶ 51, at n.2.  What the FTC omits is that, as of October 2018, LendingClub had received 53,108 ratings and reviews from borrowers (all of which are validated by

a third-party vendor, Bazaarvoice), and the company's average rating was exceptionally high—4.8 out of 5.0 stars. Exh. 6 (Wind Rep.) at 94-95.[10]  In addition, several third-party websites, including popular consumer finance websites Credit Karma and NerdWallet, independently maintain ratings and reviews of personal loan providers and platforms, including LendingClub.  *Id.* at 93.  Again, LendingClub received highly favorable ratings—as of November 2019, LendingClub's rating on Credit Karma was 4.6 out of 5.0 stars, and the company's rating on NerdWallet was 4.0 out of 5.0 stars.  *Id.*  The customer satisfaction data compiled by these independent websites corroborates LendingClub's internal data. Especially when viewed in the aggregate, the overwhelmingly positive customer ratings LendingClub receives are inconsistent with any form of widespread deception, let alone deception pertaining to a fee that averages ███████ per loan.  *See DirecTV*, 2018 WL 3911196, at *18 (indicia of consumer satisfaction is evidence that consumers were not deceived by advertisements).

### 6.    Consumer Financial Protection Bureau ("CFPB") Review and Project Catalyst

The CFPB is an agency of the United States government responsible for consumer protection in the financial sector.  The CFPB has described its "core functions" as including "[r]ooting out unfair, deceptive, or abusive acts or practices by writing rules, supervising companies, and enforcing the law," and "[r]esearching the consumer experience of using financial products."  Exh. 10.  As part of its researching function, pursuant to the Dodd-Frank Act of 2010, the CFPB in November 2012 announced the launch of Project Catalyst, which it described as "an initiative designed to encourage consumer-friendly innovation and entrepreneurship in markets for consumer financial products and services" meant to ensure "consumers access to fair, transparent, competitive, and innovative markets."  Exh. 11.

Although the FTC never mentions Project Catalyst in its motion, the record shows that LendingClub reached out to the CFPB to participate in Project Catalyst in approximately late 2013, and that the CFPB and LendingClub worked together on the effort until May 2016.  Exh. 12 (Sanborn Tr.) 205:3-7; 207:21 - 208:1.  Project Catalyst involved a voluntary, collaborative effort between the

---

[10]   Furthermore, as of July 23, 2019, the date on which Professor Wind's team pulled the underlying ratings and reviews data, only 3.2% of reviewers gave LendingClub three stars or fewer.  Exh. 6 (Wind Rep.) at 95.

CFPB and LendingClub (later with participation from WebBank, the bank that originates loans available on LendingClub's platform) to develop potential alternative formats for presenting the federally mandated TILA disclosures in LendingClub's loan application flow.  Exh. 13 (Jackson Tr.) 12:25 - 15:5; Exh. 12 (Sanborn Tr.) 201:14 - 202:16.  During this process, the CFPB conducted significant diligence on LendingClub's business practices including a "page-by-page" review of LendingClub's entire loan application funnel.  Exh. 12 (Sanborn Tr.) 234:21 - 235:12.  And, as part of that review, the CFPB █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Exh. 12 (Sanborn Tr.) 235:2 - 236:8.  Yet, notably, the CFPB expressed ***no concerns*** regarding the origination fee disclosures in LendingClub's application flow, including the disclosures of the fee in the TILA disclosure in the flow, notwithstanding that the entire project centered around potential approaches for updating the TILA form disclosures to make them, among other things, more understandable and consumer friendly.

The fact that CFPB staff conducted extensive diligence on LendingClub's entire application flow and did not find any issues with the origination fee disclosures is strong evidence that the disclosures are neither "hidden" nor deceptive.  Indeed, the corporate representative of WebBank testified that his "general experience and understanding of the CFPB is if they think you're doing something wrong . . . we would have been talking about that rather than about a test for new disclosures."  Exh. 13 (Jackson Tr.) 43:4-20.  Moreover "this evidence further underscores how this case is very unlike the straightforward deception cases upon which the FTC purports to rely."  *DirecTV*, 2018 WL 3911196, at *18 (evidence showing "[a company's] investment of substantial resources in analyzing its operations, candidly identifying areas for improvement, and following through on a number of improvements does not support a finding that the company violated the FTC Act.").

### 7.   Federal Deposit Insurance Corporation ("FDIC") Review

Pursuant to FDIC regulations, WebBank, the FDIC-supervised bank that originates the loans available on LendingClub's platform, is responsible for assessing and ensuring that the fee disclosures

1   on LendingClub's platform comply with applicable state and federal laws and regulations, including

2   TILA and Regulation Z.  *See, e.g.*, Exh. 13 (Jackson Tr.) 53:15 - 54:4.  As part of the FDIC's audits

3   and examinations of WebBank, the TILA disclosure and application flow on LendingClub's website

4   have been reviewed regularly by the FDIC multiple times during the relevant time period.  In late

5   February 2020, the FTC produced documents summarizing the results of those reviews.   The

6   summaries show █████████████████████████████████████████████████████████████

7   █████████████████████████████████████████████████████  *See* Exhs. 14-17; *see also generally*

8   Exh. 18 (Grice Supp. Rep.).  ███████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████████

12  ██████.  *See* Exh. 18 (Grice Supp. Rep.) ¶¶ 6-11.  ████████████████████████████████

13  ████████████████████████████████████████████████.  *Cf. Rubio*, 613 F.3d at 1201-02 (citing agency

14  study and commentary when evaluating TILA compliance).

**8.   Third-Party Compliance Reviews**

16  ██████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████  Exh. 19 (Grice Rep.) at 49, Exh. 2 (summarizing

20  audits).  The conclusions of these prominent auditors is evidence that the disclosures were adequate

21  and consistent with industry norms.

**D.   The FTC's Motion Is Premised Almost Entirely on Out-of-Context Quotes and Anecdotes, Highlighting the Material Dispute Between the Parties**

As in *DirecTV*, "the FTC's approach" in moving for summary judgment "appears to have been

24  to seize on language superficially helpful to its case in documents, while consistently ignoring pivotal

25  context showing the actual meaning of the evidence."  2018 WL 3911196, at *18.  Hence, in addition

26  to ignoring substantial record evidence directly refuting the allegation that material numbers of

27  borrowers were deceived, much of what the FTC casts as "undisputed material facts" is inaccurate and

materially incomplete.  At a minimum, there are very significant disputes between the parties about the inferences to be drawn from the FTC's evidence, and this too precludes summary judgment.  *See, e.g.*, *Swafford v. IBM Corp.*, 408 F. Supp. 3d 1131, 1142-43 (N.D. Cal. 2019) (summary judgment inappropriate where there was a material factual dispute regarding the inferences that could reasonably be drawn from representations made in internal company documents).

The following are but a few examples of the how the FTC's presentation of its evidence fails to accurately reflect the record facts:

- <u>Tooltip Hover/Click Rate Data</u> – The FTC asserts that LendingClub's "data regarding tooltip activation—desktop or mobile—was inconsistent" over time, and insinuates that it is unreliable.  Mot. ¶ 18.  LendingClub disputes this assertion.  As the company explained in its responses to the FTC's interrogatories, for months in which complete data is available, the hover/click rates for the tool-tip on the Offer page ranged from ███ to ███ in 2017 and 2018.  PX 202 at 4-5.  Company tests from mid-2013 show rates above ███.  PX 50.  A ████████████████████████████ is logical considering that, during this time period, the ███████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████.  Nor does the FTC address the fact that the interest rate and APR figures that are prominently displayed side-by-side on LendingClub's site, are notably different (because the APR includes the origination fee), which provides a natural trigger for consumers to question what other costs besides interest are included and, to the extent they do not understand, to obtain that information from the tooltip.

- <u>The Presentation of Origination Fee-Related Information on the TILA Disclosure</u> – The FTC seeks to discount the origination fee information presented on the TILA disclosure in LendingClub's application flow, arguing it is "[m]ore than halfway down the page," lacks "heading or typographical emphasis," and is "below the fold."  Mot. ¶¶ 22-23.  Yet the structure, presentation, and content of the TILA disclosure is essentially dictated by CFPB regulations.  And ample evidence in the record shows that the TILA disclosure on

LendingClub's website is fully compliant with those regulations. *See* Exh. 19 (Grice Rep.) at 26-51.

- Rates & Fees Page Viewing Rates – The FTC asserts that " ██ of consumers who completed an application visited the page, which mentioned the up-front fee." Mot. ¶ 30. The FTC neglects to mention, however, that this figure includes only borrowers who viewed the Rates & Fees page using the same device used to complete their loan application. This figure thus understates viewership of the Rates & Fees page. *See* Exh. 20. And, of course, it does not include consumers who viewed origination fee information in the TILA disclosures, through the tooltip on the offer page, or through other disclosures in the application flow, including the footer on the offer page. *See* Exh. 2; Exh. 6 (Wind Rep.) at 55, 57 (showing footer).

- LendingClub's "No Hidden Fees" Message Testing Results – The FTC asserts that LendingClub's "testing found that the 'no hidden fees' claim ████████████████ ██████████████████████████" Mot. ¶ 39. The document the FTC cites (PX 72), however, explicitly states that the tested statement also included the representation ███████ ████████████████████████████████████████████████████████████████ ████████████████ The FTC also omits a host of additional record evidence showing that the "no hidden fees" statement is ***not*** material to consumers, including evidence that removing the "no hidden fees" statements did not materially impact (i) loan origination rates on LendingClub's platform; (ii) application-to-loan conversion rates; or (iii) the rates at which consumers contact LendingClub with questions about the origination fee, *see* Exh. 6 (Wind Rep.) ¶ 81, as well as evidence showing that there is no material difference in borrower understanding between borrowers exposed to application flows containing or excluding the "no hidden fees" statements. *See id.* ¶¶ 104-05.

- LendingClub's "Offer Details Page" Testing Results – The FTC claims that when "[LendingClub] tested an ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████." Mot. ¶ 39 (citing PX 71).

But the full document (of which the FTC provided only a single page) shows that ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████ *See* Exh. 21 at 1.

And further contrary to the FTC's contentions, the document shows that LendingClub

concluded it would need to █████████████████████████████████

██████████████████████████████████████ *Id.* at 3.

- LendingClub Employee Correspondence – The FTC asserts that LendingClub's "employees expressly recognized that its conduct with regard to fee and loan amount claims was a violation or potential violation of laws prohibiting unfair, deceptive, or abusive acts or practices ('UDAAP' or 'UDAP')," Mot. ¶ 73, but the cited documents do not support this claim. The first internal LendingClub email cited to support this assertion (PX 117) concerns how LendingClub ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ At no point in the email does anyone say or suggest that LendingClub's "conduct with regard to fee and loan amount claims" violated UDAAP laws. *See* PX 117. The second internal email chain the FTC cites, which references a compliance "Christmas Wish List" (PX 47), likewise does not reflect the belief that LendingClub was violating UDAAP laws. Rather, LendingClub's former compliance director described the wish list as providing "suggestion[s]" rather than "recommendation[s]," *see* Exh. 22 (Chou Tr.) 79:20, and nowhere in the email chain is it ever stated or suggested that LendingClub was violating UDAAP laws, *see* PX 47. The remainder of the documents the FTC cites (PX 27, PX 7, and PX 118) appear unrelated to the FTC's assertion and were cited in error.

- Quotes Predating the Tooltip – The FTC quotes language from a 2012 LendingClub email, in which a consumer expressed dissatisfaction that the origination fee was not disclosed until the TILA disclosure, Mot. ¶ 53 (citing PX 79), but the FTC fails to mention that

1   LendingClub in this early time period had not yet implemented the tooltip disclosure on

2   the Offer page.  This email therefore does not even address the application flow that the

3   FTC challenges.

4   • <u>Quotes Relating to Phone Applications</u> – The FTC represents that it is an "undisputed

5   material fact" that LendingClub "hiring and training materials for customer service

6   supervisors listed 'borrower is upset because they believe the origination fee was not

7   disclosed to them' as a scenario that a supervisor 'would encounter regularly.'"  Mot. ¶ 54

8   (citing PX 96).  A review of the full document, however, reveals that it was focused on

9   vetting attributes important to the hiring of a supervisor-level position and it is clear that

10  the scenarios discussed focus on how a candidate would handle interdepartmental

11  personnel issues that arise.  *See* PX 96 ("[T]hat Advocate has always been gunning for my

12  teammembers.").  Furthermore, the FTC omits that this internal LendingClub document

13  relates to a scenario in which an "app by phone rep" inadvertently failed to disclose the

14  origination fee during a phone application, and has nothing to do with the ***online***

15  disclosures at issue in this case.  In any event, contrary to the FTC's representation, there

16  is nothing in the document that clearly establishes that it was the "app by phone" customer

17  interaction used in the scenario that occurred "regularly," as opposed to the

18  interdepartmental personnel dispute that was plainly the focus of the scenario.

19  • <u>Correspondence Among Company Leaders</u> – The FTC states that LendingClub's President

20  commented that "██████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████        Mot. ¶ 66 (citing PX 21).   Yet the FTC omits the remainder of the

25  communication, which provides important context:

26

27  ████████████████████████████████████████████████

28



PX 21 at 1 (emphasis added).

- <u>Conversion Rate Evidence</u> – The FTC asserts that LendingClub ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.”  Mot. ¶ 67.  This assertion mischaracterizes the record, given that LendingClub ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆  Exh. 12 (Sanborn Tr.) 199:18-25; 216:2-11.  In addition, it omits data showing that added origination fee disclosures on the Offer page **_do not_** materially impact application-to-borrower conversion rates.  *See* Exh. 6 (Wind Rep.) ¶¶ 109-110 (analyzing this issue using test/control methodology); Exh. 23 (Farrell Rep.) ¶ 79, Exhs. 3-6 (analyzing LendingClub data pre- and post-February 2019, when LendingClub adopted the FTC's preferred disclosures on the Offer page).

- <u>Removal of the TILA Disclosure</u> – The FTC asserts that "concerns about conversion led CEO Sanborn to advocate for removing [the] TILA disclosures from [LendingClub's] online application altogether."  Mot. ¶ 68.  This statement is false.  When FTC counsel asked Mr. Sanborn whether LendingClub ever considered removing the TILA page from the application flow, Mr. Sanborn testified the he was ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆"  Exh. 12 (Sanborn Tr.) 63:10-14.

- <u>Compliance Reviews</u> – The FTC asserts that, "[i]n December 2015, Defendant's Compliance team completed a UDAAP assessment that stated . . . [t]he origination fee is disclosed on the offer page tooltip, but is not readily apparent unless an applicant clicks on the tooltip.  *This omission could be perceived as deceptive as it is likely to mislead the*

*customer*."  Mot. ¶ 74 (emphasis by FTC).  The FTC omits that the conclusion of the Compliance team—as indicated at the top of the same document—was that the "review exercise ***did not*** *identify any apparent UDAAP violations*."  PX 30 (emphasis added).  The remainder of the document, including the text quoted by the FTC, merely provides "suggested enhancements" to the existing disclosures, and further confirms that the origination fee is already "clearly disclosed" within the loan application flow on the TILA disclosure.  *Id.*

- Supposed Third-Party "Warnings" – The FTC asserts that "[t]hird parties also warned" LendingClub, citing documents relating to LendingClub's relationship and correspondence with two large investors on its platform, Jefferies and Union Bank.  Mot. ¶ 76.  The FTC omits that, after further due diligence and discussions with LendingClub, both Jefferies and Union Bank became "comfortable" that LendingClub's origination fee disclosures did not raise UDAAP issues and invested very substantially in loans originated through the platform.  *See, e.g.*, Exh. 24 (Fisher Tr.) 171:12-19.  Similarly, Scott Sanborn testified that the only change that Jefferies ultimately required before investing in LendingClub was █ ████████████████ *see* Exh. 12 (Sanborn Tr.) 256:15-21, which, as shown by PX 22, ███████████████████████████████████████████████

These are but a few examples of the parties' diverging inferences regarding facts that the FTC inaccurately characterizes as "undisputed."  Many of these assertions of fact feature prominently in the FTC's argument for summary judgment on Count I.  Indeed, the FTC recites virtually all of these so-called "undisputed facts" as constituting "ample proof of actual deception" and "highly probative of the fact that [LendingClub's] loan amount and 'no hidden fees' representations were likely to mislead consumers acting reasonably under the circumstances."  Mot. at 31-32 (case quotations omitted).  But again, the FTC's snippets and quotes paint an incomplete and misleading picture.  Far from a case in which "the operative facts" are "substantially undisputed," *Gill*, 71 F. Supp. 2d at 1033, many key facts relating to Count I are hotly disputed.  Particularly considering that the evidence must be viewed in the light most favorable to LendingClub, *see, e.g.*, *Leslie v. Grupo ICA*, 198 F.3d 1152, 1157 (9th Cir. 1999); *Swafford*, 408 F. Supp. 3d at 1140, summary judgment is inappropriate here.

1

2

## II.   COUNT II RAISES A HOST OF FACT DISPUTES THAT PRECLUDE SUMMARY JUDGMENT FOR THE FTC

In Count II, the FTC asserts a separate claim of deception, alleging that LendingClub has "represented, directly or indirectly, expressly or by implication, that . . . consumers would receive loans" at a time when loan approval was not certain because "back-end review" remained ongoing. FAC ¶¶ 59-60.  The same legal standards applicable to Count I apply to this claim, and to prevail the FTC must prove that the company's challenged communications caused a significant minority of reasonable consumers to be deceived and to take away the "net impression," *Cyberspace.com*, 453 F.3d at 1200, that their loans were fully approved and no further steps or contingencies existed in the application process.  As with Count I, the FTC maintains that there is "no genuine issue of fact" pertaining to this claim and that it is entitled to judgment as a matter of law.  Mot. at 34.  But once again, the FTC's recitation of purportedly "undisputed material facts" obscures or altogether ignores a host of relevant, highly controverted facts going to the merits of this claim.  The FTC also ignores that the conduct it challenges and seeks to enjoin in Count II ceased years ago, creating additional factual disputes regarding the agency's burden to prove a likelihood of recurrence.  Given the many contested facts implicated by this claim, the FTC's motion should be denied.

### A.   The FTC's Description of the Challenged Disclosures Is Incomplete

The FTC identifies two types of LendingClub communications it contends prematurely signal loan certainty: (i) the Account Summary / To-Do List page in the loan application flow on LendingClub's website, and (ii) emails stating that the applicant's loan is "100% Backed" by investors. Mot. at 34.  With regard to both, the FTC identifies and discusses only *portions* of the challenged communications, selectively ignoring other relevant content in the same communications, as well as other contemporaneous messaging to applicants conveying that they must take additional steps to secure final loan approval.  This approach of viewing challenged content in isolation and ignoring pertinent communications is legally improper and contrary to the FTC's own stated policies.  *See* Deception Statement at 3 (assessing a challenged claim requires examining "the entire mosaic, rather than each tile separately").

1

### 1.     The Account Summary / To-Do List Page in the Loan Application Flow

2        The Account Summary / To-Do List page is one of the last steps in the online application flow

3   on LendingClub's website.   *See* Exh. 25 at 11.   The purpose of the page is for LendingClub to

4   communicate to prospective borrowers additional steps that may need to be taken by the borrower

5   before a loan can issue.   This may include providing information and/or materials necessary to verify

6   information provided by the applicant during the application process (such as proof of income) or that

7   are needed to service the loan (such as the applicant's email address).   In several ways, the FTC

8   presents an inaccurate version of the facts surrounding this page.

9        First, the FTC's description of the content of the Account Summary / To-Do List page in its

10  "Statement of Undisputed Facts" is materially incomplete.   The FTC accurately describes the top part

11  of the page, which prior to approximately November 2017 included the statements the FTC repeatedly

12  quotes, including "You're $[amount] loan is on the way," "Loan Number," and "DONE!"   *See* Mot.

13  at 34.   But the very same page also included other content clearly and prominently contextualizing

14  these statements and communicating that the applicant was required to submit additional information

15  prior to loan approval.   The screenshot of the page in the FTC's brief is cropped to avoid showing the

16  middle of the page, *see* Mot. ¶ 27, which would have appeared in the center of an applicant's screen

17  and included a variety of content explaining that final loan review cannot be completed until the

18  applicant submits additional information.   The screenshot below shows the full content of the page,

19  with a red dotted line indicating where the FTC cropped the original:

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18  Exh. 26 (screenshot of the Account Summary / To-Do List page from January 2015).

19       In its motion, the FTC cropped the screenshot just above the red dotted line shown above,

20  eliminating content on the page communicating that the borrower must complete their "To-Do list"

21  for review of their application to be complete, and then clearly signaling for the applicant what "To-

22  Do List" tasks remain incomplete.  The repeated references to the applicant's "To-Do List" (selectively

23  removed in the FTC's screenshot) also plainly communicate that the applicant must take additional

24  steps to complete their application.   Notably, the FTC's cropped screenshot also removed the

25  following statement, which appeared immediately following a highlighted yellow hazard sign:  "*Once*

26  *complete*, we can finish final review of your application." (Emphasis added).  The presentation of this

27  highlighted statement, viewed in context with the repeated references to an unfinished "To-Do List,"

28  leaves no doubt that the applicant is informed that more steps remain to be completed before

1   LendingClub can "finish final review" of the loan application process.  The FTC offers no explanation

2   for why it chose to remove this additional, highly relevant information from the screenshot featured

3   in its motion.  Nor does the FTC's motion address the substance of the content that it chose to excise,

4   much less explain how after being exposed to such content an applicant could have failed to take away

5   the "net impression" that the loan application process remained incomplete.

6        Second, the FTC insinuates that the prospective borrower's loan application may be declined

7   at this point for any reason at the whims of WebBank and/or LendingClub, *see* Mot. ¶ 100 ("Applicants

8   can be rejected during back-end review even if they complete every item on their To-Do Lists, and

9   even if they were truthful on their applications"), but that is not the case.  Rather, as reflected by the

10   evidence the FTC itself cites,[11] applications are declined at this stage only if LendingClub cannot

11   verify previously supplied information.  *See* Exh. 25 at 11.[12]

12        Third, the FTC also does not address the fact that LendingClub, as discussed below, changed

13   this page in or around November 2017 to remove the challenged statement "Your $[amount] loan is

14   on the way!"  Exh. 27 (Hiremath 30(b)(6) Tr.) 132.  The documents cited by the FTC show that the

15   company viewed this as a "minor change" at the time.  PX 124 at 3.

16                 **2.**     **The "100% Backed" Emails**

17        The FTC also challenges certain emails to LendingClub borrowers stating that their loans were

18   "100% Backed."  Mot. at 17.  The "100% Backed" emails were sent to provide notice to applicants

19   that investors on LendingClub's platform expressed interest in investing in a loan with the interest rate

20   and risk profile associated with the loan option selected by the applicant, provided that the

21   underwriting process was completed and the loan issued.  These emails were sent to borrowers at

22

23   [11]  To support the description of the reasons an applicant may be declined during back-end review,
the FTC cites Paragraph 40 of LendingClub's Amended Answer and PX 133.  *See* Mot. ¶ 100.

24   Presumably, the FTC intends to refer to Paragraph 39 in LendingClub's Amended Answer because
Paragraph 40 is unrelated to this issue.  Paragraph 39 merely says that "LendingClub admits that

25   some prospective borrowers are denied based on LendingClub's inability to verify the information
that the prospective borrower provided in his or her loan application."  PX 133 does not appear to

26   "list[] reasons for back-end rejection," as asserted by the FTC.

27   [12]  *See also* Exh. 12 (Sanborn Tr.) 53:8-12 ("Q:  So is the only reason that a consumer would be
rejected on the back end is if the information that they provided in the application flow did not

28   match documents that they later provided?  A:  Yes.  Let me just think for a minute.  I'm trying to
think of any other reason, but I can't think of anything.").

1   approximately the same point in the loan application process that borrowers were presented with the

2   Account Summary / To-Do List page described above.  The FTC's description of the "100% Backed"

3   email, Mot. ¶¶ 87-96, is incomplete in multiple respects.

4        First, the FTC mischaracterizes the content of the vast majority of the "100% Backed" emails.

5   With the exception of a single version sent for 88 days in 2015,[13] these emails also included content

6   clearly signaling that the applicant had to provide further information and that the loan application was

7   still incomplete and pending review.  An exemplar screenshot of these versions of the email is shown

8   below:



18  Exh. 25 at 23.[14]

19       This version of the email includes a clear statement that applicants must take further steps to

20  complete their loan application.  It references completing the "To-Do List," explains that "final

21  review" occurs "after" the applicant "submit[s] all of the requested documents," and states that "there

22  are two more steps that need to happen to get your loan."  All of this communicates to an applicant

23  that review of the loan application is not complete, and that final approval is not certain.  As the FTC

24  acknowledges, these versions of the "100% Backed" email "remind[] consumers to finish any tasks

25  on their To-Do List," Mot. ¶¶ 91, 93, but the email also states that final review will not occur until

---

[13]   A screenshot of this email is included in the FTC's complaint.  FAC ¶ 37.

[14]   *See also* PX 187 at 1 (referred to by the FTC as "version 2" of the "100% Backed" email, *see* Mot. ¶ 91); PX 128 at 9 (referred to by the FTC as "version 3" of the "100% Backed" email, *see* Mot. ¶¶ 92-93).

1  after the applicant "submit[s] all the requested documents."  Summary judgment cannot be granted

2  when the FTC is ignoring material parts of the very documents it cites, especially when they are

3  contrary to the FTC's claims.

4  Second, the FTC does not explain the context in which the "100% Backed" emails were sent.

5  The FTC asserts that LendingClub sent such emails from "April 2015 until at least October 2018."

6  Mot. ¶ 87.  This is technically true but ignores that LendingClub changed its internal processes in June

7  2016 so that the "100% Backed" email was sent *after* final loan approval had been completed in

8  virtually all cases.  LendingClub explained this in response to FTC Interrogatory No. 1:

9
10  > In June 2016, LendingClub changed its processes for nearly all classes of loans, such that
   > loans are not posted to investors for funding until after all other phases of the loan
11  > approval process have been completed, including back-end approval and verifications.
   > In other words, since June 2016, for nearly all classes of loans, only consumers who meet
12  > all of the applicable creditworthiness criteria and completed any verification checks
   > would have their loan applications listed for investor backing and be notified when their
13  > loans were fully backed by investors.

14  Exh. 25 at 23.  Thus, the core premise of Count II—that applicants may have prematurely believed

15  their loans were finally approved—is absent after June 2016 in virtually all cases due to the company's

16  shift in practices.

17  Third, the FTC omits that the challenged "100% Backed" emails were sent virtually

18  contemporaneously with other LendingClub communications that clearly advised applicants of any

19  remaining items on their To-Do Lists.  In his expert report, Professor Bruce Carlin summarizes these

20  communications.  *See* Exh. 7 (Carlin Rep.) ¶¶ 145-47 (citing Exhs. 28-29).  Among other things, these

21  communications included regular reminders to applicants to complete their To-Do Lists and were sent

22  *every other day.*  *See* Exh. 7 (Carlin Rep.) ¶ 147; Exh. 28.  Thus, at the same time applicants were

23  receiving "100% Backed" emails they were receiving multiple other communications underscoring

24  that their loan applications remained incomplete and supplying related details.

25  **B.  Substantial Factual Disputes Exist Regarding the Net Impression of Applicants Exposed to the Challenged Communications**

26  As summarized above, with the exception of a single version of the "100% Backed" email sent

27  for a two-and-a-half month period during 2015, the communications challenged by the FTC in

28

Count II included clear and prominent statements that loan approval was not certain and that the borrower must complete the remaining tasks on their "To-Do List."  And with regard to all of the challenged applicant communications (including the version of "100% Backed" email sent for two-and-a-half months shown in the FTC's complaint), other contemporaneous communications would have dispelled any potential for misimpressions regarding the still-incomplete status of the application process.  At a minimum, this evidence taken as a whole creates material factual questions regarding the "net impression" consumers would take away from the challenged communications.  *DirecTV*, 2016 WL 6947503, at *2 (summary judgment inappropriate where the parties "'vigorously dispute[]' what inferences should be drawn" from a communication).  As the Commission itself has recognized, "people respond differently to bits and pieces" of a communication than to "the entire" advertisement, and that properly "evaluat[ing] consumer understanding" requires "that the question be presented in the full context of" the content viewed by the consumer.  *In re Standard Oil Co. of Cal.*, 84 F.T.C. 1401, 1423 (1974).

In addition, a host of extrinsic evidence, including low complaint and inquiry rates, strongly suggests that very few consumers were confused regarding the status of their loan applications. Professor Bruce Carlin analyzed data on nearly ▮ complaints submitted to LendingClub between 2014 and 2019 and concluded that ▮ LendingClub consumers complained about issues related to Count II during that time period, comprising an ▮ of the loan applications processed by the company over the same period.  *See* Exh. 7 (Carlin Rep.) ¶ 165. ▮ ▮ ▮ Exh. 5 at 38-39.  This evidence directly controverts the FTC's allegations and the inferences the agency draws from the selected snippets from LendingClub internal documents it has chosen to highlight and therefore precludes summary judgment.

## C.   Likelihood of Recurrence Is Yet Another Fact Issue

Considering that the LendingClub communications challenged by this claim were voluntarily discontinued by the company years ago, to obtain injunctive relief the FTC must prove that, absent

such relief, there is a "likelihood" of LendingClub reintroducing such communications. *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086 (9th Cir. 1985).  LendingClub summarized the legal standards applicable to this analysis in its motion for summary judgment on Count IV.  *See* Dkt. No. 143.  In short, the agency must show that there is a "cognizable danger," rather than "the mere possibility" that the challenged conduct will recur absent an injunction.  *Id.* at 23 (citing cases).  Moreover, the fact that the challenged conduct ceased after the initiation of an FTC investigation (neither of which occurred here), or even ceased in response to such an investigation (neither of which occurred here), is insufficient to show a "likelihood" of recurrence.  *Amazon.com*, 2016 WL 10654030, at *5-6 (denying permanent injunction at summary judgment even though the defendant changed its conduct in response to the FTC's investigation).

The FTC's motion identifies no evidence that LendingClub has ever contemplated reverting to the use of the challenged statements on the Account Summary / To-Do List page, or again sending "100% Backed" emails prior to final loan approval.  In addition, the company's decisions to discontinue these practices were made independently from the FTC investigation that preceded this lawsuit.  Documents cited by the FTC in support of its motion merely reinforce that this change resulted from internal discussions and were merely designed to clarify what the company had always intended to communicate.  Notably, the first page of PX 29, an email exchange among LendingClub employees from September 2017, ███████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████  PX 29 at 1.  Another email exchange among LendingClub employees from September 2017 ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████  PX 124 at 3.  Neither of these documents nor any other evidence in the record suggests that these proposed language revisions were motivated by, or in any way related to, the FTC's investigation.

And even if that were not the case, without specific evidence indicating a "cognizable danger" of recurrence, the FTC cannot obtain an injunction.  *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *see also*

1    *Amazon.com*, 2016 WL 10654030, at *5.  The company's proactive correction of the version of the

2    "100% Backed" email that did not reference completing the To-Do List in 2015 (nearly a year before

3    the FTC initiated its investigation), voluntary changes independent from the FTC inquiry to eliminate

4    other challenged communications in 2017 or earlier, and the absence of evidence showing any

5    company intent or contemplation to revert to using the challenged communications, preclude summary

6    judgment in favor of the FTC.

7    **III.    LENDINGCLUB'S ACH WITHDRAWAL PRACTICES ARE NOT "UNFAIR" AND
          THE FTC IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT III**

8

9            In Count III, the FTC challenges infrequent processing errors relating to automated ACH

10   withdrawals as an "unfair practice" under the FTC Act.  These sporadic mistakes are not an "unfair

11   practice" by the company because there is no evidence of severe or widespread consumer harm; any

12   potential consumer injuries brought to LendingClub's attention were fully and promptly addressed

13   through refunds and reimbursements; and the company's practice of facilitating automatic ACH

     withdrawals unquestionably provides countervailing benefits to consumers.

14

15           The process of scheduling or rescheduling such "automatic" withdrawals depends on human

16   interactions and manual data entry.  Virtually any company that offers automatic payment services

17   options experiences human errors.  NACHA, the organization that oversees the ACH network and sets

18   the standards applicable to use of the network, tracks transaction return rates and has established a

19   benchmark for determining whether a company's ACH return rate indicates a compliance breakdown.

20   The FTC has endorsed the NACHA ACH return rate benchmark and its value in monitoring

21   responsible use of the ACH network.[15]  As detailed in LendingClub's own motion for summary

22   judgment, the company's ACH return rate is below the network average and well below the threshold

23   used to identify potential compliance problems.  Dkt. No. 143 at 8.  Moreover, when inevitable errors

24   occur, LendingClub upon learning of those errors offers prompt refunds.  There is nothing about these

25   facts that remotely justifies the FTC singling out LendingClub and bringing a claim for "unfair

26   practices" under the FTC Act.  In arguing otherwise, the FTC inaccurately presents the facts and

27   misapplies the law.  For the reasons discussed further below and in LendingClub's cross motion for

28   ────────────────
     [15]   *See* Exh. 30 at 5.

1    summary judgment, the FTC is not entitled to summary judgment on this claim.  LendingClub is.

2        **A.    The FTC Inaccurately Portrays the Material Facts**

3        The FTC's recitation of "undisputed facts" relating to Count III is inaccurate and materially

4    incomplete.

5        First, even among the handful of consumer complaints it identifies, the FTC omits important

6    facts showing that, for each error, the customer was fully refunded consistent with LendingClub's

7    standard policy.[16] In some instances, there was no LendingClub error, but instead the problem was

8    caused by the borrower.  For example, one of the two customers the FTC cites as being charged for a

9    "double payment" received a full refund.  PX 214, Case No. ███████ (from March 2015).  The other

10   customer (not LendingClub) initiated the payment that was later claimed to be erroneous.  *See id.*,

11   Case No. ██████.

12       Second, the FTC presents statistics that paint a misleading picture.  Specifically, it asserts that

13   LendingClub accepted two payments within a seven-day period ████████████████████

14   ██████████████," that it charged "████████████████████████████████████

15   ███████" and that these supposedly "undisputed material facts" demonstrate "harm to a large

16   number of people."  Mot. ¶¶ 111-12.  But borrowers often make additional, unscheduled payments to

17   pay down their loan balances and to reduce interest expense, and sometimes do this close in time to

18   their regularly scheduled monthly payment.  *See, e.g.*, Exh. 31 at 3-5 (explaining these scenarios);

19   Exh. 32 (Dahdah Tr.) 119:19 - 120:10.  Those actions by consumers have nothing to do with and do

20   not result in any unauthorized withdrawals.  Similarly, some borrowers seeking to pay off their loans

21   early send LendingClub an amount that exceeds the exact balance owed because they are uncertain of

22   the precise amount of interest accrued to date and/or may qualify for a partial refund of the origination

23   fee if they pay off the loan early.  Exh. 31 at 3-5; Exh. 33 (Dahdah 30(b)(6) Tr.) 94:13 - 95:5

24   (explaining reasons borrowers overpay their loan pay off amount).  Again, this does not reflect

25   mistakes by LendingClub.  When this occurs, LendingClub simply remits the over-payment back to

26   the borrower.  *See* Exh. 33 (Dahdah 30(b)(6) Tr.) 94:21 - 95:5; 121:10 - 122:6.  There is no "fault" on

27

28   _____
     [16]  LendingClub's motion for summary judgment on Count III provides a thorough explanation of
     this refund policy.  *See* Dkt. No. 143, p. 9.

the part of LendingClub and no consumer harm at all.

Third, to support its assertion that LendingClub "took payments from consumers before their due date," the FTC cites snippets of documents and deposition testimony relating to the practices of JP Morgan Chase, a third-party commercial bank used by some LendingClub customers for banking and checking account services.  Mot. ¶¶ 126-32.  But the evidence shows that JP Morgan Chase, not LendingClub, was responsible for these "early withdrawals," which in fact were not early withdrawals at all but rather examples of Chase's practice of displaying payments on the date initiated, as opposed to the date funded.  As described by LendingClub's corporate designee:

> What [Chase] do[es] is, when LendingClub initiates the payment to be processed for the borrower based on the authorized date that they agreed to—yesterday provided some context in terms of, if my payment is on September 20th, it is a Wednesday, the payment gets initiated with the financial institution on Tuesday, the 19th, so that the money comes out on their due date.  The way Chase displays their online banking tool for their customers is that on the date that the payment initiates, although the money has not left the borrower's—sorry—the mutual customer's bank account, the funds, they already debit it from their balance and show it to the side as pending.  So a mutual customer could think that LendingClub is processing the payment earlier than they had requested or authorized when, in fact, Chase debits their account balance prematurely to show that pending state.

> And so on their online banking the customer sees that and thinks their payment was processed early.  It is just the way Chase displays—and their ACH policies on how they display their balances and their pending debits to their customers.  That's their ACH policy.

Exh. 33 (Dahdah 30(b)(6) Tr.) 66:12 - 67:22.  The FTC ignores all of this.  Once again, these facts do not demonstrate that LendingClub did anything wrong or that any consumer was harmed.

### B.     The Facts Do Not Support the Required Elements of an Unfairness Claim

Even if the facts were as described by the FTC, they would not support the three-part test for an "unfair practice"—that is, whether the practice "is one that '[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition.'"  *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) ("*Neovi I*") (quoting 15 U.S.C. § 45(n)).  The FTC has not met and cannot meet its burden.

As an initial matter, the FTC creates a straw man legal standard.  Rather than appropriately

defining the relevant business practices as LendingClub's practices regarding ACH withdrawals, the FTC defines the challenged practices as "Defendant's unauthorized withdrawals"—in effect, equating the business practice with the source of the alleged consumer harm. Mot. at 38. This is wrong, as the cases cited by the FTC demonstrate. For instance, in *FTC v. Amazon.com, Inc.*, the court in applying the legal test for unfairness did not regard the relevant business practice as unauthorized "in-app purchases made by children," which would be analogous to the FTC's approach here. 2016 WL 10654030, at *2. Rather, the court evaluated more broadly "Amazon's billing practices around in-app purchases," which implicated a broader set of considerations, such as "practices around providing refunds" and consumer preferences for a "streamlined" and "efficient" app experience. *Id.* at *8, *10. Here, the Court likewise should not focus in isolation on instances of erroneous ACH withdrawals, but rather should evaluate the overall fairness of LendingClub's practices regarding ACH withdrawals as a whole, giving due attention to the benefits of ACH withdrawals, the steps LendingClub takes to avoid errors, the availability of consumer refunds, etc. Properly viewed in this context, the FTC's proof falls far short of satisfying the required elements of unfairness.

First, there is no "substantial injury." This element can be satisfied only by proof of a "'very severe harm to a small number of people'" or "'a small harm to a large number of people.'" Mot. at 38 (citation omitted). The FTC's proof shows neither. In asserting that some LendingClub consumers experienced "severe" harm, the FTC describes a handful of incidents involving erroneous charges, yet presents no evidence at all regarding the impact to affected borrowers *net of the refunds or other reimbursements* LendingClub provided.

Instead, the agency attempts to circumvent this issue by arguing that "[t]he time spent by consumers pursuing refunds of unauthorized withdrawals and fees constitutes additional substantial injury." *Id.* However, the cases the FTC cites as support for this proposition—*FTC v. Neovi, Inc.* and *FTC v. Inc21.com Corp.*—are completely distinguishable and provide no support for this contention in light of the very different facts presented here. *Neovi* involved an online check processing system, "Qchex," that—due to the defendants' grossly inadequate security measures—became a tool for "fraudsters" to access third-party bank accounts and issue checks without the account holders' knowledge or authorization. 598 F. Supp. 2d 1104, 1109-10 (S.D. Cal. 2008) ("*Neovi II*"). Many

affected consumers were not even Qchex customers, and the company provided little assistance or information making it exceedingly "difficult" for the consumers "to investigate and stop fraudulent activity on their bank accounts," and defendants, once contacted, "provided little, if any," help or information. *Id.* at 1111, 1116.  As a result, many account holders lost not only the use of fraudulently withdrawn funds but also incurred other substantial costs, including closure of bank accounts and related expenses. *Id.* at 1115.

*Inc21.com* similarly involved a situation in which the vast majority ("nearly 97%") of consumers who experienced unauthorized charges "had *not* agreed to purchase defendants' products" and were not even aware they had any commercial relationship with defendants. 745 F. Supp. 2d 975, 982 (N.D. Cal. 2010) (emphasis in original).  As in *Neovi*, when affected consumers discovered the unauthorized charges and sought to complain, defendants did little to help. *Id.* at 1005.  The facts here bear no relation to these extreme cases.  Every affected borrower in this case had a voluntary, ongoing relationship with LendingClub and access to multiple convenient ways to contact the company seeking refunds or other assistance.  And, as the evidence shows, LendingClub has followed its standard policies in offering prompt and full refunds to customers who complain of erroneous ACH withdrawals.  *See, e.g.*, Exh. 32 (Dahdah Tr.) 125:14 - 126:12, 128:24 - 129:9 (explaining LendingClub's refund practices); Exh. 34 (FTC Declarant Tr.) 157:5-19 (FTC declarant acknowledged he received refund "three days after the erroneous withdrawal").  As the Ninth Circuit has held, the provision of refunds in circumstances such as these permits consumers to "mitigate[e] the injury after the fact" and eliminates the possibility of "substantial injury."  *Davis v. HSBC Bank Nev., NA*, 691 F.3d 1152, 1168-69 (9th Cir. 2012).  The most the FTC has been able to mine from the record are fewer than a half-dozen anecdotes of friction occurring in the refund or remediation process.  Mot. at 38.  But this is plainly inadequate to prove the type of "severe" harm the FTC claims to exist here.

In the alternative, the FTC argues that there was "a small harm to a large number of people," but the FTC's cited proof is equally dubious and contested.  *Id.*  The FTC relies on NACHA data to support this contention, *id.* (cross-referencing Mot. ¶ 109),[17] but ignores that, relative to the ████

---

[17] The other pieces of evidence the agency relies on as ostensible proof of harm to a large number of people are the number of times borrowers made two loan payments within a seven-day period, the number of times borrowers were charged more than $100 more than their loan pay-off amount,

1    ███████ loans serviced by LendingClub from August 2016 and June 2019 (the date range for the

2    NACHA data the FTC cites), the ██████ withdrawals reported to NACHA as unauthorized[18] is by no

3    means a "large" number.  Following standard industry practice, reports of unauthorized withdrawals

4    are translated into return rates and LendingClub's return rate is well ***below*** those of similar companies

5    and well below the threshold NACHA has set for identifying potentially questionable compliance

6    practices.  *See* Dkt. No. 143 at 8-9 (showing statistics demonstrating that LendingClub's ACH return

7    rate is approximately ████ of the NACHA threshold for identifying potentially questionable ACH

8    network compliance practices and lower than the entire ACH network average).[19]

9         Second, the FTC also cannot satisfy the next unfairness element, "reasonable avoidability."

10   Citing *Neovi*, the FTC asserts that "[c]onsumers whose bank accounts are accessed without

11   authorization 'suffer[] unavoidable injuries.'"  Mot. at 39.  But as already explained, *Neovi* involved

12   a situation in which the affected consumers "had no chance whatsoever to avoid the injury before it

13   occurred," as they were the victims of fraud by unknown actors.  *Neovi II*, 598 F. Supp. 2d at 1115.

14   Here, the borrowers not only had established business relationships with LendingClub, but also

15   voluntarily chose to take advantage of automated ACH withdrawals in connection with the servicing

16   of their loans.  As explained in LendingClub's motion for summary judgment, it is widely understood

17   that automated payment systems, including ACH transactions, are subject to errors, albeit infrequently.

18   Dkt. No. 143 at 20-21.  As such, borrowers choosing to activate ACH services have made a choice to

19   obtain the convenience of such services notwithstanding the known (or at a minimum easily knowable)

20   low risk of erroneous withdrawals.  *Id.*  Moreover, the FTC notably does not (and cannot) argue that

21   ───────────────────────
     and circumstances surrounding the process JP Morgan Chase uses to post ACH withdrawals

22   transmitted on Fridays and scheduled to post over the weekend.  *See* Mot. at 38.  This evidence is
     not portrayed accurately as discussed above, *see*, p. 31-33, *supra*, and LendingClub vigorously

23   disputes that it can be understood as showing "substantial harm" affecting a large number of
     people.

24   [18]  In addition, NACHA itself has noted that "there is some portion of unauthorized returns that is due
     to consumer fraud."  Exh. 19 (Grice Rep.) ¶ 175.  The FTC makes no attempt to account for this

25   issue.

26   [19]  Instead, the FTC compiled unauthorized ACH return statistics for three cherry-picked student loan
     servicers and asserts that the rate of unauthorized ACH returns for those organizations is lower

27   than LendingClub's.  Mot. ¶ 110.  Whatever error rates these three student loan servicers may have
     experienced (the FTC's motion does not even mention these details), they provide "different types

28   of products" serving "different types of borrowers" and their error-rate experiences in no way
     establish a relevant benchmark by which to assess LendingClub.  Exh. 19 (Grice Rep.) ¶ 166.

1    LendingClub's refund practices are inadequate to provide borrowers affected by errors with a

2    reasonable means to avoid the harm associated with erroneous withdrawals.  Rather, the FTC again

3    falls back to the assertion that the "'time, trouble [and] aggravation' associated with seeking refunds"

4    is not reasonably avoidable.  Mot. at 39 (quoting *Neovi I*, 604 F.3d at 1158).  But as explained above,

5    there is no evidence that affected borrowers experienced meaningful impediments to obtaining refunds

6    from LendingClub.

7            Finally, the FTC cannot come close to establishing the final unfairness element—that the

8    asserted harm is not outweighed by countervailing benefits to consumers or competition.  Applying

9    circular logic, the FTC argues that "unauthorized billing has no countervailing benefits at all" and that

10   "[a]s in other unauthorized billing cases, consumers received no countervailing benefits from

11   Defendant's practice of charging them without authorization."  *Id.*  But the whole point of this element

12   is to assess whether a practice that has "adverse consequences" can, on balance, be considered to be

13   unfair in light of the "countervailing benefits to consumers or . . . competition" that may flow from

14   the same practice.  *Neovi I*, 598 F. Supp. 2d at 1116.  What the FTC has done here is attempt to define

15   the "adverse consequences" themselves (*i.e.*, mistaken withdrawals) as the relevant "business

16   practice," eliminating any realistic consideration of the clear consumer benefits derived from ACH

17   withdrawals.  Again, this is directly at odds with the FTC's prior approach to litigating unfairness

18   claims, and with applicable case law.  *See, e.g.*, *Amazon.com*, 2016 WL 10654030, at *6, *8 (analyzing

19   as the relevant business practice "Amazon's billing practices around in-app purchases," as opposed to

20   instances of "unauthorized billing" that were the source of the alleged harm); *Neovi II*, 598 F. Supp.

21   2d at 1113 (broadly analyzing the fairness of the "Qchex system," not limiting the focus to instances

22   of third-party fraud that were the source of the alleged harm).

23           When the focus is properly placed on the true business practice in question here—namely, the

24   availability and administration of ACH withdrawals at LendingClub as a whole—it is readily apparent

25   that there are significant consumer benefits that must be weighed in the balance, including the

26   flexibility, convenience, and lower costs of ACH payment transfers and LendingClub's related

27   offerings, such as 15-day "grace delays."  *See* Dkt. No. 143 at 9, 22 (discussing benefits).  The FTC

28   presents no evidence addressing these benefits, much less balancing them (as the law requires) against

1   the alleged harm, which as noted above should be viewed in terms of the "net" consumer injury, if

2   any, after properly accounting for all refunds and reimbursements.  Moreover, none of the case law

3   cited by the FTC supports the agency's approach of ignoring such consumer benefits.  On the contrary,

4   the FTC relies principally on cases such as *Neovi* and *Inc.21.com* involving intentional fraud where

5   there were no countervailing benefits to consider.  *See* Mot. at 39-40.  This is not the type of situation

6   that the unfairness doctrine was meant to address, nor has the doctrine ever before been applied to

7   facts remotely resembling this case.

8   **IV.   THE FTC IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO COUNT IV**

9          Court IV challenges LendingClub's pre-December 2016 privacy policy dissemination

10  practices as inadequate pursuant to the Gramm-Leach-Bliley Act ("GLBA").  *See* FAC ¶¶ 65-67.  To

11  obtain the only relief the FTC seeks on this claim—an injunction[20]—the agency must show a

12  "cognizable danger" that the company will revert to its pre-December 2016 practices.  *See,* p. 28-29,

13  *supra* (citing cases); Dkt. No. 143 at 23, 25 (same).  The FTC provides no such evidence in its motion,

14  and LendingClub demonstrated the absence of any such evidence in its cross-motion for summary

15  judgment on Count IV.  *See* Dkt. No. 143 at 11-12, 23-25.

16         **A.      The Challenged Conduct Is Not Likely to Recur**

17         To obtain an injunction the FTC must show a "cognizable danger of recurrent violation,

18  something more than the mere possibility."  *Accusearch Inc.*, 570 F.3d at 1201 (citation omitted).  The

19  FTC has not met this burden.

20         As explained in LendingClub's motion for summary judgment, the origin of LendingClub's

21  December 2016 change to its privacy policy dissemination practices was a recommendation from the

22  company's internal compliance group first circulated within LendingClub in December 2015, nearly

23  six months before the FTC opened its investigation in late May 2016.  *See* Dkt. No. 143 at 23-24.

24  LendingClub implemented that recommendation in December 2016, nearly a year before the FTC staff

25  first suggested that LendingClub's disclosure of its privacy policy did not comply with the GLBA and

26  nearly a year and a half before the FTC filed its complaint.  *Id.*  In its motion, the FTC largely agrees

27

28  [20]  *See* Cunningham Decl. at ¶ 37 (identifying FTC statements indicating that the agency seeks
        monetary relief only for Count I).

with this chronology, but argues that "[i]n May 2016" it sent a Civil Investigative Demand ("CID") to LendingClub "inquiring about its privacy disclosures." Mot. at 26 (citing Roller Decl. ¶ 248). This is true, but it is not sufficient to show a "cognizable danger" of recurrence. *Amazon.com*, 2016 WL 10654030, at *5-6 (denying permanent injunction at summary judgment). In addition, the May 2016 CID sought information about dozens of issues, many of which the FTC never pursued beyond initial fact-finding. *See* Cunningham Decl. ¶ 38. In this context, the May 2016 CID was not a signal to LendingClub that the FTC believed the company's pre-December 2016 privacy policy dissemination practices were non-complaint. Moreover, the FTC does not identify any evidence suggesting that LendingClub changed its disclosure practices in response to the CID. There is no such evidence.

Here as in *FTC v. Evans Products Co.*, the challenged conduct ceased more than a year before the FTC's lawsuit and there is no evidence suggesting the company is likely to revert to its prior practices; thus, an injunction is not warranted and Count IV should be dismissed. 775 F.2d at 1088. At a minimum, there is a significant factual dispute about whether the evidence supports the conclusion that there is a "cognizable danger" that LendingClub will revert to its pre-December 2016 practice, *Accusearch Inc.*, 570 F.3d at 1201, and this precludes summary judgment in favor of the FTC.

## B.    LendingClub's Pre-December 2016 Disclosures Were Lawful

As for the merits of this claim, LendingClub submits—and, in the event this claim proceeds to trial, expects to prove—that the company's pre-December 2016 privacy policy dissemination practices complied with the Privacy Rule, 16 C.F.R. §313.1 *et seq.*, and with Regulation P, 12 C.F.R. §1016.1 *et seq.*, which together implement the privacy protections of the GLBA. The Privacy Rule promulgated by the FTC and Regulation P both require that LendingClub "provide any privacy notices . . . so that each consumer can reasonably be expected to receive actual notice in writing or, if the consumer agrees, electronically." 16 C.F.R. § 313.9(a); 12 C.F.R. § 1016.9(a). And each requires "clear and conspicuous" notice of privacy policies and practices before a customer relationship is established. 16 C.F.R. § 313.4; 12 C.F.R. § 1016.4(a). The regulations include a safe-harbor disclosure method that applies if a company "clearly and conspicuously post[s] the [privacy] notice on the electronic site and require[s] the consumer to acknowledge receipt of the notice as a necessary step to obtaining a particular financial product or service." 16 C.F.R. § 313.9(b)(1)(iii); 12 C.F.R. §

1   1016.9(b)(1)(B)(iii).

2         Here, there are factual issues to be decided regarding whether LendingClub's pre-December

3   2016 disclosures fell within the safe harbor.[21]  First, LendingClub provided notice of its privacy policy

4   through prominent links to the policy on its website, including—contrary to the FTC's assertion, *see*

5   Mot. at 26—throughout the application flow.  *See* Dkt. No. 143 at 10-11; *see also* Exh. 35 at 6, 11-14,

6   17 (showing a link to the privacy policy in the upper right hand corner of the screen).  Whether

7   LendingClub's privacy policy was "clearly and conspicuously" disclosed is therefore a classic

8   question of fact.  The FTC does not identify any consumer complaints relating to LendingClub's pre-

9   December 2016 privacy policy dissemination practices, nor does the agency present expert or other

10  extrinsic evidence that consumers had difficulty locating the policy.  *See generally* Mot. at 26, 40.

11  Second, by means of its Terms of Service, LendingClub required borrowers "to acknowledge receipt

12  of the notice as a necessary step to obtaining a particular financial product or service."  16 C.F.R. §

13  313.9(b)(1)(iii); 12 C.F.R. § 1016.9(b)(1)(B)(iii); *see also* Dkt. No. 143 at 11; Exh. 36 at 7.  The safe

14  harbor does not state that the privacy policy must be acknowledged separately from other terms or

15  conditions.  Nor has the FTC identified any case law, enforcement action, or guidance stating that the

16  safe harbor requires separate acknowledgement.[22]   Because LendingClub's pre-December 2016

17  practices specifically required borrowers to acknowledge the Terms of Use that incorporated the

---

18  [21]   In addition, even if the safe harbor did not apply, factual issues would also exist regarding whether
19         borrowers "reasonably [could have been] expected to receive actual notice" of the privacy policy,
        as required by Regulation P.  16 C.F.R. § 313.9(a); 12 C.F.R. § 1016.9(a).  Borrowers consented
20         to LendingClub's terms and conditions that incorporated the company's privacy policy when they
        executed their loan agreements.  In addition, the FTC's guidance states that "[t]here will be
21         instances when a notice on a website may be delivered in a way that will enable the financial
        institution to reasonably expect that the consumer will receive it."  65 Fed. Reg. 33646 at 33664
22         (May 24, 2000).  The guidance goes on to say that, with respect to the delivery of annual privacy
        notices—a relatively analogous situation—merely posting a notice can be "appropriate" where the
23         "relationship" between the borrower and the financial institution "is conducted almost entirely at
        the website" and the customer has agreed to receive notices through the website.  *Id.*  Because
24         LendingClub has always posted prominent links to its privacy policy on its website and many
        LendingClub interactions with consumers are through its website or other electronic means, this
25         guidance suggests that LendingClub's pre-December 2016 dissemination practices were
        compliant, and the notable absence of consumer complaints further suggests the pre-December
26         2016 dissemination practices were adequate.
    [22]   The only GLBA/Privacy Rule enforcement actions LendingClub is aware of involve situations not
27         relevant here—namely, where no privacy notice was disseminated at all, *see, e.g.*, *In the Matter of*
        *Franklin's Budget Car Sales, Inc., also DBA Franklin Toyota/Scion, a Corp.*., No. 102-3094, 2012
28         WL 5375157, at *2 (Oct. 3, 2012), or where there was no clear and conspicuous posting, *see In*
        *the Matter of Taxslayer LLC*, FTC Dkt. No. C-4626 (2017).

1   privacy policy, there are also genuine issues of material fact about whether borrowers

2   "acknowledge[d] receipt of the notice," triggering the safe harbor.

3   **V.   THE FTC'S MONETARY RELIEF DEMAND IS LEGALLY AND FACTUALLY**
     **INSUPPORTABLE AND NOT AN ISSUE THAT CAN BE RESOLVED ON**
4    **SUMMARY JUDGMENT**

5          The FTC asserts that it is "appropriate and routine" to grant monetary relief at summary

6   judgment, Mot. at 43, yet the FTC's own case law shows that doing so here would be improper.  The

7   issue of monetary relief in this case implicates numerous disputed facts and expert analyses, which

8   cannot be appropriately decided on summary judgment.

9          **A.   The FTC's Own Cited Authorities Show That Its Requested Monetary Relief Is**
                **Unfounded and That Summary Judgment Here Would Be Improper**
10
11         The FTC's motion places particular emphasis on two cases:  *FTC v. AMG Services, Inc.* and

12   *FTC v. Commerce Planet, Inc.*  Neither supports summary judgment here.  In fact, both reinforce why

     the FTC's monetary relief demand is legally unfounded and factually insupportable.
13
14         *AMG Services* involved consumer loans, albeit of a very different variety—*i.e.*, "high-fee,

15   short-term payday loans."  29 F. Supp. 3d 1338, 1357 (D. Nev. 2014).  The FTC claimed that there

16   was a significant "discrepancy" between the repayment schedule the defendant "prominently

17   presented" in its mandated TILA Box disclosures, and the separate payment terms applicable to a

18   "renewal plan" borrowers were "automatically enrolled in."  *Id.* at 1345-46.  The FTC's theory was

     that consumers would notice and understand "the large prominent print in the TILA Box" clearly
19
20   disclosing one finance charge but not notice the "fine print" associated with the separate renewal plan,

21   which effectively "concealed from borrowers" multiple additional finance charges.  *Id.* at 1351.  In

22   quantifying potential consumer harm, the FTC tabulated the total aggregate amount consumers paid

23   "*in excess of*" the finance charges disclosed in the TILA Box.  *FTC v. AMG Servs., Inc.*, No. 2:12-cv-

     00536-GMN-VCF, 2016 WL 5791416, at *12 (D. Nev. Sept. 30, 2016) (emphasis added).
24
25         Hence, the FTC's approach to quantifying consumer harm in *AMG Services* involved *removing*

26   from the harm estimate any loan fees "disclosed in the TILA box."  *FTC v. AMG Capital Mgmt., LLC*,

27   910 F.3d 417, 427 (9th Cir. 2018) (emphasis added); *see id.* (the "final sum" was "minus" these

28   disclosed fees).  This was done recognizing that "mandated" fee disclosures made in accordance with

1    TILA are by definition "clearly and conspicuously" presented to consumers. *AMG Servs.*, 29 F. Supp.

2    3d at 1354-55; *see id.* at 1353 ("[t]hese mandated terms must be disclosed 'clearly and conspicuously'"

3    and "TILA requires 'absolute compliance by creditors'") (citations omitted).

4         By contrast, in this case the FTC alleges *no loan charges* to consumers "in excess of" the

5    finance charges disclosed in the TILA Box presented in the LendingClub loan application flow. *Cf.*

6    *AMG Services*, 2016 WL 5791416, at *12. It is undisputed that the finance charges included in the

7    TILA Box specifically encompass origination fees. Thus, if the approach followed in *AMG Services*

8    were taken here, there would be literally no monetary harm to consumers. But in this case the FTC is

9    seeking to reverse course. Indeed, the *entirety* of the FTC's monetary relief demand is comprised of

10   loan-related fees that were indisputably included in the government-prescribed TILA Box disclosures.

11   Whereas in *AMG Services* the FTC acknowledged that mandated TILA Box disclosures are "clear and

12   conspicuous," here the FTC claims that virtually identical TILA Box disclosures in LendingClub's

13   application flow were "confusing" and did nothing to overcome the agency's allegations of deception.

14   Mot. at 5. This is a stunning reversal of positions, and as addressed in other briefing raises significant

15   judicial estoppel concerns. *See* Dkt. No. 201 at 16-20.

16        Moreover, in *AMG Services*, the defendants did not seriously contest the FTC's monetary relief

17   calculation, other than challenging the admissibility of the declaration that the FTC relied upon to

18   explain its estimate of consumer harm. *See AMG Services*, 2016 WL 5791416, at *12. By contrast,

19   in this case—as explained below—there are numerous fact disputes pertaining to monetary relief and

20   multiple conflicting expert opinions highlighting a vast array of contested evidentiary issues and

21   competing analytical frameworks for assessing the significance of the heavily disputed factual record.

22        The second case the FTC's motion highlights in its discussion of monetary relief issues—*FTC*

23   *v. Commerce Planet*—did not even involve a summary judgment ruling. The case was decided only

24   after a 16-day bench trial at which the court weighed the factual and expert evidence provided by both

25   sides, as should happen here. And the substance of the court's analysis in that case points out serious

26   flaws in the FTC's approach to monetary relief in this case.

27        In *Commerce Planet*, the FTC challenged the defendants' marketing of "OnlineSupplier," a

28   free online auction starter kit, because, unless they cancelled during the trial period, consumers

automatically were charged recurring monthly fees that were not adequately disclosed. 878 F. Supp. 2d 1048, 1054 (C.D. Cal. 2012). The FTC's expert, Daniel Becker, assumed that "no consumer would have joined OnlineSupplier if she had known about the terms of membership," and hence that *all* consumers were deceived. *Commerce Planet*, 878 F. Supp. 2d at 1090. The district court disagreed, concluding that "not all consumers were in fact deceived." *Id.* at 1092. Based on a finding that only roughly 50% of consumers were misled, the court reduced the FTC's original harm estimate "by half." *Id.*

The FTC's approach to consumer harm here—assuming virtually all consumers were deceived and that consumer harm can be measured by the full fees paid—is exactly what the court rejected in *Commerce Planet*. The only offset the FTC makes to its simplistic "all consumers times full fees" formula[23] is a modest and understated █████) downward adjustment to account for the percent of borrowers exposed to the Rates & Fees page on LendingClub's website. *See* Mot. at 44.

By making some downward adjustment, the FTC implicitly recognizes that it is necessary, in approximating "net" consumer harm, to remove any portion of the consumer base not injured by alleged deception. The problem is that the FTC's token adjustment does not begin to go far enough. The Rates & Fees page is only one of multiple locations on LendingClub's website where the origination fee is disclosed. By the FTC's own logic, borrowers exposed to details regarding the origination fee in other locations before completing their loan applications also should be removed from any consumer harm calculation, but the FTC's approach ignores these and a host of other factual and evidentiary questions.

**B.      No Issue in This Case Implicates More Material Fact Disputes Than the Important Question of Monetary Relief, Which Cannot Properly Be Resolved on Summary Judgment**

To understand the full scope of the many disputes between the parties relating to monetary relief, it is important as background to consider the relevant expert reports submitted by both sides and the many contested evidentiary issues they draw attention to in the course of hundreds of pages of

---

[23]   The FTC's consumer harm estimate also assumes that affected consumers suffered harm equal to the full origination fee. *See* Mot. at 44-45. This assumption lacks evidentiary support and was specifically addressed and rejected in the report submitted by LendingClub's consumer harm expert, Dr. Farrell, based upon a detailed fact-based analysis of likely consumer behavior in the but-for world. *See* Exh. 23 (Farrell Rep.) at 11-24.

1    analysis.  In summary, LendingClub's consumer harm expert, Dr. Joseph Farrell, conducted a rigorous

2    analysis designed to isolate the potential consumer effects of the practices and disclosures the FTC

3    challenges.  *See generally* Exh. 23 (Farrell Rep.).  Following standard economic principles, he

4    compared actual outcomes with hypothetical outcomes in a "but-for world" in which LendingClub

5    disclosures conformed with the FTC's preferred disclosures.  Dr. Farrell then made evidence-based

6    assumptions regarding how, if at all, consumers would have acted differently when exposed to the

7    additional fee-related disclosures.  As part of this analysis, Dr. Farrell incorporated the consumer

8    testing work performed by another LendingClub expert, Dr. Jerry Wind, who found that the rate of

9    borrower confusion was approximately 2.3%.  *See supra*, p. 11.  Dr. Farrell took that population and

10   estimated total potential consumer harm, which is a fraction of the FTC's estimate.  *See id.* at 31.

11   In following this approach, Dr. Farrell did precisely what the Ninth Circuit in *Commerce*

12   *Planet* advocated.  The appellate court in that case observed that adjustments to monetary relief are

13   warranted if a defendant "offer[s] a reliable method for quantifying what portion of the consumers

14   who purchased OnlineSupplier did so free from deception."  *FTC v. Commerce Planet, Inc.*, 815 F.3d

15   593, 604 (9th Cir. 2016).  Here, Dr. Wind's analysis does provide a "reliable method" for quantifying

16   the portion of LendingClub consumers who were aware of and understood the origination fee charged

17   in connection with loans through LendingClub, and Dr. Farrell properly factored this into his analysis.

18   By contrast, the FTC made no similar adjustment in its own consumer harm estimate, even

19   though that estimate, with no factual support, assumes that *all* consumers over the relevant period were

20   deceived, and even though the FTC's own survey expert produced results that directly contradict and

21   undermine that sweeping and indefensible assumption.  *See* Exh. 37 (Simonson Tr.) 71:20 - 73:1

22   (estimating a 34-46% misunderstanding rate).  Similarly, while the FTC, as discussed above, makes a

23   modest ▉ adjustment to its consumer harm estimate to account for exposure to the origination fee

24   disclosures on the Rates & Fees page, the FTC makes no other adjustments for the various other ways

25   in which consumers applying for loans through LendingClub learn about the origination fee.

26   Page limits will not allow for an exhaustive list of the many factual disputes implicated by

27   these monetary relief issues and related expert analyses, but some include the following:

28

- the hotly contested question of what percentage of relevant consumers, acting reasonably, would have been deceived by the challenged statements and disclosures;

- the heavily disputed issue of what inferences can and should be drawn from the fact that consumers obtaining loans through LendingClub's website were necessarily exposed to the TILA disclosures on LendingClub's website, which included APR and total finance charge information that incorporated the origination fee and express identification of the origination fee and cash at disbursement lower down on the page, as required by TILA;

- the disputed question of how many LendingClub borrowers were exposed not only to the Rates & Fees page disclosures, but to other fee-related disclosures on and off of LendingClub's website, including APR disclosures, the tooltip disclosures, and fee-related disclosures on third-party aggregator sites; and

- the factually complex and heavily disputed question of what, if any, changes one could expect in consumer behavior if, in a hypothetical but-for world, LendingClub in place of the challenged statements and disclosures had used alternative disclosures conforming with the FTC's preferred approach.

No court in any FTC case has ever before decided monetary relief issues on summary judgment in the face of such substantial factual disputes. The FTC's request for summary adjudication should be denied.

1

### CONCLUSION

2        For the reasons described, LendingClub respectfully submits that the FTC's motion for

3  summary judgment should be denied.

4

5   DATED:  March 26, 2020                    Respectfully submitted,
                                              KIRKLAND & ELLIS LLP
6

7                                             */s/ M. Sean Royall*

8                                             M. Sean Royall (admitted *pro hac vice*)
                                              Rachael A. Rezabek (SBN 298711)
9                                             KIRKLAND & ELLIS LLP
                                              1601 Elm Street
10                                            Dallas, TX 75201
                                              Telephone: (214) 972-1770
11                                            Facsimile: (214) 972-1771
                                              Email: sean.royall@kirkland.com
12                                            Email: rachael.rezabek@kirkland.com

13                                            Richard H. Cunningham (admitted *pro hac vice*)
                                              KIRKLAND & ELLIS LLP
14                                            1301 Pennsylvania Avenue, NW
                                              Washington, DC 20004
15                                            Telephone: (202) 389-3119
                                              Facsimile: (202) 389-5200
16                                            Email: rich.cunningham@kirkland.com

17                                            Katie Jakola (admitted *pro hac vice*)
                                              KIRKLAND & ELLIS LLP
18                                            300 North LaSalle
                                              Chicago, IL 60654
19                                            Telephone: (312) 862-2000
                                              Facsimile: (312) 862-2200
20                                            Email: kjakola@kirkland.com

21                                            Attorneys for Defendant
                                              *LendingClub Corporation*
22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

On March 26, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

*/s/    M. Sean Royall*

M. Sean Royall
